

FILED

NOV 2 6 2013

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | |
|---|---|
| GREGG KIKEN, Individually and on Behalf of All Others Similarly Situated, ) ) ) | Civil Case No. 4:13 cv 00157 |
| Plaintiff, ) ) | **CLASS ACTION** |
| v. ) ) | **COMPLAINT** **FOR VIOLATIONS OF** |
| LUMBER LIQUIDATORS HOLDINGS, INC., ROBERT M. LYNCH, DANIEL E. TERRELL, and THOMAS D. SULLIVAN, ) ) ) ) | **FEDERAL SECURITIES LAWS** **DEMAND FOR JURY TRIAL** |
| Defendants. ) ) | |

Plaintiff Gregg Kiken ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Lumber Liquidators Holdings, Inc. ("Lumber Liquidators" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased Lumber Liquidators securities between February 22, 2012 and November 21, 2013, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Lumber Liquidators is a multi-channel specialty retailer of hardwood flooring, and hardwood flooring enhancements and accessories, operating as a single business segment. The Company purports to offer an extensive assortment of exotic and domestic hardwood species, engineered hardwoods and laminates direct to the consumer. The Company also features renewable flooring products, bamboo and cork, and provides a wide selection of flooring enhancements and accessories, including moldings, noise-reducing underlay, adhesives and flooring tools.

3.    On July 7, 2010, President Obama signed the Formaldehyde Standards for Composite-Wood Products Act into law (the "FSCWP Act"). This legislation, which adds a Title VI to Toxic Substances Control Act ("TSCA"), establishes limits for formaldehyde emissions from composite wood products: hardwood plywood, medium-density fiberboard, and particleboard. The national emission standards in the FSCWP Act mirror standards previously established by the California Air Resources Board ("CARB") for products sold, offered for sale, supplied, used or manufactured for sale in California.

4.    Congress directed the Environmental Protection Agency ("EPA") to promulgate final regulations implementing the FSCWP. In May 2013, the EPA published two proposed rules.

2

1827738.1

5. The EPA's first proposed rule sets limits on how much formaldehyde may be released from composite wood products, including hardwood plywood, medium-density fiberboard, particleboard and finished goods containing these products that are sold, supplied, offered for sale, manufactured, or imported in the United States. The proposed rules include additional implementing provisions addressing testing requirements, laminated products, product labeling, chain of custody, recordkeeping, stockpiling and enforcement.

6. The EPA's second proposed rule establishes a third-party certification framework designed to ensure that manufacturers of composite wood products meet the TSCA formaldehyde emission standards by having their composite wood products certified though an accredited third-party certifier. Under this rule, third-party certifiers would audit composite wood panel producers and verify compliance with formaldehyde emissions standards for their products.

7. On June 20, 2013, an article published on SeekingAlpha.com alleged that, among other things, testing of one of Lumber Liquidators' branded wood flooring products (imported from China and sold in California) at two accredited independent laboratories found that formaldehyde emissions from the tested product were over 3.5x the maximum legal limit even though the product was labeled as being CARB-compliant.

8. On this news, Lumber Liquidators shares declined, over the course of two trading sessions, $9.40 per share or nearly 11%, to close at $76.63 per share on June 21, 2013.

9. The Lacey Act (16 U.S.C. §§ 3371–3378) is a conservation statute that was signed into law on May 25, 1900. The Lacey Act protects both plants and wildlife by imposing civil and criminal penalties for a wide array of violations prohibiting trade in wildlife, fish, and plants that have been illegally taken, transported or sold.

3

10. The Lacey Act was amended in 2008 to add provisions banning the import and trade of illegally sourced wood products (including wood products sourced in violation of foreign laws), and imposing civil and criminal penalties on violators. The provisions of the Lacey Act are primarily enforced by the U.S. Department of Agriculture ("DOA") and the U.S. Fish and Wildlife Service ("FWS") with support from the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ").

11. The Environmental Investigation Agency ("EIA") is a non-profit organization that employs undercover investigations to expose environmental crimes around the world, and seeks to increase government enforcement of laws relating to global trade in wildlife and environmental products through advocacy and publications.

