**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| GREGG KIKEN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) ) ) |
| v. | ) ) |
| LUMBER LIQUIDATORS HOLDINGS, INC., ROBERT M. LYNCH, DANIEL E. TERRELL, and THOMAS D. SULLIVAN, | ) ) ) ) ) |
| Defendants. | ) |

No. 4:13-cv-00157-AWA-DEM
Hon. Arenda L. Wright Allen

<u>**CLASS ACTION**</u>

<u>**THIRD AMENDED COMPLAINT**</u>
**FOR VIOLATIONS OF**
**FEDERAL SECURITIES LAWS**

<u>**DEMAND FOR JURY TRIAL**</u>

<u>**CLASS ACTION COMPLAINT**</u>

Lead Plaintiffs Gregg Kiken and Keith Foster ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against defendants, alleges the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Lumber Liquidators Holdings, Inc. ("Lumber Liquidators" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants, who purchased Lumber Liquidators securities between February 22, 2012 and July 9, 2014, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      During the Class Period, Lumber Liquidators reported gross margins significantly higher than anything it or its major competitors (Home Depot and Lowe's) had ever experienced. Defendants misrepresented that its competitive advantage and the major driver of these high margins were "sourcing initiatives" implemented by the Company in China designed to reduce the cost of goods, cut out middlemen, increase control by the Company and strengthen relationships with their suppliers. In fact, the Company was purchasing wood from suppliers in China that was illegally harvested from protected forests in the Russian Far East (or "RFE"), home to the critically endangered Siberian tiger and Far East leopard, both among the rarest animal species on the planet.  The Company was also purchasing wood from mills in China that contained dangerously high and illegal levels of formaldehyde, a known carcinogen that has been deemed to have "no safe level of exposure."  As a result of disclosures on June 20, 2013, September 27, 2013, November 22, 2013, and July 9, 2014 – including the execution of sealed search warrants at the Company's corporate offices by agents for the Department of Homeland Security ("DHS"), U.S. Fish and Wildlife Service ("FWS") and the Department of Justice ("DOJ") – the market learned the truth behind the Company's "sourcing initiatives" and its unprecedented record financial results.

## INTRODUCTION

3.    Lumber Liquidators is one of the largest specialty retailers of hardwood flooring in the United States.  The Company sells to homeowners directly or to contractors acting on behalf of homeowners through its network of approximately 300 retail stores in 46 states.

4.    As a retailer of hardwood flooring, Lumber Liquidators is subject to various state and federal laws that regulate the harvesting and importation of wood used in its products as well as the chemicals used in its processing.

5.    The Lacey Act bans the import and trade of illegally sourced wood products (including wood products sourced in violation of foreign laws). The Lacey Act also requires importers to provide a basic declaration to accompany every shipment of timber or wood product into the United States, including the country of harvest, species, value and quantity of each shipment. The provisions of the Lacey Act are primarily enforced by the U.S. Department of Agriculture ("DOA") and the U.S. Fish and Wildlife Service ("FWS") with support from the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ").

6.    The Formaldehyde Standards for Composite-Wood Products Control Act and standards established by the California Air Resources Board ("CARB") establish limits for formaldehyde emissions for composite wood products.

7.    Lumber Liquidators operates in an intensely-competitive industry.  The Company controls 11% of the market.  Its two main competitors are Lowe's and Home Depot, which control 27% of the market.  Other national, regional and local flooring stores comprise the remaining 62%. Home Depot and Lowe's are bigger, more widely known and have a larger international presence than Lumber Liquidators, which they can leverage to reduce their product cost.  As a result, the Company faces constant pressure to reduce prices while increasing margins

in order to convince customers to eschew the convenience, selection and savings of the "big box" stores.

8.     Since at least 2007, Lumber Liquidators – like Home Depot and Lowe's – has sourced a large portion of its products directly from manufacturers in China at lower costs in order to maximize its margins.  Through 2011, the gross margins for all three companies were comparable, fluctuating in the narrow range of 34% - 35% each year.

9.     Determined to lower the Company's product cost and increase its margins, Defendants purchased and imported wood products from Chinese mills that were illegally harvesting wood from protected forests in the Russian Far East in violation of the Lacey Act, and contained illegally high levels of formaldehyde (a known carcinogen that has no safe level of exposure) under the CARB standards.  In the course of a multi-year undercover investigation by the Environmental Investigation Agency ("EIA"), Lumber Liquidators' largest supplier of hardwood in China admitted to illegally harvesting wood from the protected Russian Far East, as well as to providing personal tours of these illegal operations to Lumber Liquidators U.S. executives, including the Company's U.S. head of sourcing.

10.     As a result of these practices, Lumber Liquidators' margins and other financial results reached record levels during the Class Period.  For example, while gross margin for Lowe's and Home Depot remained between 34.3% and 34.8% for the years 2012 and 2013, Lumber Liquidators' gross margins skyrocketed to an astounding 41.8% by the third quarter 2013.

11.     Defendants knew and disclosed in the Company's public filings that "certain of our products are subject to laws and regulations relating to the importation, acquisition or sale of illegally harvested plants and plant products and the emissions of hazardous materials." Yet,

despite their awareness of numerous practices in violation of the laws, Defendants claimed, "[w]e work closely with our suppliers to ensure compliance with the applicable laws and regulations in these areas" and "[w]e believe that we currently conduct, and in the past have conducted, our activities and operations in substantial compliance with applicable laws and regulations relating to the environment and protection of natural resources." Defendants claimed that the unprecedented margins and related financials were a result of simple "sourcing initiatives" the Company implemented in China designed to reduce the cost of goods, cut out middlemen, increase control by the Company and strengthen relationships with their suppliers.

12. As a result of this scheme, the Company's stock price soared during the Class Period, from $19.17 to a high of $115.44 in less than two years.

13. Aspects of Defendants' sourcing scheme were only revealed when analysts began to do their own investigations into the Company's unusual margins. On June 20, 2013, an article published on SeekingAlpha revealed that, among other things, testing of one of Lumber Liquidators' branded wood flooring products (imported from China and sold in California) at two accredited independent laboratories found that formaldehyde emissions from the tested product were 0.17 ppm (parts per million), over 3.5 times the maximum legal limit of 0.05 ppm imposed by the CARB standards for hardwood plywood, even though the product was labeled as being compliant with the CARB formaldehyde regulations.

14. On this news, the Company's stock price declined $9.40, or 10.9%.

15. Defendants' sourcing scheme ultimately caught the attention of federal authorities. On September 26, 2013, agents from the DHS, FWS and DOJ executed at the Company's corporate offices sealed search warrants related to the Company's importation of "wood products from forests in far eastern Russia."

16.     Prior to this raid, the federal authorities had received an advanced copy of a report titled "Liquidating the Forest" issued by the Environmental Investigation Agency, a non-profit organization that investigates and exposes environmental crimes around the world. The report documented the results of a multi-year undercover investigation into illegal logging in the Russian Far East, a heavily forested region near Russia's border with China.

17.     The investigation revealed that Lumber Liquidators' primary supplier for hardwood flooring in China, Suifenhe Xingjia Economic and Trade Company ("Xingjia"), is the dominant player in the cross-border trade of illegal timber from the RFE. The investigation also revealed that members of management from Lumber Liquidators, including the Company's head of sourcing operations, visited Xingjia's offices and sawmills in the RFE several times in 2011 and 2012. Thereafter, Lumber Liquidators made Xingjia its chief Chinese supplier of solid oak flooring.

18.     On this news, the Company's stock price declined $5.83, or 5.2%.

19.     On November 21, 2013, well known hedge fund manager Whitney Tilson made a presentation at an investor conference, explaining that the Company was only able to maintain its unbelievably high margins, and thus inflate its earnings, by importing illegally sourced timber from Russia in direct violation of the Lacey Act. Tilson also predicted that as a result of the regulatory scrutiny, the Company would be unable to maintain its increasing margins and that the Company's stock price would decline to $53 as the Company cleaned up its act.

20.     On this news, the Company's stock price declined $13.55, or 11%.

21.     Tilson's predictions were correct. On July 9, 2014, after the close of trading, the Company updated its second quarter earnings forecast. The Company announced, among other things, that its gross margin in the second quarter of 2014 was expected to contract in

comparison to the second quarter of 2013, resulting in the first year-over-year contraction of gross margin since the second quarter of 2011. The Company also reported second quarter sales of only $263.1 million and announced that it expected to report EPS of only $0.59-$0.61, well below the consensus of $303.2 million and $0.90. Defendants admitted that an aggregate net sales shortfall in the second quarter of $18 million was a result of "constrained inventory" as suppliers in China struggled to meet the Company's new sourcing compliance requirements.

22.    On this news, the Company's stock price declined $15.17, or 21.5%, from $70.42 on July 9, 2014 to $55.25 on July 10, 2014.

23.    Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) certain of the Company's products failed to comply with applicable laws and regulations governing formaldehyde emissions from composite wood products under the CARB standards; (ii) the Company imported flooring products sourced from illegally logged wood in the RFE in violation of the Lacey Act; (iii) the Company misrepresented the country of harvest on custom forms, failing to indicate that the wood in the products had been harvested from the RFE, in violation of the Lacey Act; (iv) the Company had inadequate internal controls for ensuring compliance with the Lacey Act and the CARB standards; (v) the decrease in the Company's cost of product and increase in margins were achieved as a result of violations of the Lacey Act and the CARB standards; (vi) a substantial portion of the Company's earnings and revenues were thereby earned as a result of the violation of these laws; (vii) the Company's gross margin expansion was not sustainable, subjecting to the risk of large fines, penalties, forfeitures, judgments and/or settlements in connection with government regulatory actions and/or consumer

class actions related to its practices; and (viii) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

24. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant damages.

## JURISDICTION AND VENUE

25. The claims asserted herein arise under and pursuant to Sections l0-(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule l0b-5 promulgated thereunder by the SEC, 17 C.F.R § 240.10b-5.

26. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

27. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Lumber Liquidators maintains its principal place of business in this District and many of the acts and practices complained of occurred in substantial part herein.

28. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

29. Plaintiffs, as set forth in their previously-filed Certifications (Docket #19-2) purchased Lumber Liquidators securities at artificially inflated prices during the Class Period and have been damaged upon the issuance of the alleged corrective disclosures.

30. Defendant Lumber Liquidators is a corporation organized under the laws of the state of Delaware, maintaining its principal place of business at 3000 John Deere Road, Toano,

VA 23168. Lumber Liquidators' common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "LL."

31.  Defendant Robert M. Lynch ("Lynch") is the Company's President and Chief Executive Officer.

32.  Defendant Daniel E. Terrell ("Terrell") is the Company's Chief Financial Officer.

33.  Defendant Thomas D. Sullivan ("Sullivan") is the Company's Chairman of the Board and Founder.

34.  Defendant William K. Schlegel ("Schlegel") is the Company's Chief Merchandising Officer.

35.  The defendants referenced above in ¶¶ 31 - 34 are referred to herein as the "Individual Defendants."

**SUBSTANTIVE ALLEGATIONS**

**BACKGROUND**

**The Lacey Act**

36.  The Lacey Act (16 U.S.C. §§ 3371–3378) is a conservation statute that was signed into law on May 25, 1900, which imposes civil and criminal penalties for violations of a wide array of laws prohibiting trade in wildlife, fish, and plants that have been illegally taken, transported or sold.

37.  The Lacey Act was amended in 2008 to add provisions banning the import and trade of illegally sourced wood products (including wood products sourced in violation of foreign laws), and imposing civil and criminal penalties on violators. The provisions of the Lacey Act are primarily enforced by the U.S. Department of Agriculture ("DOA") and the U.S. Fish and Wildlife Service ("FWS") with support from the Department of Homeland Security

("DHS") and the Department of Justice ("DOJ"). This landmark legislation is the world's first law banning import and inter-state commerce of illegally sourced timber and wood products.

38.     The Lacey Act also requires importers to provide a basic declaration to accompany every shipment of timber or wood product into the United States, including the country of harvest, species, value and quantity of each shipment.

39.     The Lacey Act is a fact-based statute with strict liability, which means that only actual legality counts (no third-party certification or verification schemes can be used to "prove" legality under the Act) and violators of the law can face criminal and civil sanctions even if they did not know that they were dealing with an illegally harvested product. The Lacey Act also requires that importers of covered products – in this case, wood or wood products – exercise "due care" in identifying the source of their goods. Penalties for violating the Lacey Act vary in severity based on the violator's level of knowledge about the products; penalties are higher for those who knew or should have known through the exercise of due care that they were trading in illegally harvested materials.