12. In 2013, the EIA issued a report entitled "Liquidating the Forests" (the "EIA Report") documenting the results of a multi-year undercover investigation into illegal logging in the Russian Far East ("RFE"), a heavily forested region near Russia's border with China. Briefly, the EIA Report identifies a Chinese-owned wood-flooring company called Suifenhe Xingjia Economic and Trade Company ("Xingjia"), with three factories in northeastern China and at least 14 sawmills throughout the RFE, as the company of greatest concern with respect to illegal logging operations in the RFE. Among other things, the EIA Report alleges that Xingjia conceals its illegal logging in the RFE through falsified documents and bribes.

13. The EIA Report further alleges that analysis of U.S. import records and other undercover sources indicate that Xingjia's largest customer is Lumber Liquidators. According to the EIA Report, Lumber Liquidators has done business with Xingjia since at least 2007. The EIA Report further claims that the head of Lumber Liquidators' sourcing operations visited Xingjia's office and sawmills in the RFE in May 2012, and that thereafter Lumber Liquidators made

4

Xingjia its chief Chinese supplier of solid oak flooring. The EIA Report includes photos of what are alleged to be boxes of oak flooring stacked at one of Xingjia's factories bearing one of Lumber Liquidators' brands - Virginia Mill Works Co.

14.    On September 26, 2013, agents from the DHS, FWS and DOJ executed sealed search warrants at Lumber Liquidators' corporate offices in Toano and Richmond, Virginia, related to the importation of certain wood products.

15.    On this news, Lumber Liquidators shares declined $5.83 per share or more than 5%, to close at $107.13 per share on September 27, 2013.

16.    On October 9, 2013, the Wall Street Journal ("WSJ") reported that the EIA had provided copies of the findings in the EIA Report to federal authorities prior to the government raid. The WSJ cited an unnamed source that the federal agents who conducted the raid "were looking for evidence the [Company] had imported wood products from forests in far eastern Russia..."

17.    On November 21, 2013, well known hedge fund manager Whitney Tilson criticized the Company for importing illegally sourced timber from Russia in direct violation of U.S. laws. Mr. Tilson explained that the Company was only able to maintain its unbelievably high margins, and thus inflate its revenues, as a result of importing illegal timber.

18.    On this news the Company's shares fell over $16.07 per share, or over 13%, to $99.29 per share over two trading sessions.

19.    Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) certain of the Company's products failed to comply with applicable laws and

5

regulations governing formaldehyde emissions from composite wood products; (2) the Company imported flooring products sourced from illegally logged wood in the RFE in violation of the Lacey Act; (3) as a result of the foregoing violations, the Company faces the risk of large fines, penalties, forfeitures, judgments and/or settlements in connection with government regulatory actions and/or consumer class actions; and (4) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

20.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant damages.

## JURISDICTION AND VENUE

21.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R § 240.10b-5.

22.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

23.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Lumber Liquidators maintains its principal place of business in this District and many of the acts and practices complained of occurred in substantial part herein.

24.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

6

## PARTIES

25.   Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Lumber Liquidators securities at artificially inflated prices during the Class Period and was damaged thereby.

26.   Defendant Lumber Liquidators is a corporation organized under the laws of the state of Delaware, maintaining its principal place of business at 3000 John Deere Road, Toano, VA 23168.   Lumber Liquidators' common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "LL."

27.   Defendant Robert M. Lynch ("Lynch") is the Company's President and Chief Executive Officer.

28.   Defendant Daniel E. Terrell ("Terrell") is the Company's Chief Financial Officer.

29.   Defendant Thomas D. Sullivan ("Sullivan") is the Company's Chairman of the Board and Founder.

30.   The defendants referenced above in ¶¶ 27-29 are referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

## BACKGROUND

31.   Lumber Liquidators is a multi-channel specialty retailer of hardwood flooring, and hardwood flooring enhancements and accessories, operating as a single business segment. The Company offers an extensive assortment of exotic and domestic hardwood species, engineered hardwoods and laminates direct to the consumer. The Company also features the renewable flooring products, bamboo and cork, and provides a wide selection of flooring enhancements and accessories, including moldings, noise-reducing underlay, adhesives and flooring tools. These

products are primarily sold under the Company's private label brands, including the premium Bellawood brand floors.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS MADE DURING THE CLASS PERIOD

32. On February 22, 2012, the Company filed an annual report with the SEC on Form 10-K for the year ended December 31, 2011, which was signed by, among others, Defendants Lynch, Terrell and Sullivan. In addition, the 2011 Form 10-K contained certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX").