**The Protected Ecosystem of the Russian Far East**

40.     The Russian Far East (or "RFE") contains the world's last major stands of old-growth temperate hardwood forests, a unique biodiversity-rich ecosystem. Illegal loggers often target key hardwood species, which are vitally important to the region's ecosystem. Three hundred year old Mongolian oak and great Korean pine trees nourish deer, boar and other animals, which in turn support populations of the critically endangered Siberian tigers (*Panthera tigris altaica*) and Far East leopards (*Pantera pardus orientalis*), both among the rarest large animal species on the planet. The RFE is home to the only wild population of Siberian tigers in the world, which has dwindled to an alarming low population of 250.

41. The forests of Siberia and the RFE rival the Amazon in their size and importance as a carbon sink (the absorption of carbon dioxide through photosynthesis). Clear cutting, a practice that still accounts for more than 75% of all logging in Russia, has caused certain areas of permafrost forests in northeastern Russia to become "virtual deserts," and the release of methane from these degraded permafrost zones is a major source of greenhouse gas emissions.

42. Russian law regulates the harvesting of wood in the forests of the RFE, criminalizing the harvesting of wood in excess of stated permits and outside designated areas. As a result, importing such wood to the U.S. is a violation of the Lacey Act.

43. Most commercially valuable timber in the RFE now exists only in protective forests. Most timber cut in the RFE is destined for export, and 96% of valuable hardwood exports flow directly across the border to China.

**Illegal Sourcing of Timber in the Russian Far East by Chinese Vendors**

44. According to an analysis by the World Wildlife Fund, approximately 75% of oak exports from the Primorsky and Khabarovsky Provinces in RFE, where nearly all oak experts from the RFE originate, were illegal in origin.

45. The vast majority of Russian oak enters China at Suifenhe, a small northeastern city on the boarder of Primorsky Province. Hundreds of trading companies have taken root in the hills and valleys of the city.

46. From Suifenhe, timber is sent onwards into China by rail or road, either directly to manufacturers or to wholesale markets throughout the country. Most of the furniture and flooring produced in northeastern China is exported through the port of Dalian, although Russian hardwoods and softwoods end up in products manufactured throughout China.

**Government Regulation of Formaldehyde in Composite Wood Products**

47.  According to the Environmental Protection Agency, formaldehyde is a "colorless, pungent-smelling gas" that has been shown to cause cancer in humans along with a host of other potential health issues, including eye, nose and throat irritation, wheezing and coughing, fatigue, severe allergic reactions and more. The International Agency for Research on Cancer classified formaldehyde as "carcinogenic to humans" in 2004, based on the increased risk of nasopharyngeal cancer. Formaldehyde was also designated as a toxic air contaminant in California in 1992 with no safe level of exposure.

48.  Formaldehyde is a component in the production of pressed wood products.  One of the major sources of exposure to formaldehyde is from inhalation of formaldehyde emitted from composite wood products containing urea-formaldehyde resins.  Because of that, the federal government imposes limits on the amount of formaldehyde that can be present in wood products.

49.  On July 7, 2010, President Obama signed the Formaldehyde Standards for Composite-Wood Products Act into law (the "FSCWP Act").  This legislation, which adds a Title VI to Toxic Substances Control Act ("TSCA"), establishes limits for formaldehyde emissions from composite wood products: hardwood plywood, medium-density fiberboard, and particleboard.

50.  The national emission standards in the FSCWP Act mirror standards previously established by the California Air Resources Board ("CARB") for products sold, offered for sale, supplied, used or manufactured for sale in California.  The CARB standards have been in effect since January 1, 2009.  CARB requires formaldehyde emission standard compliance from distributors and importers like Lumber Liquidators.

51.     The CARB set limits on how much formaldehyde may be released from composite wood products, including hardwood plywood, medium-density fiberboard, particleboard and finished goods containing these products that are sold, supplied, offered for sale, manufactured, or imported in the United States. The rules include additional implementing provisions addressing testing requirements, laminated products, product labeling, chain of custody, recordkeeping, stockpiling and enforcement.

52.     Specifically, CARB dictates that all HWPW (Hardwood Plywood) products sold in the state of California should emit no more than 0.05 ppm (parts per million). Violations of CARB regulations may result in severe penalties assessed against the offending entities.

53.     The CARB also established a third-party certification framework designed to ensure that manufacturers of composite wood products meet the CARB formaldehyde emission standards by having their composite wood products certified though an accredited third-party certifier.  Under this rule, third-party certifiers would audit composite wood panel producers and verify compliance with formaldehyde emissions standards for their products.

**The Business of Lumber Liquidators**

54.     Lumber Liquidators is one of the largest specialty retailers of hardwood flooring in the United States.  The Company prides itself on having one of the largest inventories of prefinished and unfinished hardwood floors in the industry.  Lumber Liquidators carries solid and engineered hardwood, laminate flooring, bamboo flooring, cork flooring and resilient vinyl flooring, butcher blocks, molding, accessories, and tools.  These products are primarily sold under the Company's private label brands.  The Company sells to homeowners directly or to contractors acting on behalf of homeowners through its network of approximately 300 retail stores in 46 states.

55.    The Company began in 1993 when Defendant Sullivan, a then building contractor, began purchasing excess wood and reselling it from the back of a trucking yard in Stoughton, Massachusetts. The Company eventually focused on hardwood flooring.  The Company's first store opened on January 5, 1996 in West Roxbury, Massachusetts.  Eight months later, a second store opened in Harford, Connecticut, and from there the Company expanded.

56.    The Company moved headquarters from Boston to Colonial Heights, Virginia in 1999.  In 2004, the Company moved its headquarters to its current location, 306,000 square foot production center in Toano, Virginia.

57.    The Company's SEC filings identify Home Depot and Lowe's as its main competitors.  The three companies together represent approximately 37% of hardwood flooring retail sales in the United States.  The remainder of the market consists predominantly of regional and local independent retailers and smaller national chains which specialize in the lower-end, higher-volume flooring market as well as smaller national specialty flooring chains and local and regional independent flooring retailers.  Unlike Lumber Liquidators, Lowe's and Home Depot, which source a large portion of their products directly from manufacturers in China at lower costs, most of these smaller retailers purchase their hardwood flooring from domestic manufacturers or distributors.

58.    Between 2009 and 2011, Lumber Liquidators, Lowes and Home Depot reported similar and steady gross margins.

| Gross Margin | | | |
|---|---|---|---|
| | 2009 | 2010 | 2011 |
| **Lowe's** | 34.86% | 35.14% | 34.56% |
| **Home Depot** | 33.90% | 34.30% | 34.50% |
| **Lumber Liquidators** | 35.70% | 34.80% | 35.30% |

**Purchase of Sequoia and Implementation of "Sourcing Initiatives"**

59.     In 2011, the Company made it a priority to increase its gross margin by reducing the costs associated with the wood it sourced through China.  The Company sought to accomplish this by, among other things, (1) cutting out middleman suppliers; and (2) increasing control and oversight of vendor mills and manufacturers; and (3) doing "line reviews" in which the Company would award business to the mills and manufacturers willing to provide wood at the lowest price.  The Company referred to these strategies to reduce the cost of wood as its "sourcing initiatives."

60.     Spearheading the sourcing initiatives were Defendants Lynch and Schlegel who had both been hired in 2011 as President and Senior VP of Merchandising, respectively.  Schlegel is the head of the Company's sourcing operations.

61.     On September 28, 2011, the Company entered into an agreement to acquire certain assets of Sequoia Floorings ("Sequoia") relating to Sequoia's quality control and assurance, product development and logistics operations in China.  Prior to its acquisition, Sequoia, a trading company, provided sourcing services on approximately 78% of the Company's 2011 merchandise purchases from China.  As a part of the transaction, the Company established a representative office in Shanghai in October 2011, and assumed direct control of sourcing previously managed by Sequoia.

62.     With the acquisition of Sequoia, the Company began eliminating distributor middlemen and establishing – as described by Defendant Lynch – a "fully direct relationship" with the mills in China.

63.     The Company also began "line reviews" in which it pitted suppliers against each other to bid for the Company's business, increasing/consolidating business with mills and

manufacturers that could provide the lowest price and eliminating relationships with others. Many of the vendors that had the lowest prices were Chinese mills. The Company was able to get "very significant cost concessions from these vendors." As a result, the Company began shifting more of its sourcing to Chinese mills, many of which the Company had never worked with prior to the Sequoia acquisition. In 2011, the Company's top 10 suppliers accounted for approximately 70% of the Company's supply purchases. Approximately 42% of the Company's product was sourced from China. That figure increased to 50% in 2013.

**Defendants' Knowledge of the Company's Sourcing Practices in China**

64.    Defendant Lynch and Schlegel were directly involved in choosing the suppliers of the Company's wood, personally visiting mills and manufacturers in China on multiple occasions between 2011 and 2013. For example, during an analyst conference on September 7, 2011, then CEO Jeffrey W. Griffiths stated, "We brought in our President, Rob Lynch and our Senior VP of Merchandising, Bill Schlegel. Both of them have extensive experience in direct sourcing in China and they are actually both there in China today working on some of those initiatives." And during an analyst conference on June 6, 2012, Defendant Lynch stated, "The Sequoia acquisition got us closer to a lot of our factories in China. We actually then went forward and conducted our bamboo line review in China, in country that was wonderful. I mean, we got to see factories we've never seen before." During the July 25, 2012 Q2 earnings call, Defendant Lynch stated "As our Chief Merchant, Bill Schlegel, and his teams have dug in with the vendors and done these line reviews." During an analyst conference on March 4, 2013, Defendant Terrell stated "This is our breakdown of the key components of cost of sales. Cost of product is at the base. You can see it was fairly steady, 55.4%, 55.8%, 55.6% for three years. And then we improved the merchandising department. Rob [Lynch] came in 2011. Brought a

new Chief Merchant, Bill Schlegel with him, and you start to see the benefiting cost of product of our sourcing initiatives. From vendor allowances to line reviews to direct sourcing, 54.2% in 2011 down to 52.2% in 2012."

65.     The acquisition of Sequoia also provided the Company with – as described in the Company's 2011 Form 10-K – "direct servicing of mill relationships" in China. The Company did not rely on the distributors to monitor the sourcing practices at the mills in China.  Rather, as described by Defendant Lynch during a July 24, 2013 analyst conference, the Company monitored sourcing directly, with "onsite controls" at the mills.  The lumber was tested by the Company both at the mill as well as off-site in the Company's own labs.  Moreover, the Company would also do random tests of the wood at the mill.  These procedures provided the Company (as Defendant Lynch described it) "insight and visibility throughout the sourcing process."

66.     Indeed, Defendant Lynch boasted that he and Schlegel were personally well aware of the workings at the mills in China.  During an August 14, 2013 analyst conference, in response to a question by analyst requesting additional detail regarding the Company's "sourcing strategies and any advantage you have there", Lynch stated, "We absolutely have a world-class sourcing team. Our chief merchant, Bill Schlegel, and the team that he has built under him is better than I've ever seen in my career. . . . In fact, we just did a line review recently in the last couple of weeks over in China. We did an engineered line review and some of the feedback we got from the mills were how impressed they were with how closely we work with them, how we are out in the markets, in their territories, walk in their mills with them, interacting with them and building those relationships."

67. Defendants' familiarity with the practices at the mills and factories in China has been confirmed by former employees.

    (a) Confidential Witness #1 ("CW1") worked directly with Lynch, Terrell and Schlegel at the Company's corporate headquarters in Toano, VA from May 2011 through June 2012.

    (b) Confidential Witness #2 ("CW2"), held the position of Associate Buyer at the Company's corporate headquarters in Toano, VA from October 2009 to January 2012.

    (c) Confidential Witness #3 ("CW3"), worked as an Inventory Analyst at the Company's corporate headquarters in Toano, VA, from January 2011 through June 2012.

    (d) Confidential Witness #4 ("CW4"), worked as a supply chain executive in the Company's corporate headquarters from May 2008 through November 2012, working directly with Schlegel and Lynch.

68. According to CW4, the Company's single largest supplier in all of China during the Class Period was Xingjia. CW4 stated that Russian mills in Eastern Russia were contracted to supply Chinese factories like those operated by Xingjia.

69. CW1 stated that Lynch traveled to China several times a year and that Schlegel and his direct report, John Jakob (Vice President of Supply Chain / Manufacturing Operations) ("Jakob"), traveled to China frequently to oversee operations, find new Chinese suppliers and report back to Lynch. According to CW1, Schlegel was "the go-to guy for everything that was going on for [the Company] over in China." CW1 stated that the Company also had a point person located in China at Sequoia who operated as the "eyes and ears" on the ground.

70.    CW3 confirmed that Lynch, Schlegel and Jakob regularly traveled to China to visit suppliers and factories and that twice a year they would travel to China with U.S-based buyers to visit factories and negotiate agreements with suppliers.  The U.S buyers would also regularly travel to China (without Lynch and Schlegel) to find and visit suppliers and their factories.