33. For 2011, the Company reported annual net sales of $681.5 million, operating income of $42.4 million, and net income of $26.2 million with diluted earnings per share of $0.93. The Form 10-K also represented the following concerning the Company's business:

> Our value proposition to the customer is a key driver of our business. Important components include:
>
> • **Price.** A fundamental part of our business model is to provide quality hardwood flooring at everyday low prices. *We are able to maintain these prices across our product range because we generally purchase flooring directly from mills.* In addition, we operate a low-cost store model with locations in areas that carry lower rent expense than many retail stores.
>
> • **Selection.** We have developed a broad product assortment of solid and engineered hardwoods, laminates, resilient, bamboo and cork flooring products, moldings and flooring accessories sold under proprietary brands that help us to differentiate our products from those of our competitors. We offer products across a range of price points and quality levels that allow us both to target discrete market segments and to appeal to diverse groups of customers.
>
> • **Quality.** *We believe that we have achieved a reputation for quality, and that our proprietary brands are recognized for excellence by our customers. We work directly with our supplier mills to source and produce flooring that will meet our high quality standards.* We also currently finish at our Toano facility approximately 79% of our

8

premium Bellawood products, which now carry a 100-year, transferable warranty. We maintain an in-house inspection and quality control function and enforce strict certification requirements for Bellawood supplier mills.

> • **Availability.** Since our founding, we have made it a priority to build long-term relationships with our key supplier mills. We believe that these direct supplier relationships are relatively unique in our industry; and, as we have grown, we believe our relationships with our suppliers have strengthened. We believe our commitment to merchandise inventory throughout our distribution network allows us to meet the delivery needs of our customers better than our competitors.

34. Concerning the Company's suppliers, the 2011 Form 10-K stated:

We work directly with a select group of vendors and mills with whom we have cultivated relationships that provide for a consistent supply of high-quality product at the lowest prices. As part of ensuring the high-quality nature of our brands, we have developed demanding product standards. As we have grown, we believe our supplier relationships have strengthened, which we believe helps to ensure our access to a broad selection of products. Many suppliers have expanded to support our business. We select suppliers based on a variety of factors, including their ability to supply products that meet industry grading standards and our specifications.

We currently purchase products from approximately 120 domestic and international vendors, which are primarily mills or trading companies. *Trading companies contract with mills, located primarily in China, to produce quality products to our specifications, work on our behalf to control quality at the mill locations and handle certain other matters. In 2011, one of the trading companies, Sequoia Floorings Inc. ("Sequoia"), provided services on approximately one-third of our merchandise purchases, primarily in Asia. In September 2011, we entered into an agreement to acquire certain assets of Sequoia relating to Sequoia's quality control and assurance, product development, claims management and logistics operations in China. Our top 10 suppliers, including Sequoia, accounted for approximately 70% of our supply purchases in 2011.* We believe that we are the largest customer for most of our suppliers, which we believe enables us to obtain better prices in some circumstances. We believe that alternative and competitive suppliers are available for most of our products. *In 2011, approximately 42% of our product was sourced from Asia, 50% from North America, 7% from South America and 1% from other locations, including Europe and Australia.* The majority of our foreign purchases are negotiated and paid for in U.S. dollars.

35. Concerning government regulation of the Company's operations, the 2011 Form

10-K stated in relevant part:

Our operations and properties are also subject to federal, provincial, state and local laws and regulations relating to the use, storage, handling, generation, transportation,

treatment, emission, release, discharge and disposal of hazardous materials, substances and wastes and relating to the investigation and cleanup of contaminated properties, including off-site disposal locations. We do not incur significant costs complying with environmental laws and regulations. However, we could be subject to material costs, liabilities or claims relating to environmental compliance in the future, especially in the event of changes in existing laws and regulations or in their interpretation.