71.    According to CW2, the Company's U.S.-based buyers would give the Company's China-based buyers specs on products the Company was looking for and the China-based buyers would seek out the suppliers in China.  The China-based buyers would then send samples of the product to the Company in the U.S.

72.    CW3 stated that the Company's U.S.-based buyers worked with the China-based buyers and would visit the factories with the Chinese staff and would also talk to suppliers about their manufacturing processes, the quality of their products and the specifications the supplier had to meet when selling to the Company.

73.    According to CW2, all buyers in China reported to Schlegel, who was responsible for quality assurance of the wood product as the individual overseeing the Company's operations in China.  Moreover, CW4, who worked directly with Schlegel and accompanied him on trips to China, regularly communicated information from the personnel in Shanghai to Schlegel.

**Defendants' Illegal Sourcing of Timber From The Russian Far East**

74.    To reduce costs and increase gross margins as part of its "sourcing initiatives", the Company purchased timber illegally sourced from the Russian Far East, exposing it to liability and enforcement under the Lacey Act.

75.    Defendants' illegal sourcing and fraudulent reporting under the Lacey Act, has been confirmed by a multi-year undercover investigation by the EIA.  From 2011 through 2013, in the face of continued reports of extremely high levels of illegal forest degradation in the RFE by

Chinese vendors, EIA systematically investigated the nature of the crimes. EIA was able to determine the path of the illegal timber and wood products throughout the global supply chain.

76. Despite the pressure and dangers involved, many individuals in the RFE, including foresters, local nonprofit organizations, police officers, game wardens, and individual citizens, worked at high personal risk to expose the illegal logging trade. Based on communications with these partners, EIA investigators were able to highlight the loggers, sawmills, and traders operating in Russia that were associated with illegal sourcing.

77. EIA investigators concurrently analyzed customs data to determine the largest players in the export of precious hardwoods from the RFE into China and the U.S. (among other countries). These data sets from Russia, China and the U.S. provide detailed information about species, quantities, exporters, and importers involved in the trade of wood products. By cross-referencing these sets of data, EIA was able to develop a list of the Chinese manufacturers that imported large amounts of wood from high-risk exporters in Russia. EIA then established a cover company and contacted these Chinese companies as potential buyers of wood flooring products from the United States. EIA investigators visited ten of these companies in person in China as well as their mills in Russia. In these conversations, EIA asked about their knowledge of illegal logging in Russia, their own exposure to that illegal logging, and how they interacted with their customers, particularly customers from the United States. EIA detailed these results in a report, which is attached hereto as Exhibit A.[1]

78. The investigation revealed that Lumber Liquidators' primary supplier for hardwood flooring, Xingjia, is the dominant player in the cross-border trade of illegal timber between the

---

[1] *See also* http://www.youtube..com/watch?v=UKqwMH2N0vc, EIA's investigative video, which details the extent and nature of illegal logging in the Russian Far East (RFE) and tracks illegally harvested valuable hardwoods across the border into China, through factories and warehouses, to its ultimate destination in showrooms around the world.

RFE and China. According to EIA investigators, U.S. import records and undercover visits with Xingjia confirmed that its largest customer is Lumber Liquidators.

79. As Lumber Liquidators has stated in its SEC filings, any single mill may provide as much as 4% of its hardwood purchases. Xingjia owns and operates three factories in northeast China as well as at least 14 sawmills in the RFE province of Khabarovsk.

80. In conversations with EIA undercover investigators posing as potential buyers, the president of Xingjia, Mr. Sun, and other Xingjia officials openly described Xingjia's detailed system for sourcing illegal timber – illegally cutting outside of their concession boundaries, overcutting within those boundaries, and purchasing over 90% of their stocks from trading companies throughout the RFE which do not provide the required proof of legality of sourcing.

81. Xingjia officials also openly admitted to EIA investigators posing as buyers that their illegal operations were maintained through bribery and high-level political connections with both Russian and Chinese officials.

82. Moreover, numerous suppliers identified by Xingjia had strong ties to illegal logging. For example, three employees of one supplier identified by Xingjia, including its head of timber harvesting, were sentenced to prison in 2010 for illegal logging, and more company employees are currently under investigation. A different supplier is the subject of a sweeping investigation into illegal logging. These are the two largest cases of illegal logging to be uncovered in Khabarovsky Province in the past three years, and both firms under investigation (Beryozoviy and Investstroy) are Xingjia suppliers. According to EIA investigators, Xingjia openly acknowledged these companies as sources for their wood.

83. Xingjia's connection to illegal sourcing would be obvious to anyone doing business with Xingjia. The EIA report states that numerous sources throughout the RFE reported to

undercover EIA investigators that at least 80% of all trees harvested in the area are done so illegally.

84. Also, a simple Russian-language Google search for Xingjia's suppliers, such as "Beryozoviy illegal logging Khabarovsk" or "Investstroy illegal logging" brings up news articles describing recent illegal logging violations on the first page of results.

85. According to Confidential Witness #5 ("CW5"), a member of EIA who was involved in EIA's undercover investigation of illegal logging in the RFE, Xingjia was well known to Russian logging enforcement agencies as one of the worst illegal loggers in the region. "If you are Lumber Liquidators, all you would do is, first of all, Google the name of the company, and then go to forest enforcement offices if you have any interest in avoiding illegal wood," CW5 said. "You ask [the enforcement office]: 'Is my main supplier involved in this?'" CW5 said the answer would have been, "Yes."

**Defendants Knew or Were Reckless in Not Knowing Of the Illegal Sourcing**

86. Lumber Liquidators has received hardwood flooring from Xingjia since at least 2007. As described above, beginning in 2011, the Company strengthened its control over its suppliers in China through the purchase of Sequoia, its Shanghai-based quality control manager, and routine visits to mills and manufacturers by the Company's quality control teams as well as senior management, including Defendant Lynch and the head of sourcing, Schlegel.

87. Xingjia' president and manager of Russian operations, Mr. Sun, stated that since Lumber Liquidators' recent purchase of Sequoia, the Company was taking a more direct role in supply chain management in China. Mr. Sun confirmed that since 2011, high level management from Lumber Liquidators visited Xingji and its mills in the RFE on multiple occasions.

88.    In late 2011, Mr. Sun gave the EIA investigators (who were posing as buyers) a tour of Xingjia's operations in Russia and openly revealed during their very first meeting that much of Xingjia's operations involved illegally harvesting protected wood in Russia and that they also were illegally over-harvesting wood on their own land in China. According to Mr. Sun, he gave a similar tour to a high-level U.S. management team of senior executives from Lumber Liquidators.    According to CW5, Mr. Sun told undercover investigators that the "head of sourcing" for Lumber Liquidators was on the tour, and said the executive had previously worked for Home Depot.    According to the Lumber Liquidators' SEC filings, William Schlegel is the Company's Chief Merchandising Officer and previously worked at Home Depot for nearly 10 years, holding "global procurement and merchandising roles."

89.    During their visit, EIA investigators observed stacks of pallets of Lumber Liquidators' Virginia Mill Works hand-scraped solid oak flooring outside the factory, ready for export.    Inside the factory, the entire production line was hard at work to fill the remainder of this particular Lumber Liquidators purchase order.    Pictures of Lumber Liquidators' oak flooring at Xingjia's Dalian facilities, taken by EIA investigators, are provided below.





90.    Mr. Yu, who manages Xingjia's Dalian facilities and is the brother-in-law of Xingjia President Mr. Sun, told EIA investigators that the raw material for these shipments included oak from Russia.  During a second visit to Dalian Xingjia in early 2012, Mr. Yu stated that around half of the oak used in flooring for Lumber Liquidators came from Russia.  According to CW5, Mr. Yu openly admitted that Xingjia "misdeclared" the source of wood for its products.  Mr. Yu told CW5 that his company declared Russian wood as Chinese wood for tax purposes as well as to avoid scrutiny from enforcement agencies because any wood that is declared as Russian in origin receives intense scrutiny due to the high likelihood that it was harvested illegally.

91.    When CW5 asked Mr. Yu if Lumber Liquidators, was aware of this illegal harvesting activity, Mr. Yu said, "Yes, of course they know that."

92.    Mr. Yu's statements have been confirmed through testing of the wood.  During its visits, EIA obtained eleven samples of boards and manufactured flooring by the Suifenhe and Dalian facilities of Xingjia.  Five of these eleven samples were cut from a batch of flooring which EIA investigators personally observed Xingjia workers preparing for shipment to Lumber

Liquidators. EIA sent these samples to a respected laboratory with decades of expertise in stable isotopic analysis for testing. Preliminary results from stable isotopic analysis indicated that every sample provided was RFE in origin. For 18 out of 20 of these samples, the analysis gave a confidence level of 95% or greater. These results indicate that all of the samples received from Xingjia were sourced from the forests of Khabarovsk Province – the forests where Xingjia openly admitted to be illegally sourcing, and where its suppliers have previously been convicted of, and are currently suspected of, illegal logging.

93.     Mr. Sun told EIA investigators that he and his managers provided a tour similar to the one provided to EIA investigators to a high-level team of U.S. executives from Lumber Liquidators during a visit in early 2012, which included Lumber Liquidators' U.S. "head of sourcing" operations – Schlegel – as well as two representatives from the Company's Shanghai office. According to Mr. Sun, this tour included a trip to Xingjia's operations in Khabarovsk, visiting sawmills and meeting with local officials in the RFE.

94.     Mr. Yu, who accompanied these officials on their visit, reported that Lumber Liquidators officials were not troubled at all by what they saw. To the contrary, Lumber Liquidators has expanded its relationship with Xingjia. For example, Mr. Yu explained to EIA investigators that Lumber Liquidators was moving its production of hand-scraped solid oak flooring from multiple suppliers to Xingjia and, in May 2012, Lumber Liquidators' head of sourcing operations visited Xingjia's offices and sawmills in the RFE to ensure that Xingjia's oak "supply was secure for a long time."

95.     U.S. import records confirm that imports of solid oak flooring from Xingjia have not only continued since the Company's May 2012 visit, but have increased. Based on U.S. custom forms, EIA investigators estimate that Lumber Liquidators has received at least 35

separate shipments, containing nearly three million square feet, of hand-scraped solid oak flooring alone from Xingjia in the period from May 2012 until August 2013. By 2013, Xingjia was Lumber Liquidators' chief Chinese supplier of hand-scraped solid oak flooring.

**Defendants Conceal Their Illegal Sourcing**

96.    In U.S. import data, the "Commodity" field is a blank space that importers fill in with description of the shipment contents.  EIA's analysis of U.S. flooring imports indicates that in 2011 Lumber Liquidators included a detailed product description in this field.  The image below is an example for a particular shipment obtained by EIA, which arrived in Norfolk, Virginia on November 6, 2011 (the text below the image reproduces in larger print the top entry):



SOLID WOOD FLOORING SEQUOIA PO:23315-**XIN/ LUMB** ER PO:4500013182 VMCM5 ¾"X4-3/4" VIRGINIA MILLWORKS CAMBRIDGE 10011755 NAME ACCOUNT: LUMBER LIQUTDATORS,SERVICES LLC CY TO CY MSCU5654274 SOLID WOOD FLOORING SEQUOIA PO:23316-**XIN**/LUMB ER PO:4500013183 VMCM5 ¾"X4-3/4" VIRGINIA M ILLWORKS CAMBRIDGE 10011755 NAME ACCOUNT:LUMB ER LIQUTDATORS,SERVICES LLC CY TO CY SCZU3257740

97. The Shipper, Consignee, and Notify Party fields for this shipment had been removed on publicly available versions of the data. However, this field indicates clearly the manufacturer (XIN = Xingjia), destination (Lumber Liquidators) and the product (Virginia Mill Works Cambridge hand-scraped solid oak flooring). The Purchase Order (PO) numbers for this particular shipment match the numbers photographed on boxes at Xingjia's Dalian factory during a visit in late 2011 by undercover EIA investigators.

98. After Lumber Liquidators purchased Sequoia and began its "sourcing initiatives", Defendants began concealing the source of the Company's wood. First, Mr. Yu told EIA investigators that in late 2011 to early 2012, Lumber Liquidators gave Xingjia a new stamp which marks every flooring board with three letters "HEX" and with the date of manufacture. Mr. Yu explained that HEX stood for Huanan Hexin, Xingjia's other factory in northeastern China, but that the same stamp was used in both the Huanan Hexin and in the Dalian Xingjia factories. This stamp concealed Dalian Xingjia as a source.