*Our suppliers are subject to the laws and regulations of their home countries, including in particular laws regulating forestry and the environment. We consult with our suppliers as appropriate to ensure that they are in compliance with their applicable home country laws.*

\*\*\*

*In addition, certain of our products are subject to laws and regulations relating to the importation, acquisition or sale of illegally harvested plants and plant products and the emissions of hazardous materials. We work closely with our suppliers to ensure compliance with the applicable laws and regulations in these areas.*

*We believe that we currently conduct, and in the past have conducted, our activities and operations in substantial compliance with applicable laws and regulations relating to the environment and protection of natural resources, and believe that any costs arising from such laws and regulations will not have a material adverse effect on our financial condition or results of operations.* However, there can be no assurance that such laws will not become more stringent in the future or that we will not incur costs in the future in order to comply with such laws.

36.  On April 25, 2012, the Company filed a quarterly report with the SEC on Form 10-Q for the first quarterly period ending March 31, 2012. The Company reported quarterly sales of $188 million and net income of $8.1 million or $0.29 per diluted share. The report was signed by Defendant Terrell, and contained certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX.

37.  On July 25, 2012, the Company filed a quarterly report with the SEC on Form 10-Q for the period ending June 30, 2012. The Company reported quarterly sales of $210.3 million and net income of $12.1 million or $0.43 per diluted share. The report was signed by Defendant

Terrell, and contained certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX.

38. On October 24, 2012, the Company filed a quarterly report with the SEC on Form 10-Q for the period ending September 30, 2012. The Company reported net sales of $204.2 million and net income of $12.8 million or $0.46 per diluted share. The report was signed by Defendant Terrell, and contained certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX.

39. On February 20, 2013, the Company filed an annual report with the SEC on a Form 10-K for the period ended December 31, 2012, which was signed by, among others, Defendants Lynch, Terrell and Sullivan. In addition, the 2012 Form 10-K contained certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX.

40. The 2012 Form 10-K reported net sales of $813.3 million (up 11.4 % from the prior year), operating income of $78.3 million, and net income of $47 million or $1.68 per diluted share. Concerning the Company's competitive strengths, the 2012 Form 10-K stated as follows:

> We believe that our sourcing directly from the mill provides the foundation for the strongest value proposition in a highly-fragmented hardwood flooring market . . .
>
> **Sourcing Direct from the Mill**
> *Our Suppliers.* We believe that our vertically integrated business model enables us to offer a broad assortment of high-quality products to our customers at a lower cost than our competitors. We work directly with a select group of vendors and mills with whom we have cultivated strong relationships that provide for a consistent supply of our products. We select suppliers based on a variety of factors, including their ability to supply products that meet industry grading standards and our demanding product specifications, which support the high-quality nature of our brands. We believe that we are the largest customer for most of our suppliers, which we believe enables us to obtain better prices in some circumstances. As we have grown, we believe our supplier relationships have strengthened, which we believe helps to ensure our access to a broad

selection of products. Further, many suppliers have expanded to support our business.

We currently purchase products from approximately 110 domestic and international vendors, which are primarily mills. In 2012, our top 10 suppliers accounted for approximately 50% of our supply purchases. We believe that alternative and competitive suppliers are available for most of our products. In 2012, approximately 43% of our product was sourced from Asia, 50% from North America, 6% from South America and 1% from other locations, including Europe and Australia. The majority of our foreign purchases are negotiated and paid for in U.S. dollars.

*Sourcing Initiatives.* In 2011, we began a process to continually challenge, and ultimately strengthen, the structure of our sourcing relationships with the best international and domestic mills. Our sourcing initiatives play a key role in maintaining the best combination of quality and value in our product assortment, while reducing product costs. These initiatives are segregated into three primary areas, which are being implemented independently over a multi-year time frame, as follows:

- Volume-based discounts and cost sharing for a range of continuing programs, including marketing, product samples and new store openings;

- Current and potential mill partners' participation in competitive line reviews of specific merchandise categories to evaluate breadth of assortment, quality, logistics and product cost; and

- Direct sourcing with international and domestic mills to control product cost and quality, enhance forecasting and broaden our product assortment.