99. EIA also determined that by mid-2012, U.S. import data indicates that Lumber Liquidators decreased the amount of identifying information in its shipments by removing the manufacturer name, making shipments more difficult for third parties to track. The import record for the shipment that EIA investigators observed during their visit to Dalian Xingjia in early 2012, which arrived in Norfolk on May 18, 2012, (the text of which is reproduced below) illustrates this change:

> SOLID WOOD FLOORING VM HS CAMBRIDGE OAK
> ¾"X4-3/4" OLD ARTICLE NUMBER:VMCM5,10011755
> PO:45 00040263 CY TO CY MSCU5855896 SOLID
> WOOD FLOORING VM HS CAMBRIDGE OAK ¾"X
> 4 ¾" OLD ARTICLE NUMBER:VMCM5,10011755 PO:45
> 00040264 CY TO CY TCLU4024436.

100. Xingjia was not the only manufacturer that Lumber Liquidators used that illegally sourced its wood. EIA investigators determined that during 2011, when the "Commodity" field included the manufacturer's name, Lumber Liquidators received five product lines of Virginia Mill Works hand-scraped solid oak flooring (Cambridge, Coventry, Old World, Tuscany, and Windsor) from five separate manufacturers, identifiable in import data by their three-letter abbreviations; XIN (Dalian Xingjia), HEX (Huanan Hexin), GRH (Zhejiang Dadongwu Greenhome), BXW (unknown) and SGF (unknown).[2]

101. Zhejiang Dadongwu Greenhome ("Greenhome"), a flooring company located near Shanghai, and a primary supplier of hand-scraped solid flooring to Lumber Liquidators in 2011, reported to EIA investigators that although it regularly imports oak logs from Germany, those logs are supplied by mills (including Xingjia) that harvest from Russia. Greenhome told EIA investigators that Lumber Liquidators (who is aware of the true harvesting/sourcing) declared all shipments from Greenhome as German on the declaration forms required under the Lacey Act because the "U.S. market and government don't like [wood from] Russia."

102. An example of a fraudulent Lacey Act Declaration, dated May 3, 2012, is reproduced below. As can be seen from the form, Lumber Liquidators is identified as the importer. The product imported is "Quercus Mongolicus", which is more commonly known as Mongolian oak. As the name suggests, this tree is native to several Asian regions, including eastern Russia – not Germany. Nevertheless, Germany has been indicated as the "Country of Harvest."

---

[2] EIA investigators were unable to ascertain the identity of the last two companies BXW and SGF, but both imported fewer than five shipments of solid oak flooring in 2011, and so appear to be minor suppliers compared to Dalian Xingjia, Huanan Hexin, and Zhejiang Dadongwu Greenhome.

According to the Paperwork reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0579-0349. The time required to complete this information collection is estimated to average 0.5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

OMB APPROVED
0579-0349
Exp. Date:

**SECTION 1 - Shipment Information**

**Plant and Plant Product Declaration Form**

Section 3: Lacey Act Amendment (16 U.S.C. 3372)

APHIS

**U.S. DEPARTMENT OF AGRICULTURE**
ANIMAL AND PLANT HEALTH INSPECTION SERVICE

1. ESTIMATED DATE OF ARRIVAL: (MM/DD/YYYY)
05/03/2012

2. ENTRY NUMBER:

3. CONTAINER NUMBER: ☐ See Attachment
AXIU4004823

4. BILL OF LADING:
MSCUE2937992

5. MID:
CNZHEDAD2599ZHE

6. IMPORTER NAME:
LUMBER LIQUIDATORS SERVICES,LLC

7. IMPORTER ADDRESS:
3000 JOHN DEERE ROAD,TOANO,VA 23168,USA

8. CONSIGNEE NAME:
LUMBER LIQUIDATORS SERVICES,LLC

9. CONSIGNEE ADDRESS:
3000 JOHN DEERE ROAD,TOANO,VA 23168,USA

10. DESCRIPTION OF MERCHANDISE:
SOLID HARDWOOD FLOORING

**SECTION 2 - Compliance with Lacey Act Requirements (16 U.S.C. 3372(f))**

For each article or component of an article, provide the following:

| 11. HTSUS NUMBER: (no dashes/symbols) | 12. ENTERED VALUE: | 13. ARTICLE/COMPONENT OF ARTICLE | 14. PLANT SCIENTIFIC NAME: Genus | Species | 15. COUNTRY OF HARVEST: | 16. QUANTITY OF PLANT MATERIAL: | 17. UNIT: | 18. PERCENT RECYCLED: |
|---|---|---|---|---|---|---|---|---|
| 4 4 1 8 . 9 0 . 4 6 | 45,321.12 | SOLID WHITE OAK | QUERCUS | MONGOLICA | GERMANY | 1,800 | m^2 | 0 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

I certify under penalty of perjury that, to the best of my knowledge and belief, the information furnished is true and correct:

Version 08-15-2011-0856
PPQ FORM 505
AUGUST 2011

Preparer's Phone Number and Area Code | Signature | Type or Print Name | Date

Knowingly making a false statement in this Declaration for importation may subject the declarant to criminal penalties in accordance with 16 U.S.C. 3372(d).

Page 1

103. Lowe's and Home Depot each (i) are larger than Lumber Liquidators, (ii) also purchase directly from manufacturers in China (indeed, Defendant Lynch gained his experience in sourcing from China while working at Home Depot) and, (iii) have historically had comparable gross margins to Lumber Liquidators. Nevertheless, following the implementation of the Company's "sourcing initiatives" in 2011, its gross margins skyrocketed beyond anything ever experienced by any of the three companies. Graphs depicting this change are provided below:

| Gross Margin | | | | | |
|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** | **2013** |
| **Lowe's** | 34.86% | 35.14% | 34.56% | 34.30% | 34.59% |
| **Home Depot** | 33.9% | 34.3% | 34.5% | 34.6% | 34.8% |
| **Lumber Liquidators** | 35.7% | 34.8% | 35.3% | 38.0% | 41.1% |



## MATERIALLY FALSE AND MISLEADING
## STATEMENTS MADE DURING THE CLASS PERIOD

104. Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's products failed to comply with applicable laws and regulations governing formaldehyde emissions from composite wood products under the CARB standards; (ii) the Company imported flooring products sourced from illegally logged wood in the RFE in violation of the Lacey Act; (iii) the Company misrepresented the country of harvest on custom forms,

failing to indicate that the wood in the products had been harvested from the RFE, in violation of the Lacey Act; (iv) the Company had inadequate internal controls for ensuring compliance with the Lacey Act and the CARB standards; (v) the decrease in the Company's cost of product and increase in margins were achieved as a result of violations of the Lacey Act and the CARB standards; (vi) a substantial portion of the Company's earnings and revenues were thereby earned as a result of the violation of these laws; (vii) the Company's gross margin expansion was not sustainable, and the Company faced the risk of large fines, penalties, forfeitures, judgments and/or settlements in connection with government regulatory actions and/or consumer class actions related to its practices; and (viii) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

**2011 Annual Report**

105. On February 22, 2012, the Company issued a press release announcing its financial results for the quarter and year end December 31, 2011. For the quarter, the Company reported net income of $8.5 million, or $0.30 per diluted share, and $174.5 in net sales, compared to net income of $5.9 million, or $0.21 per diluted share, and $153.2 in net sales in the fourth quarter of 2010. Gross margin for the fourth quarter 2011 was 35.5% compared to 34.0% in the fourth quarter 2010. The Company attributed the increase in gross margin in part to the "lower product costs due primarily to the continued implementation of sourcing initiatives. . ." For the year, the Company reported net income of $26.3 million, or $0.93 per diluted share, and net sales of $681.6 million compared to net income of $26.3 million, or $0.93 per diluted share, and net sales of $620.3 in 2010. Gross margin for the year increased to 35.3% compared to 34.8% in 2010.

106. On February 22, 2012, the Company filed an annual report with the SEC on a Form 10-K for the year ended December 31, 2011, which was signed by, among others, Defendants

Lynch, Terrell and Sullivan, where it reiterated the Company's previously reported financial results and financial position. In addition, the 2011 Form 10-K contained certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX").

107. The foregoing representations in ¶¶ 105-106 were materially false and/or misleading for the reasons set forth in ¶ 104(v)-(viii).

108. For 2011, the Form 10-K also represented the following concerning the Company's business:

> Our value proposition to the customer is a key driver of our business. Important components include:
>
> • **Price.** A fundamental part of our business model is to provide quality hardwood flooring at everyday low prices. *We are able to maintain these prices across our product range because we generally purchase flooring directly from mills*.
>
> ***
>
> • **Quality.** *We believe that we have achieved a reputation for quality, and that our proprietary brands are recognized for excellence by our customers. We work directly with our supplier mills to source and produce flooring that will meet our high quality standards*.

109. The foregoing representations in ¶ 108 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(v), (vii)-(viii).

110. Concerning the Company's suppliers, the 2011 Form 10-K stated that: "We work directly with a select group of vendors and mills with whom we have cultivated relationships that provide for a consistent supply of high-quality product at the lowest prices. As part of ensuring the high-quality nature of our brands, we have developed demanding product standards. … We select suppliers based on a variety of factors, including their ability to supply products that meet industry grading standards and our specifications." It went on to state "We believe that we are

the largest customer for most of our suppliers, which we believe enables us to obtain better prices in some circumstances."

111. The foregoing representations in ¶ 110 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(v), (vii)-(viii).

112. Concerning government regulations bearing on formaldehyde and the harvesting wood, the 2011 Form 10-K stated the following:

> *Our suppliers are subject to the laws and regulations of their home countries, including in particular laws regulating forestry and the environment. We consult with our suppliers as appropriate to ensure that they are in compliance with their applicable home country laws.*
>
> \*\*\*
>
> *In addition, certain of our products are subject to laws and regulations relating to the importation, acquisition or sale of illegally harvested plants and plant products and the emissions of hazardous materials. We work closely with our suppliers to ensure compliance with the applicable laws and regulations in these areas.*
>
> We believe that we currently conduct, and in the past have conducted, our activities and operations in substantial compliance with applicable laws and regulations relating to the environment and protection of natural resources, and believe that any costs arising from such laws and regulations will not have a material adverse effect on our financial condition or results of operations*. . .*

113. The foregoing representations in ¶ 112 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(iv), (vii)-(viii).

114. Concerning the Company's gross margins, the 2011 Form 10-K attributed the increase primarily to the company's close and direct oversight of its suppliers through its "sourcing initiatives", which were described as follows:

> *Sourcing Initiatives.* In 2011, we began a process which will continually challenge the structure of our sourcing relationships with our vendor-mill partners and ultimately strengthen our relationships with the best international and domestic partners, and eliminate weaker sources. *Our sourcing initiatives play a key role in maintaining the best combination of quality and value in our*

*product assortment and will continue to result in lower net product costs,*
*enabling us to strengthen the value proposition to our customer.* . . . Through
our own international sourcing operations and working directly with our vendor-
mill partners, we can better control product cost and quality, enhance forecasting
and broaden our product assortment. As aligned with our strategic long-term
goals, we utilize our balance sheet to control raw material costs through scale not
available to our vendor-mill partners.

115. The foregoing representations in ¶ 114 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(v), (vii)-(viii).

116. On a conference call with analysts on February 22, 2012, to discuss the Company's 4Q 2011 and full year 2011 results, Defendant Lynch emphasized that the Company would continue to "focus on sourcing" in China, which would be key to the Company's future financial results:

We will continue to execute the strategy we've pursued over the last year,
conducting line reviews and expanding our product assortments. We expect to
further leverage our China office following our acquisition last year. And we will
continue to work closely with our vendor partners to develop strong, long-term
relationships.

Defendant Terrell, echoed Lynch's remarks, asserting that these sourcing initiatives would lead to a lower cost of product and higher margins, stating that "where our sourcing initiatives either allow us to reduce certain basic stocking levels or the product will come from a new source in 2012, often at a lower cost." Terrell continued, "I think the real long-term benefit is that ability to be closer to the mill, challenge the purchase cycle, look at broad-based assortment of lower-cost products. And that's what is ahead of us in 2012. So it certainly gave us some lift in 2011, but the real power is coming in 2012.

117. The foregoing representations in ¶ 116 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(viii).

## Website Representations

118. At least as early as April 6, 2012 the Company's website represented, under the heading "Eco-friendly Flooring" that "Our flooring comes from managed forests", stating that "Lumber Liquidators offers flooring brands that practice responsible harvesting. . . . Tree cutting is monitored very carefully within a selective cutting and replanting strategy. . . . Flooring mills must submit harvesting plans to the local government for approval. As a part of this process, they map and grid the land affected and take an inventory of the trees (size and species) in each grid. The government will then approve the plan and the mills must cut to it. There are limitations on the number and size of each species that can be harvested from each grid and then they must move to the next grid. Once a grid is harvested, they cannot go back there until 30 years has passed."[3]

119. The foregoing representations in ¶ 118 were materially false and/or misleading for the reasons set forth in ¶ 104(ii)-(iv), (vii)-(viii).