41.   Concerning government regulation of the Company's operations, the 2012 Form

10-K stated in relevant part:

*Our suppliers are subject to the laws and regulations of their home countries, including in particular laws regulating labor, forestry and the environment. We consult with our suppliers as appropriate to ensure that they are in compliance with their applicable home country laws.* We also support social and environmental responsibility among our supplier community and our suppliers agree to comply with our expectations concerning environmental, labor and health and safety matters. Those expectations include representations and warranties that our suppliers comply with the laws, rules and regulations of the countries in which they operate.

Products that we import into the United States and Canada are subject to laws and regulations imposed in conjunction with such importation, including those issued and/or enforced by U.S. Customs and Border Protection and the Canadian Border Services Agency. *In addition, certain of our products are subject to laws and regulations relating to the importation, acquisition or sale of illegally harvested plants and plant products and the emissions of hazardous materials. We work closely with our suppliers to ensure compliance with the applicable laws and regulations in these areas.*

We believe that we currently conduct, and in the past have conducted, our activities and operations in substantial compliance with applicable laws and regulations relating to the environment and protection of natural resources, and believe that any costs arising from such laws and regulations will not have a material adverse effect on our financial condition or results of operations. However, there can be no assurance that such laws will not become more stringent in the future or that we will not incur costs in the future in order to comply with such laws.

42.     On a conference call with analysts on February 20, 2013, to discuss the Company's

4Q 2012 and full year 2012 results, Defendant Lynch stated in relevant part:

Our sourcing and supply chain optimization initiatives have continued to contribute significantly to our gross margin expansion.

Ongoing line reviews and product assortment evaluations have remained critical in our ability to align with customer preferences and flooring trends and these initiatives remain top priorities. We have been pleased with the reduction in product cost, but equally as important, our people have forged stronger relationships with our mills to deliver a broader assortment, enhanced availability and stronger control over product quality.

We continue to invest in our team on the ground in China . . .

43.     On April 24, 2013, the Company filed with the SEC on Form 10-Q its quarterly

report for the quarter ending March 31, 2013. The Form 10-Q reported net sales of $230.4

million and net income of $15.7 million or $0.57 per diluted share. The report was signed by

Defendant Terrell, and contained certifications signed by Defendants Lynch and Terrell pursuant

to Sections 302 and 906 of SOX. The report further stated in relevant part that "[i]n 2013 . . .

[w]e expect to . . . [expand] gross margin through continued execution of our sourcing initiatives

and optimization of our supply chain."

44. On a conference call with analysts on April 24, 2013, to discuss the Company's 1Q 2013 results, Defendant Lynch stated in relevant part:

> [O]ur sourcing strategy and merchandising strategies are really focused on buying direct from the mill. No middlemen, going direct to them. So that's one thing that helps us. The other thing is, as you've noticed the last couple of years, we've been expanding our global sourcing operation, acquiring the office in China, we've diversified our mill base within China, within all of Asia. We did the same thing in Brazil -- in South America, I mean, taking over operations there and expanding to other countries within South America. And most recently, we've also expanded into Europe and are sourcing there now from several new partners. So again, the focus is on global sourcing, direct to the mill and having the best people managing those processes.

45. The statements referenced in ¶¶ 32-44 above were materially false and/or misleading because they misrepresented and failed to disclose that: (1) certain of the Company's products failed to comply with applicable laws and regulations governing formaldehyde emissions from composite wood products; (2) the Company imported flooring products sourced from illegally logged wood in the RFE in violation of the Lacey Act; (3) as a result of the foregoing noncompliance and violations, the Company faces the risk of large fines, penalties, forfeitures, judgments and/or settlements in connection with government regulatory actions and/or consumer class actions; and (4) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

46. On June 20, 2013, an article published on SeekingAlpha.com alleged that, among other things, testing of one of Lumber Liquidators' branded wood flooring products (imported from China and sold in California) at two accredited independent laboratories found that formaldehyde emissions from the tested product were over 3.5x the maximum legal limit even though the product was labeled as being CARB-compliant.