## Quarterly Report for 1Q 2012

120. On April 25, 2012, the Company issued a press release announcing its financial results for the quarter ended March 31, 2012. For the quarter, the Company reported quarterly net sales of $188 million, net income of $8.1 million, or $0.29 per diluted share, compared to net sales of $159.7 million, net income of $5.8 million, or $0.20 per diluted share, in the first quarter of 2011. Gross margin was 37.3% in the first quarter of 2012 compared to 36.2% in the first quarter of 2011. The Company and Defendant Lynch attributed the increase in gross margin to a "lower costs of product" due to "sourcing initiatives".

---

[3] http://web.archive.org/web/20130716135521/http://www.lumberliquidators.com/ll/flooring/ECOfriendly

121. On April 25, 2012, the Company filed a quarterly report with the SEC on a Form 10-Q for the first quarterly period ending March 31, 2012, where it reiterated the Company's previously reported financial results and financial position. The report was signed by Defendant Terrell, and contained certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX.

122. The foregoing representations in ¶¶ 120-121 were materially false and/or misleading for the reasons set forth in ¶ 104(v)-(viii).

123. On a conference call with analysts on April 25, 2012, to discuss the Company's 1Q 2012 results, Defendant Lynch stated highlighted the impact that the Company's "sourcing initiatives" have had on gross margin: "In terms of sourcing, we are executing the strategy we have employed in recent quarters, performing line reviews and expanding our product assortments. We will continuously foster our vendor relationships and work closely with our vendor partners around the world to further enhance our sourcing strategies. I'm impressed with the team's performance in this area, the benefits of which are reflected in our gross margin and operating income." Providing more detail, Defendant Terrell stated "Within our sourcing initiatives, gross margin in the first quarter of 2012 benefited relative to 2011, due to the continuing impact of line reviews and an increase in direct sourcing from certain international vendors which were serviced by Sequoia prior to our acquisition in the third quarter of last year, partially offset by lower vendor allowances."

124. The foregoing representations in ¶ 123 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(v), (vii)-(viii).

125. On this news, the Company's stock price increased $4.01, or 17%, from $23.47 on April 24, 2012 to $27.48 on April 26, 2012, on unusually high trading volume.

**Quarterly Report for 2Q 2012**

126.  On July 25, 2012, the Company issued a press release announcing its financial results for the quarter ended June 30, 2012.  For the quarter, the company reported quarterly net sales of $210.3 million, net income of $12.2 million, or $0.43 per diluted share, compared to net sales of $175.5 million, net income of $5.3 million, or $0.19 per diluted share, in the second quarter of 2011.  Gross margin was 37.3% in the second quarter of 2012 compared to 34.0% in the second quarter of 2011. The Company once again attributed the increase in gross margin to a "lower costs of product" due to "sourcing initiatives".

127.  On July 25, 2012, the Company filed a quarterly report with the SEC on a Form 10-Q for the period ending June 30, 2012 signed by Defendant Terrell, where it reiterated the Company's previously reported financial results and financial position.  In addition, the Form 10-Q certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX.

128.  The foregoing representations in ¶¶ 126-127 were materially false and/or misleading for the reasons set forth in ¶ 104(v)-(viii).

129.  On a conference call with analysts on July 25, 2012, to discuss the Company's 2Q 2012 results, Defendant Lynch again asserted that the reason for the company's higher gross margin was the lower costs gained as a result of the "sourcing initiatives":

> To touch on sourcing. We continue to perform line reviews and consider potential product assortment expansions to align with the evolving needs and preferences of our consumer. ***Our sourcing initiatives and optimization of our supply chain continue to positively impact and expand gross margin***. . . . Additionally, our close working relationships with our vendor partners worldwide enable us to continue enhancing our sourcing strategies. And we remain committed to seeking direct relationships with all of our vendors. As many of you know, our fall 2011 acquisition provides us with direct relationships with our vendor mills in China. . . . ***We have restructured our sourcing and quality control practices and removed certain third-party distributors to strengthen our relationships in this key area***. .

. . ***As our Chief Merchant, Bill Schlegel, and his teams have dug in with the vendors and done these line reviews***, it's not just been about first cost. It's been about the assortment, expanding.

Defendant Terrell also represented that the Company's line reviews and other sourcing initiatives were the cause for the decline in cost of product and increase in gross margins:

> Overall, our cost of product continued to benefit from shifts in our sales mix and the continuing benefit of our sourcing initiatives. Together, these benefits drove an improvement of approximately 250 net basis points. ***Within our sourcing initiatives, gross margin continued to benefit from the impact of line reviews and the establishment of direct relationships with our vendor mills, particularly in China, following our September 2011 acquisition.***

130. The foregoing representations in ¶ 129 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(v), (vii)-(viii).

131. On this news, the Company's stock price increased $8.73, or 26.8%, from $32.58 on July 24, 2012 to $41.31 on July 25, 2012, on unusually high trading volume.

**August and September 2012 Analyst Conferences**

132. On a conference call with analysts for the Canaccord Genuity Global Growth Conference on August 16, 2012, Defendant Lynch identified the Company's sourcing as its "key competitive advantage" in its price, selection and quality: "Our sourcing – direct sourcing is a key competitive advantage in our price, selection and quality in our stores. . . . Quality and availability, because we work directly with the mills, we better control the quality of the product, which allows us industry-leading warranties."

133. The foregoing representations in ¶ 132 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(viii).

134. On a conference call with analysts for the Goldman Sachs Global Retailing Conference on September 6, 2012, in response to analyst Matthew J. Fassler's observation that "gross margin has been the biggest story for you. And within that, sourcing has probably been

the biggest driver", and request for more detail regarding the Company's sourcing efforts, Defendant Lynch stated that sourcing was "the most important" driver of the Company's gains in gross margin – "only buying direct from factory, no middle man, no distributors, working directly with those factories, expanding our factory base."  He further stated that the "line reviews" had been "very effective" in reducing costs and that more reductions could be expected: "We feel that we are about 50% the way through conducting the line reviews in terms of the categories and the cost of goods in terms of that."

135.  The foregoing representations by Defendants in ¶ 134 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(v), (vii)-(viii).

**Quarterly Report for 3Q 2012**

136.  On October 24, 2012, the Company issued a press release announcing its financial results for the quarter ended September 30, 2012.  For the quarter, the company reported quarterly net sales of $204.3 million, net income of $12.9 million, or $0.46 per diluted share, compared to net sales of $172.0 million, net income of $6.7 million, or $0.24 per diluted share, in the third quarter of 2011.  Gross margin was 38.1% in the third quarter of 2012 compared to 35.6% in the second quarter of 2011. The Company once again attributed the increase in gross margin to a "lower costs of product" due to "sourcing initiatives".

137.  On October 24, 2012, the Company filed a quarterly report with the SEC on a Form 10-Q for the period ending September 30, 2012 signed by Defendant Terrell, where it reiterated the Company's previously reported financial results and financial position.  In addition, the Form 10-Q certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX.

138. The foregoing representations in ¶¶ 136-137 were materially false and/or misleading for the reasons set forth in ¶ 104(v)-(viii).

139. On a conference call with analysts on October 24, 2012, to discuss the Company's 3Q 2012 results, Defendant Terrell stated that the quarters increase in gross margin was again a direct result of the "line reviews" and other "sourcing initiatives", including the Company's quality control procedures:

- "Within our sourcing initiatives, gross margin continued to benefit from both the impact of line reviews and the close, direct relationships we have with our vendor mills."

- "[W]e're making investments in our quality control procedures and strengthening our relationships with vendors where we feel like we'll eventually get some gross margin benefit   here as well."

- "It's – because we've now had a stronger relationship than Asia after our acquisition of September of 2011, that opened up the market to additional vendors who may show up at a line review. It also strengthens the direct relationship that we have. So whether the benefit of a lower cost of product is strictly related to the line review or the acquisition of that office and the relationship with the vendor, it's hard to parse that out."

140. The foregoing representations in ¶ 139 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(v), (vii)-(viii).

141. On this news, the Company's stock price increased $5.67 (11.3%) from $50.14 on October 23, 2012 to $55.81 on October 24, 2012, on unusually high trading volume.

***The Company's Supplier Code of Conduct***

142. At least as early as November 11, 2012, the Company's website represented that the Company ensures that every supplier complies with the Company's "Supplier Code of Conduct with Respect to Environmental and Social Responsibility":

Since 2007, each of our suppliers has been required to comply with our supplier code of conduct. . . . Over the years, we have worked directly with a select group of vendors and mills with whom we have cultivated long-standing relationships. We often pay announced and unannounced visits to our suppliers' mills and

forests and assess their adherence to our code of conduct and its protocols concerning labor as well as health and safety matters. In many cases, we visit potential suppliers to assess their ability to comply with our environmental and social policies prior to ordering products from them. . . . In the event we learn that any employee or supplier has engaged in behavior that has violated our policies, we would take appropriate remedial action.[4]

143. The foregoing representations in ¶ 142 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(iv), (vii)-(viii).

**2012 Annual Report**

144. On February 20, 2013, the Company issued a press release announcing record financial results for the quarter and year end December 31, 2012. For the quarter, the Company reported net income of $13.8 million, or $0.50 per diluted share, and $210.7 in net sales, compared to net income of $8.5 million, or $0.30 per diluted share, and $174.5 in net sales in the fourth quarter of 2011. Gross margin for the fourth quarter 2011 was 39.1% compared to 35.5% in the fourth quarter 2011. The Company attributed the increase in gross margin in part to the "lower product costs due primarily to the continued implementation of sourcing initiatives. . ." For the year, the Company reported net income of $47.1 million, or $1.68 per diluted share, and net sales of $813.3 million compared to net income of $26.3 million, or $0.93 per diluted share, and net sales of $681.6 in 2011. Gross margin for the year increased to 38.0% compared to 35.3% in 2011.

145. On February 20, 2013, the Company filed an annual report with the SEC on a Form 10-K for the period ended December 31, 2012, which was signed by, among others, Defendants Lynch, Terrell and Sullivan. In addition, the 2012 Form 10-K contained certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX.

---

[4]http://web.archive.org/web/20131020150207/http://www.lumberliquidators.com/assets/images/product_page/California_Supply_Chains_Act.pdf

146. The foregoing representations in ¶¶ 144-145 were materially false and/or misleading for the reasons set forth in ¶ 104(v)-(viii).

147. The 2012 Form 10-K reported the Company's previously reported financial results and financial position. Concerning the Company's competitive strengths, the 2012 Form 10-K stated that "We believe that our sourcing directly from the mill provides the foundation for the strongest value proposition in a highly-fragmented hardwood flooring market . . ." as follows:

> **Sourcing Direct from the Mill**
> *Our Suppliers*. We believe that our vertically integrated business model enables us to offer a broad assortment of high-quality products to our customers at a lower cost than our competitors. We work directly with a select group of vendors and mills with whom we have cultivated strong relationships that provide for a consistent supply of our products. We select suppliers based on a variety of factors, including their ability to supply products that meet industry grading standards and our demanding product specifications, which support the high-quality nature of our brands. We believe that we are the largest customer for most of our suppliers, which we believe enables us to obtain better prices in some circumstances.

148. The foregoing representations in ¶ 147 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(viii).

149. Concerning the company's "sourcing initiatives", the 2012 Form 10-K stated that "Our sourcing initiatives play a key role in maintaining the best combination of quality and value in our product assortment, while reducing product costs.":

> These initiatives are segregated into three primary areas, which are being implemented independently over a multi-year time frame, as follows:
>
> - Volume-based discounts and cost sharing for a range of continuing programs, including marketing, product samples and new store openings;
>
> - Current and potential mill partners' participation in competitive line reviews of specific merchandise categories to evaluate breadth of assortment, quality, logistics and product cost; and

- Direct sourcing with international and domestic mills to control product cost and quality, enhance forecasting and broaden our product assortment.

150. The foregoing representations in ¶ 149 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(v), (vii)-(viii).

151. Concerning gross margin, the 2012 Form 10-K stated that a significant driver of gross margin expansion was a reduction in the "cost of product" resulting from the Company's "sourcing initiatives":

> ***Cost of Product:*** In both 2012 and 2011, gross margin benefited from our sourcing initiatives and shifts in our sales mix. Our sourcing initiatives, originally launched in the first quarter of 2011, include vendor allowances, line reviews and increases in the percentage of product we source direct from the mill. . . . In September 2011, we entered into an agreement to acquire certain assets of Sequoia Floorings Inc. ("Sequoia") relating to Sequoia's quality control and assurance, product development, claims management and logistics operations in China. ***We believe our cost of product was reduced, primarily in 2012, due to both the net cost reduction of owning those services and the benefits of working directly with the mills.***

152. The foregoing representations in ¶ 151 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(v), (vii)-(viii).

153. Concerning government regulation of the Company's foreign suppliers' operations, the 2012 Form 10-K stated in relevant part:

> ***Our suppliers are subject to the laws and regulations of their home countries, including in particular laws regulating labor, forestry and the environment. We consult with our suppliers as appropriate to ensure that they are in compliance with their applicable home country laws.*** We also support social and environmental responsibility among our supplier community and our suppliers agree to comply with our expectations concerning environmental, labor and health and safety matters. Those expectations include representations and warranties that our suppliers comply with the laws, rules and regulations of the countries in which they operate.