1827738.1

47. On this news, Lumber Liquidators shares declined, over the course of two trading sessions, $9.40 per share or nearly 11%, to close at $76.63 per share on June 21, 2013.

48. On July 24, 2013, the Company filed with the SEC on Form 10-Q its quarterly report for the quarter ending June 30, 2013. The Form 10-Q reported net sales of $257.1 million and net income of $20.4 million or $0.73 per diluted share. The report was signed by Defendant Terrell, and contained certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX. The report further stated in relevant part that "[i]n 2013 . . . [w]e expect to . . . [expand] gross margin through continued execution of our sourcing initiatives and optimization of our supply chain."

49. On a conference call following the release of the Q2 2013 results, Defendant Lynch discussed the quality and sourcing of the Company's products:

> I'd like to spend a few minutes today on quality, which is fundamentally important to the success of our premium brands and key to a loyal customer base. *Sourcing directly from the mill provides the foundation for our entire value proposition. Due to our scale, we often purchase the majority of our mill partner's capacity, and as a result, we have insight and visibility throughout the sourcing process.*
>
> This provides a significant competitive advantage compared to the distributor model of many of our competitors. Our product offering features our high-quality proprietary brands, which represent more than 95% of our net sales and include the premium brands Virginia Mill Works Handscraped Hardwoods, Morning Star Bamboo and our flagship, Bellawood lines.
>
> Our commitment to quality begins with well-designed product specifications, followed by strict adherence to a set of internal standards set well above regulatory requirements. Because of these standards, the products we sell nationally exceed the most stringent requirements of any state.
>
> *We have developed quality control and assurance processes for our products that we believe lead our industry. Due to our international sourcing, we have more than 60 professionals around the world, including in the U.S., Canada, China and South America, who perform and monitor those processes that we believe are most effectively executed on the ground at the mill.*

1827738.1

We augment the on-site controls with additional testing in both our own labs and in independent certified facilities. The combination of our on-site controls and our additional testing is designed to ensure that our products exceed the highest regulatory requirements and meet our more stringent internal quality standards. As national standards are developed around product quality, construction and packaging, we will engage in and intend to lead our industry in the process.

50.   On September 26, 2013, agents from the DHS, FWS and DOJ executed sealed search warrants at Lumber Liquidators' corporate offices in Toano and Richmond, Virginia, related to the importation of certain wood products.

51.   On September 27, 2013, in a press release, the Company stated:

Lumber Liquidators (NYSE: LL), the largest specialty retailer of hardwood flooring in North America, today commented on actions taken by Federal authorities, which relate to the importation of certain of the Company's wood flooring products. Yesterday, sealed search warrants were executed at the Company's corporate offices in Toano and Richmond, Virginia by the Department of Homeland Security's Immigration and Customs Enforcement and the U.S. Fish and Wildlife Service. The Company takes its sourcing and compliance very seriously, and is cooperating with authorities to provide them with requested information.

Lumber Liquidators sources its products directly from approximately 110 domestic and international mills around the world. As a result of the normal course of business, the Company is subject to a range of international and domestic regulations. Due to the scale of its international and domestic operations, Lumber Liquidators has policies and procedures in place for the sourcing, harvesting and manufacturing of its products designed to comply with federal and other regulations related to the importation of wood flooring products. The Company has more than 60 professionals around the world who perform and monitor those processes. Quality is a key component of Lumber Liquidators' value proposition, and through its commitment to continuous improvement, the Company invests significant resources for quality control and assurance.

52.   On this news, Lumber Liquidators shares declined $5.83 per share or more than 5%, to close at $107.13 per share on September 27, 2013.

53.   On November 21, 2013, well known hedge fund manager Whitney Tilson criticized the Company for importing illegally sourced timber from Russia in direct violation of U.S. laws. Mr. Tilson explained that the Company was only able to maintain its unbelievably high margins, and thus inflate its revenues, as a result of importing illegal timber.