154. The foregoing representations in ¶ 153 were materially false and/or misleading for the reasons set forth in ¶ 104(ii)-(iv), (vii)-(viii).

155. Concerning government regulation of the Company's operations, the 2012 Form 10-K stated in relevant part:

> *In addition, certain of our products are subject to laws and regulations relating to the importation, acquisition or sale of illegally harvested plants and plant products and the emissions of hazardous materials. We work closely with our suppliers to ensure compliance with the applicable laws and regulations in these areas.*
>
> *We believe that we currently conduct, and in the past have conducted, our activities and operations in substantial compliance with applicable laws and regulations relating to the environment and protection of natural resources*, and believe that any costs arising from such laws and regulations will not have a material adverse effect on our financial condition or results of operations.

156. The foregoing representations in ¶ 155 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(iv), (vii)-(viii).

157. On a conference call with analysts on February 20, 2013, to discuss the Company's 4Q 2012 and full year 2012 results, Defendant Lynch stated that, once again, the Company's "sourcing initiative" have "continued to contribute significantly to our gross margin expansion": "Ongoing line reviews and product assortment evaluations have remained critical in our ability to align with customer preferences and flooring trends and these initiatives remain top priorities. We have been pleased with the reduction in product cost, but equally as important, our people have forged stronger relationships with our mills to deliver a broader assortment, enhanced availability and stronger control over product quality."

158. The foregoing representations in ¶ 157 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(v), (vii)-(viii).

159. During the same call, Defendant Terrell provided more detail, stating that as a result of sourcing initiatives, products costs were, as a percentage of net sales, 220 basis points lower:

Sourcing initiatives favorable to gross margin included the net benefit of direct relationships with our vendor mills, competitive line reviews and vendor cost sharing primarily through certain allowances.. . . . Looking back over the two years since initial implementation, our cost of product for the full year 2012 is 200 basis points lower than the full year 2011 and 340 basis points lower than the full year 2010. *We believe these sourcing initiatives have not only lowered product costs, they have facilitated the assortment expansion of premium products and enhanced product availability.*

160. The foregoing representations in ¶ 159 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(v), (vii)-(viii).

## Quarterly Report for 1Q 2013

161. On April 24, 2013, the Company issued a press release announcing record financial results for the quarter ended March 31, 2013. For the quarter, the company reported quarterly net sales of $230.4 million, net income of $15.8 million, or $0.57 per diluted share, compared to net sales of $188.0 million, net income of $8.1 million, or $0.29 per diluted share, in the first quarter of 2012. Gross margin was 40.4% in the first quarter of 2012 compared to 37.3% in the first quarter of 2012.

162. On April 24, 2013, the Company filed a quarterly report with the SEC on a Form 10-Q for the first quarterly period ending March 31, 2013 signed by Defendant Terrell, where it reiterated the Company's previously reported financial results and financial position. In addition, the Form 10-Q certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX. The report further stated in relevant part that "[i]n 2013 . . . [w]e expect to . . . [expand] gross margin through continued execution of our sourcing initiatives and optimization of our supply chain."

163. The foregoing representations in ¶¶ 161-162 were materially false and/or misleading for the reasons set forth in ¶ 104(v)-(viii).

164. On a conference call with analysts on April 24, 2013, to discuss the Company's 1Q 2013 results, Defendant Lynch again attributed the continued increase in gross margin to the sourcing initiatives: "The first thing I would tell you is our sourcing strategy and merchandising strategies are really focused on buying direct from the mill. No middlemen, going direct to them. So that's one thing that helps us. The other thing is, as you've noticed the last couple of years, we've been expanding our global sourcing operation, acquiring the office in China, we've diversified our mill base within China, within all of Asia."

165. The foregoing representations in ¶ 164 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(v), (vii)-(viii).

166. On this news, the Company's stock price increased $8.19, or 11.6%, from $70.49 on April 23, 2013 to $78.68 on April 25, 2012, on unusually high trading volume.

**THE TRUTH BEGINS TO EMERGE**

167. On June 20, 2013, an article published on SeekingAlpha.com revealed that, among other things, testing of one of Lumber Liquidators' branded wood flooring products (imported from China and sold in California) at two accredited independent laboratories found that formaldehyde emissions from the tested product were over 3.5x the maximum legal limit even though the product was labeled as being CARB-compliant. The article explained that the investigation into the quality of the Company's wood sourced from China came about as a result of the Company's explanation for how it has been able to continually produce record gross margins:

> The Company's stock has been on a tear, rallying 300% over the last year, primarily on dramatic expansion of its gross and net margins. Management has often made reference to the significance of its acquisition of Sequoia Floorings Inc., based in Shanghai, as a primary reason for the tremendous improvement in margins. Sourcing product in China is certainly hardly unknown to competitors, and skeptics have wondered how an $8 million acquisition could have such a dramatic effect on gross margin and bottom line, and more

importantly, enable Lumber Liquidators to undercut fierce price competitors such as Home Depot (HD) and Lowe's (LOW).

168. Samples of Lumber Liquidators house branding floor ("Mayflower" brand), which was imported from China and purchased from a Southern California Lumber Liquidators retail store, was provided to Berkeley Analytical, an IAS accredited testing laboratory. Samples from the same package were also submitted to NTA, one of the "gold standard" labs for the National Wood Flooring Association. Each lab independently confirmed that the product was in violation of the legal limit for formaldehyde. The article provided a photo of the product tested, which is reproduced below.



169. It also provided the lab results from Berkeley Analytical (reproduced below), showing that while the CARB standards require all Hardwood Plywood products sold in the state of California should emit no more than 0.05 ppm (parts per million), the samples tested emitted 0.17 ppm.



170. On this news, the Company's stock price declined $9.40, or 10.9%, from $86.03 on June 19, 2013 to $76.63 on June 21, 2013, on unusually high trading volume.

**Quarterly Report for 2Q 2013**

171. On July 24, 2013, the Company issued a press release announcing its financial results for the quarter ended June 30, 2013. For the quarter, the company reported quarterly net sales of $257.1 million, net income of $20.4 million, or $0.73 per diluted share, compared to net sales of $210.3 million, net income of $12.2 million, or $0.43 per diluted share, in the second quarter of 2012. Gross margin was 41.3% in the second quarter of 2012 compared to 37.3% in the second quarter of 2012. Defendant Lynch stated "Our value proposition of price, selection, quality, availability and expertise continues to be recognized by a growing customer base, and our commitment to continuous improvement drove strong performance throughout the organization. We are pleased that our coordinated efforts enabled us to capture additional market share and deliver record operating margin."

172. On July 24, 2013, the Company filed a quarterly report with the SEC on a Form 10-Q for the period ending June 30, 2013 signed by Defendant Terrell, where it reiterated the Company's previously reported financial results and financial position. In addition, the Form

10-Q certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX. The report further stated in relevant part that "[i]n 2013 . . . [w]e expect to . . . [expand] gross margin through continued execution of our sourcing initiatives and optimization of our supply chain."

173. The foregoing representations in ¶¶ 171-172 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(viii).

174. On a conference call on July 24, 2013, following the release of the Q2 2013 results, Defendant Lynch discussed the quality and sourcing of the Company's products, stating that "our mills comply with our product specs because we have personnel on the ground, in the mills. . . We don't rely on a distributor to measure and control our quality. . . We do stringent testing of our products at multiple levels beyond what's required. Our products are tested by third party experts both at the mill and then off-site . . . And we also go in and do random tests at the mill."

175. The foregoing representations in ¶ 174 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(iv), (vii)-(viii).

176. Emphasizing his and management's knowledge of the Company's sourcing practices, Defendant Lynch stated "I'd like to spend a few minutes today on quality, which is fundamentally important to the success of our premium brands and key to a loyal customer base. ***Sourcing directly from the mill provides the foundation for our entire value proposition. Due to our scale, we often purchase the majority of our mill partner's capacity, and as a result, we have insight and visibility throughout the sourcing process***." Defendant Lynch continued, stating that "This provides a significant competitive advantage compared to the distributor model of many of our competitors," specifically referring to "***Virginia Mill Works Handscraped***

*Hardwoods*" (which was one of the brands supplied by Xingjia) as an example of the Company's "high-quality" products.

177. The foregoing representations in ¶ 176 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(iv), (vii)-(viii).

178. Regarding regulatory compliance, Lynch stated as follows:

Our commitment to quality begins with well-designed product specifications, followed by *strict adherence to a set of internal standards set well above regulatory requirements*. Because of these standards, the products we sell nationally exceed the most stringent requirements of any state.

*We have developed quality control and assurance processes for our products that we believe lead our industry.* Due to our international sourcing, we have more than 60 professionals around the world, including in the U.S., Canada, China and South America, who perform and monitor those processes that we believe are most effectively executed on the ground at the mill.

*We augment the on-site controls with additional testing in both our own labs and in independent certified facilities.* The combination of our on-site controls and our additional testing is designed to ensure that our products exceed the highest regulatory requirements and meet our more stringent internal quality standards. As national standards are developed around product quality, construction and packaging, we will engage in and intend to lead our industry in the process.

179. The foregoing representations in ¶ 178 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(iv), (vii)-(viii).

180. On this news, the Company's stock price increased $6.00, or 6.9%, from $86.61 on July 23, 2013 to $92.61 on July 24, 2013, on unusually high trading volume.

**August and September 2013 Analyst Conferences**

181. On a conference call with analysts for the Canaccord Genuity Growth Conference on August 14, 2013, Defendant Lynch asserted that the Company's advantage on cost, price and sourcing was a result of the size of the Company and its sourcing team lead by Schlegel:

We absolutely have a world-class sourcing team. Our chief merchant, Bill Schlegel, and the team that he has built under him is better than I've ever seen in my career. . . . [I]t's because of our size. I mean, all we do is hardwood flooring, okay? That gives us an advantage so we're able to have people on the ground, in foreign markets, working directly with the mills."

182. The foregoing representations in ¶ 181 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(iv), (vii)-(viii).

183. On a conference call with analysts for the Goldman Sachs Global Retailing Conference on September 10, 2013, in which Lynch, Terrell and Schlegel participated, Defendant Lynch represented that the dramatic increase in gross margins since 2011 was a result of the Company's $8 million acquisition of Sequoia and the sourcing initiatives (direct purchasing and line reviews), which Lynch again emphasized as being spearheaded by the Company's Chief Merchandising Officer, Schlegel:

Margin has been a big driver for us and this guy [William K. Schlegel] has been a big part of that, our chief merchant. . . . But one major thing, we've been last couple of years is really going back to being 99% direct to the factory, big driver. Not getting direct and working more closely with them and we also shifted to real thorough and professional line of new process that Bill has spearheaded. That has driven margin enhancement.

184. The foregoing representations in ¶ 183 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(v), (vii)-(vii).

**Federal Authorities Raid Lumber Liquidators' Corporate Offices**

185. On September 26, 2013, agents from the DHS, FWS and DOJ executed sealed search warrants at Lumber Liquidators' corporate offices in Toano and Richmond, Virginia, related to the importation of certain wood products.

186. On September 27, 2013, in a press release, the Company stated:

Lumber Liquidators (NYSE: LL), the largest specialty retailer of hardwood flooring in North America, today commented on actions taken by Federal authorities, which relate to the importation of certain of the Company's wood

flooring products. Yesterday, sealed search warrants were executed at the Company's corporate offices in Toano and Richmond, Virginia by the Department of Homeland Security's Immigration and Customs Enforcement and the U.S. Fish and Wildlife Service. The Company takes its sourcing and compliance very seriously, and is cooperating with authorities to provide them with requested information.

187. On this news, the Company's stock price declined $5.83 (5.2%) from $112.96 on September 26, 2013 to $107.13 on September 27, 2013, on unusually high trading volume.

188. In the same press release that announced the raid by the federal authorities, the Company continued to deny any impropriety as to the sourcing of their products:

Due to the scale of its international and domestic operations, Lumber Liquidators has policies and procedures in place for the sourcing, harvesting and manufacturing of its products designed to comply with federal and other regulations related to the importation of wood flooring products. The Company has more than 60 professionals around the world who perform and monitor those processes. Quality is a key component of Lumber Liquidators' value proposition, and through its commitment to continuous improvement, the Company invests significant resources for quality control and assurance.