16

54.   On this news the Company's shares fell over $16.07 per share, or over 13%, to $99.29 per share over two trading sessions.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

55.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Lumber Liquidators securities during the Class Period (the "Class"); and were damaged thereby.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

56.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Lumber Liquidators securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Lumber Liquidators or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

57.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

17

58. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

59. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Lumber Liquidators;

- whether the Individual Defendants caused Lumber Liquidators to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Lumber Liquidators securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

60. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

61. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

18

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Lumber Liquidators securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Lumber Liquidators securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

62.   Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

63.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

64.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.   This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

66. During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Lumber Liquidators securities; and (iii) cause Plaintiff and other members of the Class to purchase Lumber Liquidators securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

67. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Lumber Liquidators securities and options. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Lumber Liquidators' finances and business prospects.

68. By virtue of their positions at Lumber Liquidators, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged

20

herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

69. Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of Lumber Liquidators, the Individual Defendants had knowledge of the details of Lumber Liquidators' internal affairs.

70. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Lumber Liquidators. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Lumber Liquidators' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Lumber Liquidators securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Lumber Liquidators' business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased Lumber Liquidators securities at artificially inflated prices and

relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

71. During the Class Period, Lumber Liquidators securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Lumber Liquidators securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiff and the Class, the true value of Lumber Liquidators securities were substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Lumber Liquidators securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

72. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

73. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure of the alleged corrective disclosures.

22

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

74. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

75. During the Class Period, the Individual Defendants participated in the operation and management of Lumber Liquidators, and conducted and participated, directly and indirectly, in the conduct of Lumber Liquidators' business affairs.

76. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Lumber Liquidators' financial condition and results of operations, and to correct promptly any public statements issued by Lumber Liquidators which had become materially false or misleading.

77. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Lumber Liquidators disseminated in the marketplace during the Class Period concerning Lumber Liquidators' financial prospects. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Lumber Liquidators to engage in the wrongful acts complained of herein. The Individual Defendants therefore were "controlling persons" of Lumber Liquidators within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Lumber Liquidators securities.

78. Each of the Individual Defendants, therefore, acted as a controlling person of Lumber Liquidators. By reason of their senior management positions and/or being directors of Lumber Liquidators, each of the Individual Defendants had the power to direct the actions of,

23

and exercised the same to cause, Lumber Liquidators to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Lumber Liquidators and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

79. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Lumber Liquidators.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

24

Dated:  November 26, 2013

COHEN MILSTEIN SELLERS &
TOLL PLLC



Steven J. Toll (Va. Bar # 15300)
Daniel S. Sommers
S. Douglas Bunch
Elizabeth A. Aniskevich (Va. Bar # 81809)
1100 New York Ave. N.W.
Suite 500, West Tower
Washington, DC 20005-3965
Tel.: (202) 408-4600
Fax: (202) 408-4699
Email: stoll@cohenmilstein.com
        dsommers@cohenmilstein.com
        dbunch@cohenmilstein.com
        eaniskevich@cohenmilstein.com

*Liaison Counsel for Plaintiff*

Jeremy A. Lieberman
Lesley F. Portnoy
**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**
600 Third Ave., 20th Floor
New York, NY 10016
Tel.: (212) 661-1100
Fax: (212) 661-8665

Patrick V. Dahlstrom
**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**
10 South LaSalle St., Suite 3505
Chicago, IL 60603
Tel.: (312) 377-1181
Fax: (312) 377-1184

J. Elazar Fruchter
**WOHL & FRUCHTER LLP**
570 Lexington Ave., 16th Floor
New York, NY 10022
Tel.: (212) 758-4000
Fax: (212) 758-4004

*Counsel for Plaintiff*

25

## CERTIFICATION OF GREGG KIKEN PURSUANT TO
## THE PRIVATE SECURITIES LITIGATION REFORM ACT

I, Gregg Kiken, hereby declare as follows:

1.      I have reviewed the facts and allegations in a complaint against Lumber Liquidators Holdings, Inc. ("LL") and related parties, and authorize its filing.

2.      I did not purchase LL securities at the direction of plaintiffs' counsel or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      The attached Schedule A lists all of my purchases and sales in LL securities during the class period set forth in the complaint.

5.      During the three year period preceding the date hereof, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

6.      I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except for reasonable costs and expenses (including lost wages) directly relating to the representation of the class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 25th day of November 2013.

Gregg Kiken