189. The foregoing representations in ¶ 188 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(iv), (vii)-(viii).

190. On October 9, 2013, the Wall Street Journal ("WSJ") reported that the EIA had provided copies of the findings in the EIA Report to federal authorities prior to the government raid. The WSJ cited an unnamed source that the federal agents who conducted the raid "were looking for evidence the [Company] had imported wood products from forests in far eastern Russia…"

**Quarterly Report for 3Q 2013**

191. On October 23, 2013, the Company issued a press release announcing its financial results for the quarter ended September 30, 2013. For the quarter, the Company reported quarterly net sales of $254.3 million, net income of $20.4 million, or $0.73 per diluted share,

compared to net sales of $204.3 million, net income of $12.9 million, or $0.46 per diluted share, in the third quarter of 2012. Gross margin was 41.8% in the third quarter of 2013 compared to 38.1% in the second quarter of 2012.

192. On October 23, 2013, the Company filed a quarterly report with the SEC on a Form 10-Q for the period ending September 30, 2013 signed by Defendant Terrell, where it reiterated the Company's previously reported financial results and financial position. In addition, the Form 10-Q certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX.

193. The foregoing representations in ¶¶ 191-192 were materially false and/or misleading for the reasons set forth in ¶ 104(v)-(viii).

194. On a conference call on October 23, 2013, following the release of the Q3 2013 results, Defendant Lynch addressed the sealed search warrant issued by federal authorities and denied that the Company engaged in any illegal sourcing: "I can assure you of our commitment to uncompromising integrity and ethical business conduct across all areas of Lumber Liquidators' operations. We expect and require the same of our suppliers. Working together, we strive to advance responsible forest management." Defendant Lynch went on to stress the quality of the Company's sourcing practices and its product:

> The nature of our supplier relationships within our direct sourcing model allows us to develop and produce the highest quality merchandise and the broadest assortment at industry-leading value. We believe these direct relationships are unique in our industry and provide us with a competitive advantage.
>
> ***
>
> Once we establish a mill relationship, we monitor and enforce our specifications and practices through more than 60 employees dedicated to quality control and assurance located on the ground in the U.S., Canada, China and South America. We invest significant time and resources to safeguard quality and enforce product compliance, and we terminate relationships with suppliers we believe are not adhering to those standards."

195. The foregoing representations in ¶ 194 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(iv), (vii)-(viii).

196. On this news, the Company's stock price increased $5.17 (4.75%) from $108.82 on October 22, 2013 to $113.99 on October 23, 2013, on unusually high trading volume.

**Whitney Tilson Presentation**

197. On November 21, 2013, well known hedge fund manager Whitney Tilson criticized the Company for importing illegally sourced timber from Russia in direct violation of U.S. laws. Analyzing the Company's dramatic increase in margins since 2011, and the Company's assertion that it is a result of the Sequoia acquisition and other sourcing initiatives, Mr. Tilson sought to answer the question "How could a tiny $8 million acquisition have such a big impact???", observing that "It's not like directly sourcing wood from mills in China is some great secret, unavailable to Home Depot, Lowe's and others…". Discussing the EIA's Liquidating the Forests report and the federal government's September 26th raid on the Company, Mr. Tilson demonstrated that the Company was only able to maintain its unbelievably high margins, and thus inflate its revenues, as a result of importing illegal timber. For example, Mr. Tilson concluded that "While the largest mill supplying [Lumber Liquidators] only accounts for 4% of LL's hardwood purchases, I think it is likely that a meaningful percentage of the 51% of [Lumber Liquidators'] wood sourced in Asia is from Chinese mills that are trafficking in illegal wood."

198. On this news, the Company's stock price declined $13.55 (11%) from $115.36 on November 21 to $101.81 on November 22, on unusually high trading volume.

## 2013 Annual Report

199.  On February 19, 2014, the Company issued a press release announcing financial results for the quarter and year end December 31, 2013.  For the quarter, the Company reported net income of $20.8 million, or $0.74 per diluted share, and $258.4 million in net sales, compared to net income of $13.8 million, or $0.50 per diluted share, and $210.7 million in net sales in the fourth quarter of 2012.  Gross margin for the fourth quarter 2011 was 40.8% compared to 39.1% in the fourth quarter 2012.  The Company attributed the increase in gross margin in part to the "lower net product costs."  For the year, the Company reported net income of $77.4 million, or $2.77 per diluted share, and net sales of $1 billion compared to net income of $47.1 million, or $1.68 per diluted share, and net sales of $813.3 million in 2012. Gross margin for the year increased to 41.1% compared to 38.0% in 2012.

200.  On February 19, 2014, the Company filed an annual report with the SEC on a Form 10-K for the period ended December 31, 2013, which was signed by, among others, Defendants Lynch, Terrell and Sullivan, where it reiterated the Company's previously reported financial results and financial position.  In addition, the 2013 Form 10-K contained certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX.

201.  The foregoing representations in ¶¶ 199-200 were materially false and/or misleading for the reasons set forth in ¶ 104(v)-(viii).

202.  Concerning the Company's competitive strengths, the 2013 Form 10-K stated that "Sourcing directly from the mill provides the foundation for [the Company's] value proposition . . ."  As to price, the Form 10-K stated "Our retail prices in each merchandise category are generally lower than our competitors. . . . We are able to maintain these prices through our direct sourcing model, including the relationship with the mill . . .."

203. The foregoing representations in ¶ 202 were materially false and/or misleading for the reasons set forth in ¶ 104 (i)-(viii).

204. Concerning the Company's "sourcing model", the 2013 Form 10-K stated as follows:

**Our Direct Sourcing Model**
*Supplier Relationships*. ***We believe sourcing directly from mills enables us to offer a broad assortment of high-quality, proprietary products to our customers at a consistently lower cost than our competitors***. We seek to establish strong relationships with mills around the world where the significance of our scale, breadth of assortment and liquidity allow for both higher quality and lower cost. We believe our collaborative relationship enhances the mills' productivity, yield and financial flexibility, such that we access lower net costs than our competitors. We are able to set demanding specifications for product quality and our own quality control and assurance teams are on-site at the mills, coordinating inspection and assurance procedures. . . . ***We seek long-term, core relationships with mills committed to our demanding product specifications, sustainable supply and regulatory compliance***.

205. The foregoing representations in ¶ 204 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(v), (vii)-(viii).

206. Concerning the Company's "sourcing initiatives", the 2013 Form 10-K stated that "Our sourcing initiatives play a key role in maintaining the best combination of quality and value in our product assortment, while reducing product costs.":

These initiatives, now a continuous and integral part of our sourcing strategy and process, can be segregated into three primary areas:

- Volume-based discounts and cost sharing for a range of continuing programs, including marketing, product samples and new store openings;

- Current and potential mill partners' participation in competitive line reviews of specific merchandise categories to evaluate breadth of assortment, quality, logistics and product cost; and

- Direct sourcing with international and domestic mills to control product cost and quality, enhance forecasting and broaden our product assortment.

207. The foregoing representations in ¶ 206 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(v), (vii)-(viii).

208. Concerning gross margin, the 2013 Form 10-K stated that a "significant driver[] of gross margin expansion" was a "[s]ourcing initiatives, including line reviews and the percentage of product we source direct form the mill, generally lowered net costs from our suppliers. . ."

209. The foregoing representations in ¶ 208 were materially false and/or misleading for the reasons set forth in ¶ 104 (i)-(v), (vii)-(viii)

210. Concerning government regulation of the Company's foreign suppliers' operations, the 2013 Form 10-K stated in relevant part:

> ***Our suppliers are subject to the laws and regulations of their home countries, including in particular laws regulating labor, forestry and the environment. We consult with our suppliers as appropriate to ensure that they are in compliance with their applicable home country laws.*** We also support social and environmental responsibility among our supplier community and our suppliers agree to comply with our expectations concerning environmental, labor and health and safety matters. Those expectations include representations and warranties that our suppliers comply with the laws, rules and regulations of the countries in which they operate.

211. The foregoing representations in ¶ 210 were materially false and/or misleading for the reasons set forth in ¶ 104(ii)-(iv), (vii)-(viii).

212. Concerning government regulation of the Company's operations, the 2013 Form 10-K stated in relevant part:

> ***In addition, certain of our products are subject to laws and regulations relating to the importation, acquisition or sale of illegally harvested plants and plant products and the emissions of hazardous materials. We work closely with our suppliers to ensure compliance with the applicable laws and regulations in these areas.***
>
> ***We believe that we currently conduct, and in the past have conducted, our activities and operations in substantial compliance with applicable laws and regulations relating to the environment and protection of natural resources***.

213. The foregoing representations in ¶ 212 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(iv), (vii)-(viii).

214. Concerning sustainable forestry, the 2013 Form 10-K stated "We are committed to uncompromising integrity across our operations, and quality is a key component of our value proposition. The scale of our purchasing and diversity of products require sustainable forestry. We invest significant time and resources to safeguard quality and comply with regulatory requirements. We discontinue sourcing from suppliers not adhering to our standards. We seek long-term relationships with mills that can provide sustainable and growing supplies of high-quality product."

215. The foregoing representations in ¶ 214 were materially false and/or misleading for the reasons set forth in ¶ 104(ii)-(iv), (vii)-(viii).

216. On a conference call with analysts on February 19, 2014, to discuss the Company's 4Q 2013 and full year 2013 results, Defendant Lynch stated that, "The direct sourcing relationships we have with our mills around the world have never been stronger, which enables us to offer the highest quality merchandise and the broadest assortment at the lowest prices. . . [W]e have always been and remain committed to uncompromising integrity and ethical business conduct across all areas of the company's operations. We expect and require the same of our suppliers and work together to advance responsible forest management."

217. The foregoing representations in ¶ 216 were materially false and/or misleading for the reasons set forth in ¶ 104(ii)-(iv), (vii)-(viii).

218. In reference to the federal search warrant served at the end of September 2013, Lynch stated, "In combination with our internal team, we have engaged third-party resources, including forensic specialists, to review our sourcing in Northern China. These review efforts are

in addition to our continuing investment in product sourcing processes and practices over the last two years. I remain confident in these processes and practices, which are designed to elicit adherence to our comprehensive standards for quality and compliance, which we believe exceed industry standards. Overall, our direct sourcing model is intact and our diversified sourcing across more than 150 suppliers will continue to afford us the flexibility to add or remove vendors quickly, seamlessly and appropriately as needed."

219. The foregoing representations in ¶ 218 were materially false and/or misleading for the reasons set forth in ¶ 104(ii)-(iv), (vii)-(viii).

220. Concerning gross margin, Defendant Terrell stated, "in the fourth quarter, the product margin category drove 210 basis points of gross margin expansion . . . Within product margin, our sourcing initiatives continued to lower net product cost. . ."

221. The foregoing representations in ¶ 220 were materially false and/or misleading for the reasons set forth in ¶ 104(i)-(v), (vii)-(viii).

222. On this news, the Company's stock price increased $4.98, or 5.2%, from $95.60 on February 18, 2014 to $100.58 on February 19, 2014, on unusually high trading volume.

**Quarterly Report for 1Q 2014**

223. On April 30, 2014, the Company issued a press release announcing financial results for the quarter ended March 31, 2014. For the quarter, the company reported quarterly net sales of $246.3 million, net income of $13.7 million, or $0.49 per diluted share, compared to net sales of $230.4 million, net income of $15.8 million, or $0.57 per diluted share, in the first quarter of 2013. Gross margin was 41.1% in the first quarter of 2014 compared to 40.4% in the first quarter of 2013.

224. On April 30, 2014, the Company filed a quarterly report with the SEC on a Form 10-Q for the first quarterly period ending March 31, 2014 signed by Defendant Terrell, where it reiterated the Company's previously reported financial results and financial position. In addition, the Form 10-Q certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX. The report further stated in relevant part that gross margin benefited from "[s]ourcing initiatives [that] lowered net costs from our suppliers."

225. The foregoing representations in ¶¶ 223-224 were materially false and/or misleading for the reasons set forth in ¶ 104(v)-(viii).

226. On a conference call with analysts on April 30, 2014, to discuss the Company's 1Q 2014 results, Defendant Lynch again attributed the continued increase in gross margin to the sourcing initiatives: "Turning now to our gross margin, which expanded 70 basis points to 41.1% in the first quarter, . . ..  Within product margin, gross margin benefited by 50 basis points, as sourcing initiatives continued to lower net product costs . . ."

227. In response to an analyst's question, "should that product-based gross margin gain be bigger in the second quarter than what you experienced in the first?", Terrell stated "As far as throughout the rest of the year, we would expect that to increase. We're looking at a greater expansion of gross margin for the full year than we saw given these 70 bps. And product will continue to take the lead in that. . . . [P]roduct margin will drive gross margin expansion during the year."

228. The foregoing representations in ¶ 226-227 were materially false and/or misleading for the reasons set forth in ¶ 104 (v)-(viii).

**Second Quarter 2014 Business Update**

229. On July 9, 2014, after the close of trading, the Company updated its second quarter earnings forecast. The Company announced, among other things, that its gross margin in the second quarter of 2014 was expected to contract in comparison to the second quarter of 2013, resulting in the first year-over-year contraction of gross margin since the second quarter of 2011. The Company also reported second quarter sales of only $263.1 million and announced that it expected to report EPS of only $0.59-$0.61, well below the consensus of $303.2 million and $0.90. Multiple analysts noted that Whitney Tilson correctly predicted that the Company stock would drop to $53 as the Company struggled to clean up its illegal supply chain in China.

230. On the July 9, 2014, business update call, Defendant Lynch attributed the "aggregated net sales shortfall in the second quarter of up to $18 million" to reduced traffic at their stores, which was significantly a result of inventory unavailability due to the company's foreign suppliers needing to comply with stricter compliance controls:

> "*Our inventory was constrained in certain key products, including laminates, vinyl plank and engineered hardwoods, as certain of our mills experienced production delays in meeting our open orders, as we continued to enhance our quality assurance requirements*. . . . Across all product categories with constrained inventory, we estimate an aggregate net sales shortfall in the second quarter of up to $18 million. . . *.[W]e have continued to implement enhanced controls throughout our supply chain*. For example, we changed the timing and level of supporting documentation required from our international mills. . . *.[C]ertain mills and their supply chains experienced delays in meeting the revised requirements*. We underestimated the impact that these requirements would create at any individual mill, and we did not anticipate the aggregate impact on our supply chain."

231. In response to an analyst's question regarding the cause for the estimated "aggregate net sales shortfall in the second quarter of up to $18 million" Defendant Terrell stated, "the constrained inventory situation that we called out impacted all stores regardless of the category they were in."

232. No doubt was left as to the specific cause to the financial shortfall after an analyst asked "geographically is there any one particular source country where you had the biggest QA challenges?"

[Terrell]: Asia.

[Lynch]: Yes. In Asia.

[Analyst]: And are you . . .

[Terrell]: China.

[Lynch]: Yeah.

[Analyst]: Specifically, China? Yes?

[Lynch]: Yes.

233. On this news, the Company's stock price declined $15.17, or 21.5%, from $70.42 on July 9, 2014 to $55.25 on July 10, 2014, on unusually high trading volume. By July 15, 2014, the Company stock was trading at $53.85, less than half of the Class Period high of $115.36.

234. On July 30, 2014, the Company issued a press release announcing financial results for the quarter ended June 30, 2014. For the quarter, the Company reported quarterly net sales of $263.1 million, net income of $16.6 million, or $0.60 per diluted share, compared to net sales of $257.1 million, net income of $20.4 million, or $0.73 per diluted share, in the second quarter of 2013. Gross margin was 40.4% in the second quarter of 2014 compared to 41.3% in the second quarter of 2013. Selling, general and administrative expenses in the second quarter of 2014 increased $6.1 million, or 8.3%, to 79.1 million.

235. On a conference call with analysts on July 30, 2014, to discuss the Company's 2Q 2014 results, Defendant Terrell stated "As most of you know, we segregate our gross margin drivers into those associated with our product, including our sales mix; those associated with transportation; and those associated with all other costs. *In product, our margin decreased 80 basis* points after an increase of 320 basis points in the second quarter of 2013. *We believe the*

*conditions of lower customer count and constrained inventory levels led to shifts in our net sales mix that were adverse to gross margin*."

<u>**ADDITIONAL SCIENTER ALLEGATIONS**</u>

236. In addition to the facts alleged above demonstrating Defendants knowledge and/or reckless disregard of the Company's sourcing scheme, Defendants' and other insiders' stock transactions during the Class Period were unusual and well-timed to take advantage of the inflated stock price before the fraud was revealed to the market, indicating knowledge that Defendants' statements had inflated the Company stock price.

<u>**Transactions by Defendant Lynch**</u>

237. As of May, 2013 Lynch held 34,000 shares of unrestricted stock (all but 7,147 of which had been granted to him by the Company). He also owned 130,040 options with a strike price of $26.73.

238. Prior to May, 2013, Lynch's lone stock sale occurred on January 17, 2012 when he sold 1,492 shares for $19.94 per share under Transaction Code "F" indicating that the sale was for "Payment of exercise price or tax liability by delivering or withholding securities incident to the receipt, exercise or vesting of a security issued in accordance with Rule 16b-3."

239. Lynch's trading changed dramatically in May 2013 when the Company's stock reached unprecedented heights as a result of the fraud. Between May 14, 2013 and July 31, 2013, *Lynch engaged in a wholesale selloff of stock, exercising 129,960, or 99.94% of his vested options*, selling the shares for a total of $12,000,831.39, reaping an instantaneous profit of $8,525,931.39. During this time, Lynch also sold an additional 24,500 shares of stock for $2,100,917.03. By the time the government raided the Company's headquarters on September 26, 2013, Lynch owned only 10,000 shares of unrestricted stock.

**Transactions by Defendant Terrell**

240. Terrell has been with the Company since 2006. Prior to November 2012, Terrell owned 170,122 vested stock options (150,405 of which had vested by March 2011), and he had independently purchased 7,000 shares of stock. During this six year and four month period, Terrell did not exercise a single option or sell a single share of stock. On November 7, 2012, after the Company's stock price had increased from $19.17 at the start of the Class Period to $58.04, ***Terrell exercised over 94% of his vested options, selling 116,960 shares of stock*** at an average price of 57.858, for a total of $6,767,071.68, an immediate profit of $5,873,675.99. On July 31, 2013, after additional options vested in March 2013, Terrell exercised another 21,750 options, selling them for an average price of $97.3958, for a total of $2,118,358.65 and a profit of $1,692,588.55. Following the July 31, 2013 transaction, Terrell had exercised ***over 97%*** (all but 5,367) of his vested options. ***In total, between November 7, 2012 and July 31, 2013, Terrell sold a total of 138,710 shares, for a total of $8,885,430.33 and a profit of $7,566,264.54.***

**Transactions by Defendant Sullivan**

241. Upon the Company's purchase of Sequoia on September 28, 2011, Defendant Sullivan held 2,199,801 shares of Company stock. During the Class Period (when the stock price was inflated by the fraud), Sullivan did not purchase a single share of stock. Rather, following the acquisition of Sequoia, between November 11, 2011 and September 26, 2013 (when federal agents raided the Company's corporate offices), ***Sullivan sold 1,590,803 shares, over 72% of his holdings, for a total of $60,216,632.10***. Sullivan's last sale was on August 22, 2013, just one month before the raid.

**Transactions of Defendant Schlegel**

242.  As of July 29, 2013, Schlegel owned 15,591 vested stock options.  Prior to this date (and prior to the Class Period) he had not sold a single share of stock or exercised a single option.  ***On July 29, 2013 he exercised every last one of his vested options and sold all 15,591 shares at an average price of $93.3521, a total of $1,455,452.59, an instant profit of $1,076,997.44.***  Following this transaction, Schlegel owned only 685 shares that were not restricted.

**Coordination of Transactions by Insiders**

243.  When transactions of insiders are examined together, a suspicious pattern of sales emerges.  Between May 3, 2013 and May 24, 20113, when the Company's stock was hitting record highs, fluctuating between $81.90 and $89.91, the following insider transactions occurred:

- Defendant Sullivan sold 200,000 shares for $16,455,671.13;
- Defendant Lynch sold 104,500 shares for $9,277,848.42;
- Marco Pescara (Chief Marketing Officer) sold 28,199 shares for $2,533,292.81;
- E. Jean Matherne (Senior V.P.) sold 7,124 shares for $594,511.34;
- Livingston B. Haskell (Secretary and General Corporate Counsel) sold 2,500 shares for $223,125;
- Douglas T. Moore (Director) sold 10,547 shares for a total of $914,213; and
- John M. Presley (Director) sold 3,739 shares for $323,577.

In total, these insiders sold 356,607 shares for $30,322,238.70 during this three week period.

244. Similarly, between July 24, 2013 and August 5, 2013, immediately after announcing record results on July 24, 2013, which resulted in a one day $6.00 increase and record stock prices as high as $96.82 per share, the following insider transactions occurred:

- Defendant Lynch sold 50,000 shares for $4,823,900;
- Terrell sold 21,750 shares for $2,118,358.65;
- Schlegel sold 15,591 shares for $1,455,452.59;
- Pescara sold 6,012 shares for $584,667, and
- Haskell sold 5,000 shares for $482,250;

In total, these insiders sold 98,353 shares for $9,464,628.24 during this 12-day window. Moreover, on August 22, 2013, Sullivan sold 100,000 shares for an additional $10,159,420.

245. After the above transactions, the following were the holdings of each insider not individually discussed above in ¶¶ 204 - 209:

- Pescara held only 3,001 shares (having sold 87,381 shares during the Class Period);
- Matherne held only 4,000 shares (having sold 13,109 shares during the Class Period);
- Haskell held only 2,095 shares (having sold 7,500 shares during the Class Period); and
- Moore held only 1,965 shares (having sold 25,547 shares during the Class Period)

246. Management's coordinated and wholesale dump of securities in the summer of 2013 prior to the revelation of the fraud did not go unnoticed by analysts. On May 29, 2013 an article appeared in Barron's titled "Lumber Liquidators Execs Sell Near All-Time High: Seven insiders sold $30.3 million in shares of the flooring retailer", detailing how "From May 6 through 28, seven insiders including the company's founder and top executive sold 355,909 shares to the tune of $30,259,377, an average of $85.02 each", including 200,000 shares by Sullivan and 104,500 shares by Lynch. InsiderScore, which monitors and reports on trading activity by company insiders, also noted the unusual stock sales.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

247. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Lumber Liquidators securities during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their

legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

248. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Lumber Liquidators securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Lumber Liquidators or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

249. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

250. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

251. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Lumber Liquidators;

- whether the Individual Defendants caused Lumber Liquidators to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Lumber Liquidators securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

252. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

253. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Lumber Liquidators securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Lumber Liquidators securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

254. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

255. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

256. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

257. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

258. During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Lumber Liquidators securities; and (iii) cause Plaintiffs and other members of the Class to

purchase Lumber Liquidators securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

259. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Lumber Liquidators securities and options. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Lumber Liquidators' finances and business prospects.

260. By virtue of their positions at Lumber Liquidators, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

261. Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or

directors of Lumber Liquidators, the Individual Defendants had knowledge of the details of Lumber Liquidators' internal affairs.

262. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Lumber Liquidators. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Lumber Liquidators' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Lumber Liquidators securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Lumber Liquidators' business and financial condition which were concealed by defendants, Plaintiffs and the other members of the Class purchased Lumber Liquidators securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

263. During the Class Period, Lumber Liquidators securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Lumber Liquidators securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said securities or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiffs and the Class, the true value of Lumber Liquidators securities

were substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Lumber Liquidators securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

264. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

265. As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure of the alleged corrective disclosures.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

266. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

267. During the Class Period, the Individual Defendants participated in the operation and management of Lumber Liquidators, and conducted and participated, directly and indirectly, in the conduct of Lumber Liquidators' business affairs.

268. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Lumber Liquidators' financial condition and results of operations, and to correct promptly any public statements issued by Lumber Liquidators which had become materially false or misleading.

269. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and

public filings which Lumber Liquidators disseminated in the marketplace during the Class Period concerning Lumber Liquidators' financial prospects. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Lumber Liquidators to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Lumber Liquidators within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Lumber Liquidators securities.

270. Each of the Individual Defendants, therefore, acted as a controlling person of Lumber Liquidators. By reason of their senior management positions and/or being directors of Lumber Liquidators, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Lumber Liquidators to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Lumber Liquidators and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

271. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Lumber Liquidators.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.     Requiring defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  November 26, 2014

**COHEN MILSTEIN SELLERS
& TOLL PLLC**

  /s/ Elizabeth A. Aniskevich

Steven J. Toll (Va. Bar #15300)
Daniel S. Sommers
S. Douglas Bunch
Elizabeth A. Aniskevich (Va. Bar #81809)
1100 New York Ave. N.W.
Suite 500, East Tower
Washington, DC 20005-3965
Tel.: (202) 408-4600
Fax: (202) 408-4699
Email: stoll@cohenmilstein.com
        dsommers@cohenmilstein.com
        dbunch@cohenmilstein.com
        eaniskevich@cohenmilstein.com

*Liaison Counsel for Plaintiffs*

Jeremy A. Lieberman
Michael J. Wernke
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: 212-661-1100
Facsimile:  212-661-8665
Email: jalieberman@pomlaw.com
        mjwernke@pomlaw.com

Patrick V. Dahlstrom
**POMERANTZ LLP**
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: 312-377-1181
Facsimile:  312-377-1184
Email: pdahlstrom@pomlaw.com

*Counsel for Plaintiffs*