**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

| | |
|---|---|
| IN RE LUMBER LIQUIDATORS HOLDINGS, INC. SECURITIES LITIGATION | Master File No.: 4:13-cv-00157-AWA-DEM |
| | Hon. Arenda L. Wright Allen |
| | **<u>CLASS ACTION</u>** |
| | **<u>JURY TRIAL DEMANDED</u>** |

**CONSOLIDATED AMENDED COMPLAINT**
**<u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................... 1

II.   JURISDICTION AND VENUE ............................................................................. 9

III.  THE PARTIES...................................................................................................... 10

      A.    Lead Plaintiffs ........................................................................................... 10

      B.    Defendants ................................................................................................. 10

            1.    Corporate Defendant...................................................................... 10

            2.    Individual Defendants .................................................................... 11

IV.   OVERVIEW OF THE FRAUD............................................................................ 12

      A.    Background On Lumber Liquidators ......................................................... 12

            1.    History And Business Operations................................................... 12

            2.    Acquisition Of Sequoia And Implementation Of "Sourcing
                  Initiatives"...................................................................................... 14

            3.    Defendants' Knowledge Of Lumber Liquidators' Sourcing
                  Practices In China .......................................................................... 16

      B.    Applicable Government Regulations ......................................................... 21

            1.    The Lacey Act Bans The Import And Trade Of Illegally
                  Sourced Wood Products.................................................................. 21

            2.    The Protected Ecosystem Of The Russian Far East....................... 22

            3.    Government Regulation Of Formaldehyde In Composite
                  Wood Products................................................................................ 24

      C.    Defendants' Illegal Sourcing Of Timber In Violation Of The Lacey
            Act.............................................................................................................. 26

            1.    The Company Illegally Purchased Lumber Sourced From
                  the Russian Far East....................................................................... 26

            2.    Xingjia's Executives Further Confirm Defendants' Illegal
                  Sourcing Activities......................................................................... 29

            3.    Lumber Liquidators Concealed The Illegal Sourcing.................... 32

      D.    Defendants' Illegal Selling Of Laminate And Engineered
            Hardwood Flooring With High Levels Of Formaldehyde ........................ 36

i

1.   Sourcing From China .................................................................... 37

2.   Xuhua Zhou Conducted Independent Tests Of Lumber
     Liquidators' Chinese-Made Laminates ...................................... 38

3.   Additional Independent Tests Demonstrate That Lumber
     Liquidators Chinese-Made Laminates Were 100 Times
     Above Legal Limits Set By Proposition 65 ............................... 42

4.   *60 Minutes*' Independent Tests And Investigation Of
     Lumber Liquidators' Chinese-Made Laminates ....................... 44

5.   The Company's Defective And Insufficient Quality Control
     For Formaldehyde Emissions ..................................................... 50

6.   Aftermath And Regulatory Actions In Response To The *60
     Minutes* Report .......................................................................... 52

V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
      OMISSIONS ............................................................................................ 53

      A.   2011 Annual Report ................................................................... 54

      B.   Website Representations ............................................................ 60

      C.   Quarterly Report For 1Q 2012 .................................................. 61

      D.   Quarterly Report For 2Q 2012 .................................................. 63

      E.   August And September 2012 Analyst Conferences .................... 66

      F.   Quarterly Report For 3Q 2012 .................................................. 68

      G.   The Company's Supplier Code of Conduct ................................ 70

      H.   2012 Annual Report ................................................................... 71

      I.   Quarterly Report For 1Q 2013 .................................................. 78

      J.   Quarterly Report For 2Q 2013 .................................................. 79

      K.   August And September 2013 Analyst Conferences .................... 83

      L.   September 27, 2013 Press Release .............................................. 85

      M.   Quarterly Report For 3Q 2013 .................................................. 86

      N.   December 10, 2013 Investor Conference .................................... 88

      O.   2013 Annual Report ................................................................... 89

      P.   Quarterly Report For 1Q 2014 .................................................. 97

      Q.   Quarterly Report For 2Q 2014 ................................................ 100

R.      Quarterly Report For 3Q 2014 .............................................................. 102

S.      2014 Annual Report ................................................................................ 104

VI.     THE INDIVIDUAL DEFENDANTS PROFITED FROM THEIR
        FRAUDULENT SCHEME ........................................................................... 111

        A.      Insider Trading Allegations ..................................................... 111

        B.      Defendants' Bonus Compensation Was Linked To Gross Margins
                And Operating Income ........................................................... 114

VII.    ADDITIONAL ALLEGATIONS OF SCIENTER ....................................... 116

VIII.   LOSS CAUSATION ................................................................................. 122

IX.     PRESUMPTION OF RELIANCE ............................................................ 129

X.      INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND
        BESPEAKS CAUTION DOCTRINE ........................................................ 130

XI.     CLASS ACTION ALLEGATIONS ........................................................... 131

COUNT I  (For Violations Of Section 10(B) And Rule 10b-5 Promulgated
         Thereunder Against The Company, Lynch, Terrell, And Sullivan) ............... 134

COUNT II  (For Violations Of Section 20(a) Of The Exchange Act Against The
          Individual Defendants) ..................................................................... 137

XII.    PRAYER FOR RELIEF ............................................................................ 138

XIII.   DEMAND FOR TRIAL BY JURY ........................................................... 139

## CLASS ACTION COMPLAINT

Lead Plaintiffs Gregg Kiken ("Kiken"), Keith Foster ("Foster"), David Lorenzo ("Lorenzo"), and Charles Hickman ("Hickman") (collectively "Plaintiffs" or "Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters based upon the investigation conducted by and through their attorneys, which included, among other things, review and analysis of Lumber Liquidators Holdings, Inc.'s ("Lumber Liquidators" or the "Company") public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports, and reports from investigative journalists and investment advisors about the Company. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants, who purchased Lumber Liquidators securities between February 22, 2012 and February 27, 2015, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").[1]

---

[1] Defendants include Lumber Liquidators, the Company's founder Thomas D. Sullivan, President and Chief Executive Officer ("CEO") Robert M. Lynch, Chief Financial Officer ("CFO") Daniel E. Terrell, and Chief Merchandising Officer William K. Schlegel (together the "Individual Defendants" and along with Lumber Liquidators, collectively the "Defendants").

2.     During the Class Period, Lumber Liquidators and its founder and top officers reported record gross margins which were significantly higher than its major competitors (Home Depot and Lowe's). Defendants misrepresented that the major driver of these high margins were legitimate "sourcing initiatives" implemented by the Company in China designed to reduce the cost of goods, cut out middlemen, increase control by the Company, and strengthen relationships with their suppliers.

3.     In truth, however, the Company was purchasing wood from suppliers in China that had been illegally harvested from protected forests in the Russian Far East (or "RFE"), home to the critically endangered Siberian tiger and Far East leopard, both among the rarest animal species on the planet. Such practices led to the execution of sealed search warrants at the Company's corporate offices by agents for the Department of Homeland Security ("DHS"), U.S. Fish and Wildlife Service ("FWS"), and the Department of Justice ("DOJ").

4.     The Company was also purchasing engineered and laminate flooring manufactured in China that contained and emitted dangerously high and illegal levels of formaldehyde, a known carcinogen that has "no safe level of exposure."

5.     As a result of disclosures on June 20, 2013, September 27, 2013, November 22, 2013, July 9, 2014, February 25, 2015, and March 1, 2015, the market learned the truth behind the Company's "sourcing initiatives" and its unprecedented record financial results. The Company's reported margins have now plunged.

6.     Lumber Liquidators is one of the largest specialty retailers of hardwood flooring in the United States. The Company sells directly to homeowners or to contractors acting on behalf of homeowners through its network of approximately 300 retail stores in 46 states.

7.     As a retailer of hardwood flooring, Lumber Liquidators is subject to various state and federal laws that regulate the harvesting and importation of wood used in its products as well as the chemicals used in its processing.  The Lacey Act bans the import and trade of illegally sourced wood products (including wood products sourced in violation of foreign laws).  The Lacey Act also requires importers to provide a basic declaration to accompany every shipment of timber or wood product into the United States, including the country of harvest, species, value and quantity of each shipment.  The Formaldehyde Standards for Composite-Wood Products Control Act and standards established by the California Air Resources Board ("CARB") establish limits for formaldehyde emissions for composite wood products.

8.     Lumber Liquidators operates in an intensely-competitive industry.  The Company controls 11% of the market.  Its two main competitors are Lowe's and Home Depot, which control 27% of the market.  Other national, regional, and local flooring stores comprise the remaining 62%.  Home Depot and Lowe's are bigger, more widely known, and have a larger international presence than Lumber Liquidators, enabling them to reduce their product cost.  As a result, the Company faces constant pressure to reduce prices while increasing margins in order to compete against the "big box" stores that offer convenience, selection, and savings.

9.     Since at least 2007, Lumber Liquidators – like Home Depot and Lowe's – has sourced a large portion of its products directly from manufacturers in China at lower costs in order to maximize its margins.  Through 2011, the gross margins for all three companies were comparable, fluctuating in the narrow range of 34% - 35% each year.

10.    Determined to lower the Company's product cost and increase its margins, Defendants purchased and imported wood products from Chinese mills that were illegally harvesting wood from protected forests in the RFE in violation of the Lacey Act, and contained

high and illegal levels of formaldehyde.  In the course of a multi-year undercover investigation by the Environmental Investigation Agency ("EIA"), Lumber Liquidators' largest supplier of hardwood in China admitted to illegally harvesting wood from the protected RFE, as well as to providing personal tours of these illegal operations to Lumber Liquidators' U.S. executives, including the Company's U.S. head of sourcing.

11.   As a result of these practices, Lumber Liquidators' margins and other financial results reached record levels during the Class Period.  For example, while gross margin for Lowe's and Home Depot remained between 34.3% and 34.8% for the years 2012 and 2013, Lumber Liquidators' gross margins skyrocketed to an astounding 41.8% by the third quarter 2013.

12.   Defendants knew and disclosed in the Company's public filings that "certain of our products are subject to laws and regulations relating to the importation, acquisition or sale of illegally harvested plants and plant products and the emissions of hazardous materials."  Yet, despite their awareness of numerous practices in violation of the laws, Defendants claimed, "[w]e work closely with our suppliers to ensure compliance with the applicable laws and regulations in these areas" and "[w]e believe that we currently conduct, and in the past have conducted, our activities and operations in substantial compliance with applicable laws and regulations relating to the environment and protection of natural resources."  Defendants claimed that the unprecedented margins and related financials were a result of legitimate "sourcing initiatives" that the Company implemented in China designed to reduce the cost of goods, cut out middlemen, increase control by the Company, and strengthen relationships with their suppliers.

13.   Throughout the Class Period, Defendants made false and misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and

4

prospects. Specifically, Defendants made false or misleading statements and failed to disclose that: (i) the Company sourced laminate and engineered flooring products that contained and emitted dangerously high levels of formaldehyde and that failed to comply with applicable laws and regulations governing formaldehyde emissions under CARB standards; (ii) the Company imported flooring products sourced from illegally harvested wood from the RFE in violation of the Lacey Act; (iii) the Company misrepresented the country of harvest on custom forms, failing to indicate that the wood in the products had been harvested from the RFE, in violation of the Lacey Act; (iv) the Company had inadequate internal controls for ensuring compliance with the Lacey Act and CARB standards; (v) the decrease in the Company's cost of product and increase in margins were achieved by sourcing flooring products that violate the Lacey Act and CARB standards; (vi) a substantial portion of the Company's earnings and revenues were thereby earned as a result of these practices and violations; and (vii) the Company's gross margin expansion was not sustainable, subjecting the Company to the risk of large fines, penalties, forfeitures, and judgments.

14. As a result of this scheme, the Company's stock price soared during the Class Period, from $19.17 to a high of $115.44 in less than two years. The Individual Defendants capitalized on the inflated share price and unloaded over $85 million worth of their own shares during the Class Period.

15. While they later claimed to be in the dark about the true source of the Company's reported margins, Defendants knew and recklessly disregarded the truth. The Individual Defendants were intimately involved in the Company's operations and sourcing in China, including through personal visits to mills and manufacturers on multiple occasions by Defendants Lynch and Schlegel. Even third parties easily determined through investigation that

Lumber Liquidators' Chinese-made products were manufactured with illegally harvested wood and contaminated with toxic levels of formaldehyde.

16.    Aspects of Defendants' sourcing scheme were only revealed when analysts began to do their own investigations into the Company's unusual margins.  On June 20, 2013, an article published on *Seeking Alpha* revealed that testing of one of Lumber Liquidators' branded wood flooring products (imported from China and sold in California) at two independent laboratories found that formaldehyde emissions from the tested product were 0.17 parts per million ("ppm"), over 3.5 times the maximum legal limit of 0.05 ppm imposed by CARB standards, even though the product was labeled as being compliant with CARB formaldehyde regulations.  On this news, the Company's stock price declined $5.53 per share, or 6.73%.  This information, however, was only a partial disclosure.  The Company continued to misrepresent its sourcing initiatives and margins.

17.    Defendants' sourcing scheme ultimately came to the attention of federal authorities.  Federal authorities received an advanced copy of a report titled "Liquidating the Forest" issued by the EIA, a non-profit organization that investigates and exposes environmental crimes around the world.  The report documented the results of a multi-year undercover investigation into illegal logging in the RFE.

18.    The investigation revealed that Lumber Liquidators' primary supplier for hardwood flooring in China, Suifenhe Xingjia Economic and Trade Company ("Xingjia"), is the dominant player in the cross-border trade of illegal timber from the RFE.  The investigation also revealed that several Lumber Liquidators executives, including Defendant Schlegel, visited Xingjia's offices and sawmills in the RFE several times in 2011 and 2012.  Thereafter, Lumber Liquidators made Xingjia its chief Chinese supplier of solid oak flooring.

19.   On September 26, 2013, agents from the DHS, FWS, and DOJ executed at the Company's corporate offices sealed search warrants related to the Company's importation of "wood products from forests in far eastern Russia."   On news of the search warrants, the Company's stock price declined $5.83 per share, or 5.16%.

20.   On November 22, 2013, Whitney Tilson ("Tilson"), a well-known hedge fund manager, made a presentation at an investor conference, explaining his conclusions that the Company's high margins were due to importing illegally sourced timber from Russia in direct violation of the Lacey Act.  Tilson also predicted that as a result of the regulatory scrutiny, the Company would be unable to maintain its increasing margins and that the Company's stock price would decline when the Company was forced to clean up its act.  In response, the Company's stock price declined $13.55 per share, or 11.75%.

21.   On July 9, 2014, after the close of trading, the Company updated its second quarter earnings forecast.  The Company announced, among other things, that its gross margin in the second quarter of 2014 was expected to contract in comparison to the second quarter of 2013, resulting in the first year-over-year contraction of gross margin since the second quarter of 2011. The Company also reported ***an aggregate net sales shortfall which Defendants admitted was a result of "constrained inventory" due to new "quality assurance requirements" in China***.  On this news, the Company's stock price declined $15.17 per share, or 21.54%, from $70.42 on July 9, 2014, to $55.25 on July 10, 2014.

22.   On February 25, 2015, Lumber Liquidators filed its annual report on Form 10-K which disclosed that the DOJ may file criminal charges for violation of import laws under the Lacey Act.  Also on February 25, 2015, Lumber Liquidators held a conference call to discuss fourth quarter results, during which Defendant Lynch disclosed that the DOJ "were either going

7

to come with a misdemeanor or a felony under the Lacey Act."   Defendant Lynch further disclosed during this conference call that the CBS News program, *60 Minutes,* would feature the Company in an "unfavorable light with regard to our sourcing and product quality, specifically related to laminates."

23.    In response, the Company's stock price declined $18.15 per share, or 26.39%, from $68.78 on February 24, 2015, to $50.63 on February 25, 2015.

24.    On the evening of March 1, 2015, *60 Minutes* news broadcasted a detailed report into Lumber Liquidators laminate wood products.   Based on an extensive investigation, tests performed on the products, and undercover surveillance, the report demonstrates that the products had higher levels of formaldehyde than competitors' products and violated California formaldehyde standards.   Three certified labs tested more than 150 boxes of Lumber Liquidators laminate flooring from stores around California.   The results showed that "every single sample of Chinese-made laminate flooring from Lumber Liquidators failed to meet California formaldehyde emissions standards.   Many by a large margin."[2]

25.    When *60 Minutes* provided two certified laboratories with 31 boxes of Lumber Liquidators Chinese-made flooring from stores located in Virginia, Florida, Texas, and New York, "[i]t turns out of the 31 samples of Chinese-made laminate flooring, only one was compliant with formaldehyde emissions standards.   Some were more than 13x over the California limit."[3]

---

[2] *Lumber Liquidators Linked to Health and Safety Violations*, *60 MINUTES* (Mar. 1, 2015), CBS News, available at http://www.cbsnews.com/news/lumber-liquidators-linked-to-health-and-safety-violations/ (last visited April 13, 2015).
[3] *Id.*

26.   *60 Minutes* sent undercover investigators with hidden cameras to the city of Changzhou, China.   The investigators posed as buyers and visited three different mills that manufacture laminate flooring on behalf of Lumber Liquidators.   The results of the undercover investigation confirmed the violations:

> Employees at the mills **openly admitted** that they use core boards with higher levels of formaldehyde to make Lumber Liquidators laminates, saving the company 10-15 percent on the price.  At all three mills **they also admitted falsely labeling the company's laminate flooring as CARB 2**, meaning it meets California formaldehyde emissions standards, and the new U.S. federal law.[4]

27.   The day following the broadcast, March 2, 2015, Lumber Liquidators' stock price declined $13.03 per share, or 25.13%, from $51.86 on February 27, 2015, to $38.83 on March 2, 2015.

28.   During the Class Period, Lumber Liquidators' investors lost a total of $1.52 billion in market capitalization as a result of Defendants' misrepresentations.   The Company's stock price, which had steadily increased seven-fold over the prior two years, dropped by approximately 68% from its high during the Class Period.

29.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered substantial damages.

## II.   <u>JURISDICTION AND VENUE</u>

30.   The claims asserted herein arise under and pursuant to Sections l0-(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule l0b-5 promulgated thereunder by the SEC, 17 C.F.R § 240.10b-5.

---

[4] *Id* (emphasis added).

31.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

32.   Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Lumber Liquidators maintains its principal place of business in this District and many of the acts and practices complained of occurred in substantial part herein.

33.   In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   THE PARTIES

### A.   Lead Plaintiffs

34.   Lead Plaintiffs Kiken, Foster, Lorenzo, and Hickman purchased Lumber Liquidators securities at artificially inflated prices during the Class Period.  Kiken's and Foster's Class Period transactions in Lumber Liquidators stock are set forth in their previously-filed Certifications, *see* ECF No. 19-2, while Class Period transactions for Lorenzo and Hickman are set forth in Certifications submitted herewith.  On March 23, 2015, the Court appointed Kiken, Foster, Lorenzo, and Hickman as Lead Plaintiffs for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).

### B.   Defendants

#### 1.   Corporate Defendant

35.   Defendant Lumber Liquidators is a corporation organized under the laws of the state of Delaware, maintaining its principal place of business at 3000 John Deere Road, Toano, Virginia.  Lumber Liquidators' common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "LL".

2. **Individual Defendants**

36.     Defendant Thomas D. Sullivan ("Sullivan") is, and at all relevant times during the Class Period was, the Company's Chairman of the Board.  He founded the Company in 1994. Prior to September 2006, Sullivan also served as the Company's President and CEO.  He currently advises and supports the Company's marketing and advertising departments and is active in Lumber Liquidators sourcing initiatives.  He plays a key role in setting and maintaining the Company's corporate culture.

37.     Defendant Robert M. Lynch ("Lynch") is, and at all relevant times during the Class Period was, the Company's President and CEO.  Prior to joining the Company in January 2011, Lynch served as President and CEO of Orchard Supply Hardware from 2004 to 2010. Previously, Lynch was employed by The Home Depot, Inc. ("Home Depot") in various store operations and business development positions.

38.     Defendant William K. Schlegel ("Schlegel") is, and at all relevant times during the Class Period was, the Company's Chief Merchandising Officer.  As Chief Merchandising Officer, Defendant Schlegel was intimately involved in implementing the Company's "sourcing initiatives" and managing the Company's supply chain.  In his role as Chief Merchandising Officer, Defendant Schlegel was involved in drafting, reviewing, and/or disseminating the false and misleading statements that were issued by Lumber Liquidators, approved or ratified these statements.  Prior to assuming this position, Schlegel served as Vice President ("VP") of Merchandising at Harbor Freight Tools, Inc. from 2009 to 2010.  From 2007 to 2009, Schlegel served as VP of Merchandising at Gander Mountain Company.  He was President of Pine Creek Consulting from 2002 to 2007.  Previously, Schlegel held global procurement and merchandising roles during nearly 10 years of employment at Home Depot.

39.     Defendant Daniel E. Terrell ("Terrell") is, and at all relevant times during the Class Period was, the Company's Chief Financial Officer.  Prior to assuming his current position, Terrell served as Controller from November 2004.  He served as the VP, Controller & Credit of Peebles Inc., a specialty apparel retailer that he joined in 1990 and where he continued to work after it was acquired in 2003 by Stage Stores, Inc.  Before joining Peebles, Mr. Terrell worked for Ernst & Young.

40.     The Individual Defendants, by virtue of their high-level positions with the company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements and financial condition, as alleged herein.  The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.

## IV.    OVERVIEW OF THE FRAUD

### A.    Background On Lumber Liquidators

#### 1.    History And Business Operations

41.     Lumber Liquidators is one of the largest specialty retailers of hardwood flooring in the United States.  The Company prides itself on having one of the largest inventories of prefinished and unfinished hardwood floors in the industry.

42.     Lumber Liquidators carries solid and engineered hardwood, laminate flooring, bamboo flooring, cork flooring and resilient vinyl flooring, butcher blocks, molding, accessories, and tools.  These products are primarily sold under the Company's private label brands.  The

Company sells to homeowners directly or to contractors acting on behalf of homeowners through its network of approximately 300 retail stores in 46 states.

43.    The Company began in 1993 when Defendant Sullivan, a then building contractor, began purchasing excess wood and reselling it from the back of a trucking yard in Stoughton, Massachusetts.  The Company eventually focused on hardwood flooring.  The Company's first store opened on January 5, 1996, in West Roxbury, Massachusetts.  Eight months later, a second store opened in Hartford, Connecticut, and from there the Company expanded.

44.    The Company moved headquarters from Boston to Colonial Heights, Virginia in 1999.  In 2004, the Company moved its headquarters to its current location, a 306,000 square foot production center in Toano, Virginia.

45.    The Company's SEC filings identify Home Depot and Lowe's as its main competitors.  The three companies together represent approximately 37% of hardwood flooring retail sales in the United States.  The remainder of the market consists predominantly of regional and local independent retailers and smaller national chains which specialize in the lower-end, higher-volume flooring market as well as smaller national specialty flooring chains and local and regional independent flooring retailers.  Unlike Lumber Liquidators, Lowe's and Home Depot, which source a large portion of their products directly from manufacturers in China at lower costs, most of these smaller retailers purchase their hardwood flooring from domestic manufacturers or distributors.

46.    Between 2009 and 2011, Lumber Liquidators, Lowe's, and Home Depot reported similar and steady gross margins.

| Gross Margin | | | |
|---|---|---|---|
| | **2009** | **2010** | **2011** |
| **Lowe's** | 34.86% | 35.14% | 34.56% |
| **Home Depot** | 33.90% | 34.30% | 34.50% |
| **Lumber Liquidators** | 35.70% | 34.80% | 35.30% |

### 2. Acquisition Of Sequoia And Implementation Of "Sourcing Initiatives"

47.    In 2011, the Company made it a priority to increase its gross margin by reducing the costs associated with the wood and flooring products it sourced through China.  The Company sought to accomplish this by, among other things: (1) cutting out middleman suppliers; (2) increasing control and oversight of vendor mills and manufacturers; and (3) doing "line reviews" of suppliers in which the Company would award business to the mills and manufacturers willing to provide wood at the lowest price.  The Company referred to these strategies to reduce the cost of wood as its "sourcing initiatives."

48.    Spearheading the sourcing initiatives were Defendants Lynch and Schlegel who had both been hired in 2011 as President and Senior VP of Merchandising, respectively.  Schlegel is the head of the Company's sourcing operations.

49.    On September 28, 2011, the Company entered into an agreement to acquire certain assets of Sequoia Floorings ("Sequoia") relating to Sequoia's quality control and assurance, product development and logistics operations in China.  Prior to its acquisition, Sequoia, a trading company, provided sourcing services on approximately 78% of the Company's 2011 merchandise purchases from China.  As part of the transaction, the Company established a representative office in Shanghai in October 2011, and assumed direct control of sourcing previously managed by Sequoia.

14

50.   With the acquisition of Sequoia, the Company began eliminating distributor middlemen and establishing – as described by Defendant Lynch – a "fully direct relationship" with the mills in China.

51.   The Company also began "line reviews" in which it pitted suppliers against each other to bid for the Company's business, increasing and consolidating business with mills and manufacturers that could provide the lowest price and eliminating relationships with others. Many of the vendors that had the lowest prices were Chinese mills.  The Company was able to get "very significant cost concessions from these vendors."  As a result, the Company began shifting more of its sourcing to Chinese mills, many of which the Company had never worked with prior to the Sequoia acquisition.

52.   In 2011, the Company's top 10 suppliers accounted for approximately 70% of the Company's supply purchases.  Approximately 42% of the Company's product was sourced from China.  That figure *increased to 50% in 2013*, but then dropped to 40% in 2014 for Asia after revelations regarding the fraud described herein began to emerge.

53.   Lowe's and Home Depot each: (i) are larger than Lumber Liquidators, (ii) also purchase directly from manufacturers in China (indeed, Defendant Lynch gained his experience in sourcing from China while working at Home Depot); and (iii) have historically had comparable gross margins to Lumber Liquidators.  Nevertheless, following the implementation of the Company's "sourcing initiatives" in 2011, Lumber Liquidators' gross margins skyrocketed.  This change is depicted below:

| Gross Margin | | | | | |
|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** | **2013** |
| **Lowe's** | 34.86% | 35.14% | 34.56% | 34.30% | 34.59% |
| **Home Depot** | 33.9% | 34.3% | 34.5% | 34.6% | 34.8% |
| **Lumber Liquidators** | 35.7% | 34.8% | 35.3% | 38.0% | 41.1% |

15



### 3. Defendants' Knowledge Of Lumber Liquidators' Sourcing Practices In China

54.    Defendants were aware of both the source and quality of the wood and laminate products it purchased from Chinese manufacturers.   Defendants Lynch and Schlegel were directly involved in choosing the suppliers of the Company's wood, personally visiting mills and manufacturers in China on multiple occasions since 2011.   For example, during an analyst conference on September 7, 2011, then CEO Jeffrey W. Griffiths stated, "[w]e brought in our President, Rob Lynch and our Senior VP of Merchandising, Bill Schlegel.   Both of them have extensive experience in direct sourcing in China and they are actually both there in China today working on some of those initiatives."

55.    And during an analyst conference on June 6, 2012, Defendant Lynch stated, "The Sequoia acquisition got us closer to a lot of our factories in China.   We actually then went forward and conducted our bamboo line review in China, in country that was wonderful.   I mean, we got to see factories we've never seen before."   During the July 25, 2012 Q2 earnings call, Defendant Lynch stated "As our Chief Merchant, Bill Schlegel, and his teams have dug in with the vendors and done these line reviews."

56.   During an analyst conference on March 4, 2013, Defendant Terrell stated "This is our breakdown of the key components of cost of sales.  Cost of product is at the base.  You can see it was fairly steady, 55.4%, 55.8%, 55.6% for three years, and then we improved the merchandising department.  Rob [Lynch] came in 2011, brought a new Chief Merchant, Bill Schlegel, with him, and you start to see the benefiting cost of product of our sourcing initiatives – from vendor allowances, to line reviews to direct sourcing, 54.2% in 2011 down to 52.2% in 2012."

57.   The acquisition of Sequoia also provided the Company with – as described in the Company's 2011 Form 10-K – "direct servicing of mill relationships" in China.  The Company did not rely on the distributors to monitor the sourcing practices at the mills in China.  Rather, as described by Defendant Lynch during a July 24, 2013 analyst conference, the Company monitored sourcing directly, with "on-site controls" at the mills.  "Sourcing directly from the mill provides the foundation for our entire value proposition.  Due to our scale, we often purchase the majority of our mill partners' capacity.  And, as a result, *we have insight and visibility throughout the sourcing process.*"

58.   The lumber was tested by the Company both at the mill as well as off-site in the Company's own labs.  Moreover, the Company would also do random tests of the wood at the mill.  These procedures provided the Company (as Defendant Lynch described it) "insight and visibility throughout the sourcing process."  According to Lynch's representation before the DOJ raided the Company's headquarters for violation of the Lacey Act, Lumber Liquidators had implemented methods to stay informed concerning the quality of its products:

> **We have developed quality control and assurance processes for our products that we believe lead our industry**.  Due to our international sourcing, we have more than 60 professionals around the world, including in the US, Canada, China

and South America, who perform and monitor those processes that we believe are most effectively executed on the ground at the mill.

**We augment the on-site controls with additional testing in both our own labs and in independent, certified facilities.   The combination of our on-site controls and our additional testing is designed to ensure that our process exceed the highest regulatory requirements and meet our more stringent internal quality standards**. As national standards are developed around product quality, construction, and packaging, we will engage in and intend to lead our industry in the process.

\* \* \*

**We do stringent testing of our products at multiple levels, beyond what's required**. Our products are tested by third-party experts, both at the mill and in off-site labs, as I said in my remarks. And we also go in and do random tests at the mill.   And then I think the important thing is, we are selling, nationally, products that exceed the most stringent requirements of any state.   And that's something that we're going to continue to make sure that we are doing around -- on the forefront of any changes, any national statements that may be coming out, and then we're going to lead the way if there are.

59.   Indeed, Defendant Lynch boasted that he and Defendant Schlegel were personally well aware of the workings at the mills in China.  During an August 14, 2013 analyst conference, in response to a question by analyst requesting additional detail regarding the Company's "sourcing strategies and any advantage you have there," Lynch stated, "[w]e absolutely have a world-class sourcing team.  Our Chief Merchant, Bill Schlegel, and the team that he has built under him is better than I've ever seen in my career. . . . In fact, we just did a line review recently in the last couple of weeks over in China.  We did an engineered line review.  And some of the feedback we got from the mills were how impressed they were with how closely we work with them; how we are out in the markets, in their territories, walk in their mills with them, interacting with them, and building those relationships."

60.   Defendants' familiarity with the practices at the mills and factories in China has been confirmed by former employees.

(a) Confidential Witness #1 ("CW1") worked directly with Defendants Lynch, Terrell, and Schlegel at the Company's corporate headquarters from May 2011 through June 2012.

(b) Confidential Witness #2 ("CW2") held the position of Associate Buyer at the Company's corporate headquarters from October 2009 to January 2012.

(c) Confidential Witness #3 ("CW3") worked as an Inventory Analyst at the Company's corporate headquarters from January 2011 through June 2012.

(d) Confidential Witness #4 ("CW4") worked as a supply chain executive in the Company's corporate headquarters from May 2008 through November 2012, working directly with Defendants Schlegel and Lynch.

(e) Confidential Witness #5 ("CW5") worked as a member of the EIA who was involved in EIA's undercover investigation of illegal logging in the RFE.

(f) Confidential Witness #6 ("CW6") worked at Lumber Liquidators for 11 years from January 2001 to October 2014 and had several jobs within the Company during that time, including inbound sales, commercial sales, marketing and special events.

61.   According to CW4, the Company's single largest supplier in all of China during the Class Period was Xingjia.  CW4 stated that Russian mills in Eastern Russia were contracted to supply Chinese factories like those operated by Xingjia.

62.   CW1 stated that Defendant Lynch traveled to China several times a year and that Defendant Schlegel and his direct report, John Jakob (VP of Supply Chain / Manufacturing Operations) ("Jakob"), traveled to China frequently to oversee operations, find new Chinese suppliers, and report back to Lynch.   According to CW1, Schlegel was "the go-to guy for

everything that was going on for [the Company] over in China." CW1 stated that the Company also had a point person located in China at Sequoia who operated as the "eyes and ears" on the ground.

63. CW3 confirmed that Jakob and Defendants Lynch and Schlegel regularly traveled to China to visit suppliers and factories and that twice a year they would travel to China with U.S-based buyers to visit factories and negotiate agreements with suppliers. The U.S buyers would also regularly travel to China (without Lynch and Schlegel) to find and visit suppliers and their factories.

64. According to CW2, the Company's U.S.-based buyers would give the Company's China-based buyers specs on products the Company was looking for and the China-based buyers would seek out the suppliers in China. The China-based buyers would then send samples of the product to the Company in the U.S.

65. CW3 stated that the Company's U.S.-based buyers worked with the China-based buyers and would visit the factories with the Chinese staff and would also talk to suppliers about their manufacturing processes, the quality of their products and the specifications the supplier had to meet when selling to the Company.

66. According to CW2, all buyers in China reported to Defendant Schlegel, who was responsible for quality assurance of the wood product as the individual overseeing the Company's operations in China. Moreover, CW4, who worked directly with Schlegel and accompanied him on trips to China, regularly communicated information from the personnel in Shanghai to Schlegel.

67. At the time they were published through *Seeking Alpha*, CW6 was aware of Tilson's comments regarding Lumber Liquidators and its formaldehyde issue. According to

CW6, Lumber Liquidator's response was to attempt to disparage Tilson instead of dealing with the issue Tilson called out.  Moreover, CW6 stated that nothing changed within the Company when Tilson's allegations came out.  He believed that Defendant Schlegel had first-hand knowledge of the issues because of their trips to China, which CW6 said occurred "twice, if not three times a year."

68.    With regard to laminates and formaldehyde content, CW6 said that "there may have been some wrong doing on our part."  CW6 believed that "vertical integration of the supply chain" was a problem at the Company.  According to CW6, Lumber Liquidators treated all their suppliers like they were the "cheapest suppliers around" and that vendors would be cut based on a price differential of three cents a foot.  CW6 said that vendors were selected by price rather than quality and that was how negotiations were driven.  CW6 stated that Lumber Liquidators "had the due diligence to know better what we were buying" but bought anyway.  CW6 stated, "if you're going to keep buying the cheapest car on the market, when your car breaks down how can you act surprised?"

**B.    Applicable Government Regulations**

**1.    The Lacey Act Bans The Import And
Trade Of Illegally Sourced Wood Products**

69.    The Lacey Act (16 U.S.C. §§ 3371–3378) is a conservation statute that was signed into law on May 25, 1900, which imposes civil and criminal penalties for violations of a wide array of laws prohibiting trade in wildlife, fish, and plants that have been illegally taken, transported, or sold.

70.    The Lacey Act was amended in 2008 to add provisions banning the import and trade of illegally sourced wood products (including wood products sourced in violation of foreign laws), and imposing civil and criminal penalties on violators. The provisions of the

Lacey Act are primarily enforced by the DOA and the FWS with support from the DHS and the DOJ. This landmark legislation is the world's first law banning import and inter-state commerce of illegally sourced timber and wood products.

71. The Lacey Act also requires importers to provide a basic declaration to accompany every shipment of timber or wood product into the United States, including the country of harvest, species, value and quantity of each shipment.

72. The Lacey Act is a fact-based statute with strict liability, which means that only actual legality counts (no third-party certification or verification schemes can be used to "prove" legality under the Act) and violators of the law can face criminal and civil sanctions even if they did not know that they were dealing with an illegally harvested product. The Lacey Act also requires that importers of covered products – in this case, wood or wood products – exercise "due care" in identifying the source of their goods.

73. Penalties for violating the Lacey Act vary in severity based on the violator's level of knowledge about the products; penalties are higher for those who knew or should have known through the exercise of due care that they were trading in illegally harvested materials.

## 2. The Protected Ecosystem Of The Russian Far East

74. The RFE contains the world's last major strands of old-growth temperate hardwood forests, a unique biodiversity-rich ecosystem. Illegal loggers often target key hardwood species, which are vitally important to the region's ecosystem. Three hundred year old Mongolian oak and great Korean pine trees nourish deer, boar and other animals, which in turn support populations of the critically endangered Siberian tigers and Far East leopards, both among the rarest large animal species on the planet. The RFE is home to the only wild population of Siberian tigers in the world, which has dwindled to an alarming low population of 250.

75. The forests of Siberia and the RFE rival the Amazon in their size and importance as a carbon sink (the absorption of carbon dioxide through photosynthesis). Clear cutting, a practice that still accounts for more than 75% of all logging in Russia, has caused certain areas of permafrost forests in northeastern Russia to become "virtual deserts," and the release of methane from these degraded permafrost zones is a major source of greenhouse gas emissions.

76. Russian law regulates the harvesting of wood in the forests of the RFE, criminalizing the harvesting of wood in excess of stated permits and outside designated areas. As a result, importing such wood to the U.S. is a violation of the Lacey Act.

77. Most commercially valuable timber in the RFE now exists only in protective forests. Most timber cut in the RFE is destined for export, and 96% of valuable hardwood exports flow directly across the border to China.

78. According to an analysis by the World Wildlife Fund, approximately 75% of oak exports from the Primorsky and Khabarovsky Provinces in RFE, where nearly all oak experts from the RFE originate, were illegal in origin.

79. The vast majority of Russian oak enters China at Suifenhe, a small northeastern city on the boarder of Primorsky Province. Hundreds of trading companies have taken root in the hills and valleys of the city.

80. From Suifenhe, timber is sent onwards into China by rail or road, either directly to manufacturers or to wholesale markets throughout the country. Most of the furniture and flooring produced in northeastern China is exported through the port of Dalian, although Russian hardwoods and softwoods end up in products manufactured throughout China.

### 3.     Government Regulation Of
### Formaldehyde In Composite Wood Products

81.    Formaldehyde is a component in the production of pressed wood products.  It can be found in the glues used to bind wood particles together to make the core boards in laminate and engineered hardwood flooring.  Composite wood products, including engineered and laminate flooring, are often made of melamine resin or urea formaldehyde resin ("UFR").

82.    According to the Environmental Protection Agency, formaldehyde is a "colorless, pungent-smelling gas" that has been shown to cause cancer in humans along with a host of other potential health issues, including eye, nose and throat irritation, wheezing and coughing, fatigue, severe allergic reactions and more.  The International Agency for Research on Cancer classified formaldehyde as "carcinogenic to humans" in 2004, based on the increased risk of nasopharyngeal cancer.  Formaldehyde was also designated as a toxic air contaminant in California in 1992 with no safe level of exposure.

83.    One of the major sources formaldehyde exposure is from inhalation of formaldehyde emitted from flooring products containing UFR and melamine resins.  For this reason, the federal government imposes limits on the amount of formaldehyde that can be present in wood products.

84.    On July 7, 2010, President Obama signed the Formaldehyde Standards for Composite-Wood Products Act into law (the "FSCWP Act").  This legislation, which adds a Title VI to the Toxic Substances Control Act ("TSCA"), establishes limits for formaldehyde emissions from composite wood products such as hardwood plywood, medium-density fiberboard, and particleboard.

85.    The national emission standards in the FSCWP Act mirror standards previously established by CARB for products sold, offered for sale, supplied, used or manufactured for sale

24

in California.  CARB oversees all air pollution control efforts in California to maintain air quality standards.  CARB requires formaldehyde emission standard compliance from distributors and importers like Lumber Liquidators.

86.    CARB set limits on how much formaldehyde may be released from composite wood products, including hardwood plywood, medium-density fiberboard, particleboard, and finished goods containing these products that are sold, supplied, offered for sale, manufactured, or imported in the United States.  The rules include additional implementing provisions addressing testing requirements, laminated products, product labeling, chain of custody, recordkeeping, stockpiling, and enforcement.  Lumber Liquidators, like other wood product businesses operating in California, must comply with all CARB regulations and standards.

87.    In January of 2009, CARB promulgated regulations called the Airborne Toxic Control Measure to Reduce Formaldehyde Emissions from Composite Wood Products.  *See* 17 CCR §§ 93120-93120.12.  CARB regulations apply to various wood products, including wood flooring products.  Phase 2 of CARB regulations mandate that all wood flooring products sold in the State of California must emit no more than 0.05 ppm of formaldehyde for hardwood plywood ("HWPW") as of July 1, 2012.  The Phase 1 CARB Regulations limit for HWPW at 0.08 ppm between July 1, 2009, and July 1, 2012.

88.    CARB regulations for Phase 2 Emission Standard for MDF dictates that, as of January 1, 2011, medium density fiberboard ("MDF") flooring products must emit no more than 0.11 ppm of formaldehyde.  CARB Phase 2 Emission Standard for "thin" MDF dictates that, as of January 1, 2012, thin MDF flooring products must emit no more than 0.13 ppm of formaldehyde.

89.     Violations of CARB regulations and standards may result in severe penalties assessed against the offending entities.

90.     CARB also established a third-party certification framework designed to ensure that manufacturers of composite wood products meet CARB formaldehyde emission standards by having their products certified though an accredited third-party certifier.  Under this rule, third-party certifiers audit composite wood panel producers and verify compliance with formaldehyde emissions standards for their products.

### C.     Defendants' Illegal Sourcing Of Timber In Violation Of The Lacey Act

#### 1.     The Company Illegally Purchased Lumber Sourced From the Russian Far East

91.   To reduce costs and increase gross margins as part of its "sourcing initiatives," the Company purchased timber illegally sourced from the RFE, exposing it to liability and enforcement under the Lacey Act.

92.   Defendants' illegal sourcing and fraudulent reporting under the Lacey Act has been confirmed by a multi-year undercover investigation by the EIA.  From 2011 through 2013, in the face of continued reports of extremely high levels of illegal forest degradation in the RFE by Chinese vendors, EIA systematically investigated the nature of the crimes.  EIA was able to determine the path of the illegal timber and wood products throughout the global supply chain.

93.   Despite the pressure and dangers involved, many individuals in the RFE, including foresters, local nonprofit organizations, police officers, game wardens, and individual citizens, worked at high personal risk to expose the illegal logging trade.  Based on communications with these partners, EIA investigators were able to highlight the loggers, sawmills, and traders operating in Russia that were associated with illegal sourcing.

94.     EIA investigators concurrently analyzed customs data to determine the largest players in the export of precious hardwoods from the RFE into China and the U.S. (among other countries).   These data sets from Russia, China, and the U.S. provide detailed information about species, quantities, exporters, and importers involved in the trade of wood products.   By cross-referencing these sets of data, EIA developed a list of the Chinese manufacturers that imported large amounts of wood from high-risk exporters in Russia.   EIA then established a cover company and contacted these Chinese companies as potential buyers of wood flooring products from the United States.   EIA investigators visited ten of these companies in person in China as well as their mills in Russia.   In these conversations, EIA asked about their knowledge of illegal logging in Russia, their own exposure to that illegal logging, and how they interacted with their customers, particularly customers from the United States.   EIA detailed these results in a report.[5]

95.     The investigation revealed that Lumber Liquidators' primary supplier for hardwood flooring, Xingjia, is the dominant player in the cross-border trade of illegal timber between the RFE and China.   According to EIA investigators, U.S. import records and undercover visits with Xingjia confirmed that its largest customer is Lumber Liquidators.

96.     As Lumber Liquidators has stated in its SEC filings, any single mill may provide as much as 4% of its hardwood purchases. Xingjia owns and operates three factories in northeast China as well as at least 14 sawmills in the RFE province of Khabarovsk.

97.     In conversations with EIA undercover investigators posing as potential buyers, the president of Xingjia, Mr. Sun, and other Xingjia officials openly described Xingjia's detailed

---

[5]  *See also*  http://www.youtube..com/watch?v=UKqwMH2N0vc,  EIA's  investigative  video, which details the extent and nature of illegal logging in the RFE and tracks illegally harvested valuable hardwoods across the border into China, through factories and warehouses, to its ultimate destination in showrooms around the world.

system for sourcing illegal timber – illegally cutting outside of their concession boundaries, overcutting within those boundaries, and purchasing over 90% of their stocks from trading companies throughout the RFE which do not provide the required proof of legality of sourcing.

98.   Xingjia officials also openly admitted to EIA investigators posing as buyers that their illegal operations were maintained through bribery and high-level political connections with both Russian and Chinese officials.

99.   Moreover, numerous suppliers identified by Xingjia had strong ties to illegal logging.  For example, three employees of one supplier identified by Xingjia, including its head of timber harvesting, were sentenced to prison in 2010 for illegal logging, and more company employees are currently under investigation.  A different supplier is the subject of a sweeping investigation into illegal logging.  These are the two largest cases of illegal logging to be uncovered in Khabarovsky Province in the past several years, and both firms under investigation (Beryozoviy and Investstroy) are Xingjia suppliers.  According to EIA investigators, Xingjia openly acknowledged these companies as sources for their wood.

100.  Xingjia's connection to illegal sourcing would be obvious to anyone doing business with Xingjia.  The EIA report states that numerous sources throughout the RFE reported to undercover EIA investigators that at least 80% of all trees harvested in the area are done so illegally.

101.  For example, a simple Russian-language Google search for Xingjia's suppliers, such as "Beryozoviy illegal logging Khabarovsk" or "Investstroy illegal logging" returns numerous news articles describing recent illegal logging violations.

102.  According to CW5, a member of EIA who was involved in EIA's undercover investigation of illegal logging in the RFE, Xingjia was well known to Russian logging

enforcement agencies as one of the worst illegal loggers in the region. "If you are Lumber Liquidators, all you would do is, first of all, Google the name of the company, and then go to forest enforcement offices if you have any interest in avoiding illegal wood," CW5 said. "You ask [the enforcement office]: 'Is my main supplier involved in this?'" CW5 said the answer would have been, "Yes."

### 2. Xingjia's Executives Further Confirm Defendants' Illegal Sourcing Activities

103. Lumber Liquidators has received hardwood flooring from Xingjia since at least 2007. As described above, beginning in 2011, the Company increased its control over suppliers in China through the purchase of Sequoia, its Shanghai-based quality control manager, and regular visits to mills and manufacturers by the Company's quality control teams as well as senior management, including Defendant Lynch and the head of sourcing, Defendant Schlegel.

104. Xingjia's president and manager of Russian operations, Mr. Sun, stated that since Lumber Liquidators' recent purchase of Sequoia, the Company was taking a more direct role in supply chain management in China. Mr. Sun confirmed that since 2011, high level management from Lumber Liquidators visited Xingji and its mills in the RFE on multiple occasions.

105. In late 2011, Mr. Sun gave the EIA investigators (who were posing as buyers) a tour of Xingjia's operations in Russia and openly revealed during their very first meeting that much of Xingjia's operations involved illegally harvesting protected wood in Russia and that they also were illegally over-harvesting wood on their own land in China. According to Mr. Sun, he gave a similar tour to a high-level U.S. management team of senior executives from Lumber Liquidators. According to CW5, Mr. Sun told undercover investigators that the "head of sourcing" for Lumber Liquidators was on the tour, and said the executive had previously worked for Home Depot. According to the Lumber Liquidators' SEC filings, Defendant Schlegel is the

Company's Chief Merchandising Officer and previously worked at Home Depot for nearly 10 years, holding "global procurement and merchandising roles."

106. During their visit, EIA investigators observed stacks of pallets of Lumber Liquidators' Virginia Mill Works hand-scraped solid oak flooring outside the factory, ready for export. Inside the factory, the entire production line was hard at work to fill the remainder of this particular Lumber Liquidators purchase order. Pictures of Lumber Liquidators' oak flooring at Xingjia's Dalian facilities, taken by EIA investigators, are provided below.





107. Mr. Yu, who manages Xingjia's Dalian facilities and is the brother-in-law of Xingjia President Mr. Sun, told EIA investigators that the raw material for these shipments

included oak from Russia. During a second visit to Dalian Xingjia in early 2012, Mr. Yu stated that around half of the oak used in flooring for Lumber Liquidators came from Russia. According to CW5, Mr. Yu openly admitted that Xingjia "misdeclared" the source of wood for its products. Mr. Yu told CW5 that his company declared Russian wood as Chinese wood for tax purposes as well as to avoid scrutiny from enforcement agencies because any wood that is declared as Russian in origin receives intense scrutiny due to the high likelihood that it was harvested illegally.

108. When CW5 asked Mr. Yu if Lumber Liquidators was aware of this illegal harvesting activity, Mr. Yu said, "Yes, of course they know that."

109. Mr. Yu's statements have been confirmed through testing of the wood. During its visits, EIA obtained eleven samples of boards and manufactured flooring by the Suifenhe and Dalian facilities of Xingjia. Five of these eleven samples were cut from a batch of flooring which EIA investigators personally observed Xingjia workers preparing for shipment to Lumber Liquidators. EIA sent these samples to a respected laboratory with decades of expertise in stable isotopic analysis for testing. Preliminary results from stable isotopic analysis indicated that every sample provided was RFE in origin. For 18 out of 20 of these samples, the analysis gave a confidence level of 95% or greater. These results indicate that all of the samples received from Xingjia were sourced from the forests of Khabarovsk Province – the forests where Xingjia openly admitted to be illegally sourcing, and where its suppliers have previously been convicted of, and are currently suspected of, illegal logging.

110. Mr. Sun told EIA investigators that he and his managers provided a tour similar to the one provided to EIA investigators to a high-level team of U.S. executives from Lumber Liquidators during a visit in early 2012, which included Lumber Liquidators' U.S. "head of

sourcing" operations – Defendant Schlegel – as well as two representatives from the Company's Shanghai office. According to Mr. Sun, this tour included a trip to Xingjia's operations in Khabarovsk, visiting sawmills and meeting with local officials in the RFE.

111. Mr. Yu, who accompanied these officials on their visit, reported that Lumber Liquidators officials were not troubled at all by what they saw. To the contrary, Lumber Liquidators has expanded its relationship with Xingjia. For example, Mr. Yu explained to EIA investigators that Lumber Liquidators was moving its production of hand-scraped solid oak flooring from multiple suppliers to Xingjia and, in May 2012, Lumber Liquidators' head of sourcing operations visited Xingjia's offices and sawmills in the RFE to ensure that Xingjia's oak "supply was secure for a long time."

112. U.S. import records confirm that imports of solid oak flooring from Xingjia have not only continued since the Company's May 2012 visit, but have increased. Based on U.S. custom forms, EIA investigators estimate that Lumber Liquidators has received at least 35 separate shipments, containing nearly three million square feet, of hand-scraped solid oak flooring alone from Xingjia in the period from May 2012 until August 2013. By 2013, Xingjia was Lumber Liquidators' chief Chinese supplier of hand-scraped solid oak flooring.

### 3. Lumber Liquidators Concealed The Illegal Sourcing

113. In U.S. import data, the "Commodity" field is a blank space that importers fill in with a description of the shipment contents. EIA's analysis of U.S. flooring imports indicates that in 2011, Lumber Liquidators included a detailed product description in this field. The image below is an example for a particular shipment obtained by EIA, which arrived in Norfolk, Virginia on November 6, 2011 (the text below the image reproduces in larger print the top entry):



SOLID WOOD FLOORING SEQUOIA PO:23315-**XIN/
LUMB** ER PO:4500013182 VMCM5 ¾"X4-3/4"
VIRGINIA MILLWORKS CAMBRIDGE 10011755 NAME
ACCOUNT: LUMBER LIQUTDATORS,SERVICES LLC
CY TO CY MSCU5654274 SOLID WOOD FLOORING
SEQUOIA PO:23316-**XIN**/LUMB ER PO:4500013183
VMCM5 ¾"X4-3/4" VIRGINIA M ILLWORKS
CAMBRIDGE 10011755 NAME ACCOUNT:LUMB
ER LIQUTDATORS,SERVICES LLC CY TO CY
SCZU3257740

114. The Shipper, Consignee, and Notify Party fields for this shipment were removed on publicly available versions of the data. However, this field indicates clearly the manufacturer (XIN = Xingjia), destination (Lumber Liquidators) and the product (Virginia Mill Works Cambridge hand-scraped solid oak flooring). The Purchase Order (PO) numbers for this particular shipment match the numbers photographed on boxes at Xingjia's Dalian factory during a visit in late 2011 by undercover EIA investigators.

115. After Lumber Liquidators purchased Sequoia and began its "sourcing initiatives," Defendants began concealing the source of the Company's wood. First, Mr. Yu told EIA investigators that in late 2011 to early 2012, Lumber Liquidators gave Xingjia a new stamp which marks every flooring board with three letters "HEX" and with the date of manufacture.

Mr. Yu explained that HEX stood for Huanan Hexin, Xingjia's other factory in northeastern China, but that the same stamp was used in both the Huanan Hexin and in the Dalian Xingjia factories. This stamp concealed Dalian Xingjia as a source.

116. EIA also determined that by mid-2012, U.S. import data indicates that Lumber Liquidators decreased the amount of identifying information in its shipments by removing the manufacturer name, making shipments more difficult for third parties to track. The import record for the shipment that EIA investigators observed during their visit to Dalian Xingjia in early 2012, which arrived in Norfolk on May 18, 2012, (the text of which is reproduced below) illustrates this change:

> SOLID WOOD FLOORING VM HS CAMBRIDGE OAK
> ¾"X4-3/4" OLD ARTICLE NUMBER:VMCM5,10011755
> PO:45 00040263 CY TO CY MSCU5855896 SOLID
> WOOD FLOORING VM HS CAMBRIDGE OAK ¾"X
> 4 ¾" OLD ARTICLE NUMBER:VMCM5,10011755 PO:45
> 00040264 CY TO CY TCLU4024436.

117. Xingjia was not the only manufacturer that Lumber Liquidators used that illegally sourced its wood. EIA investigators determined that during 2011, when the "Commodity" field included the manufacturer's name, Lumber Liquidators received five product lines of Virginia Mill Works hand-scraped solid oak flooring (Cambridge, Coventry, Old World, Tuscany, and Windsor) from five separate manufacturers, identifiable in import data by their three-letter abbreviations; XIN (Dalian Xingjia), HEX (Huanan Hexin), GRH (Zhejiang Dadongwu Greenhome), BXW (unknown) and SGF (unknown).[6]

---

[6] EIA investigators were unable to ascertain the identity of the last two companies BXW and SGF, but both imported fewer than five shipments of solid oak flooring in 2011, and so appear to be minor suppliers compared to Dalian Xingjia, Huanan Hexin, and Zhejiang Dadongwu Greenhome.

118.  Zhejiang Dadongwu Greenhome ("Greenhome"), a flooring company located near Shanghai, and a primary supplier of hand-scraped solid flooring to Lumber Liquidators in 2011, reported to EIA investigators that although it regularly imports oak logs from Germany, those logs are supplied by mills (including Xingjia) that harvest from Russia.  Greenhome told EIA investigators that Lumber Liquidators (who is aware of the true harvesting/sourcing) declared all shipments from Greenhome as German on the declaration forms required under the Lacey Act because the "U.S. market and government don't like [wood from] Russia."

119. An example of a fraudulent Lacey Act Declaration, dated May 3, 2012, is reproduced below.  As can be seen from the form, Lumber Liquidators is identified as the importer.  The product imported is "Quercus Mongolicus," which is more commonly known as Mongolian oak.  As the name suggests, this tree is native to several Asian regions, including eastern Russia – not Germany.  Nevertheless, Germany has been indicated as the "Country of Harvest."

**D.    Defendants' Illegal Selling Of Laminate And Engineered Hardwood Flooring With High Levels Of Formaldehyde**

120.  Lumber Liquidators achieved its improved margins, in part, by importing laminated and engineered hardwood flooring from China with high levels of formaldehyde.  Tests confirm that the level is higher than Lumber Liquidators' American-made laminate flooring and higher than laminate flooring from Lowe's and Home Depot.

121. The Company does not comply with CARB Regulations when marketing and selling its Chinese-made laminate and engineered hardwood flooring.  Employees of three different Chinese mills that manufacture laminate flooring for Lumber Liquidators openly admit that they used core boards with higher levels of formaldehyde to make the Company's laminates, saving Lumber Liquidators 10-15 percent on the price.  These mills also admitted to falsely labeling the Company's laminate flooring as CARB 2 compliant.

122. Several independent tests conducted by certified laboratories reveal that the Chinese-made laminates emit formaldehyde levels well beyond what is allowable by CARB regulations and standards.  These test results have shown that average formaldehyde exposures during testing exceeded the 0.05 ppm as allowed under CARB Regulations.

## 1. <u>Sourcing From China</u>

123. Chinese manufacturers reportedly will place their own economic interests above complying with the environmental and consumer protection laws of other countries.  The risks from importing goods from China are well documented – from missing goods, substandard products and projects running over time, to straight out scams.  Chinese companies, especially those in highly competitive, commoditized industries, may disregard most regulations, especially if the product is being shipped to the United States.  High-profile scandals involving Chinese manufacturers choosing profits over regulatory compliance are common.  For example, the "Chinese drywall" scandal involved defective drywall manufactured in China and imported to the United States starting in 2001 and growing as a result of the housing boom and Hurricane Katrina.[7]  Similarly, the "Clenbuterol Scandal," is another example.  There, 95 people in central Henan Province were taken into police custody for producing, selling, or using toxic amounts of Clenbuterol in porcine feed to increase pork exporting profits in violation of health regulations.[8]

124. According to the White Paper entitled *Sourcing From China, How To Import From China*, cheap prices raise red flags:  "[a]n extremely low quote should set off alarm bells-perhaps inferior materials would be used, or there's been a mistake."  The laminate flooring at issue here is a low-end, global commodity product in which 1% or 2% differences in pricing are

---

[7] http://en.wikipedia.org/wiki/Chinese_drywall
[8] www.rsc.org/chemistryworld/News/2011/April/19041102.asp

meaningful.[9]  This type of flooring is typically manufactured by pressing together layers of wood particles that are then sealed with adhesives containing UFR.[10]  UFR is "highly water-soluble and therefore is the most problematic mixture for indoor air pollution."[11]  It is possible to manufacture pressed wood laminate products with different mixtures of UFRs and thus a range of formaldehyde emissions.[12]  Some pressed wood products have low, or zero, added formaldehyde.  However, such low-emission products necessarily have longer curing times, and thus lower manufacturing throughput, and higher production costs.  Lumber Liquidators' Chinese-made laminate flooring contains UFR formaldehyde (or other formaldehyde resin) and is considered a major source of indoor formaldehyde emissions.

125.  With experience sourcing in China for almost two decades, Defendants are sophisticated players in the wood flooring industry.  Defendants realized when they were offered laminates at 10% below the standard price that the products were cheaply made with inferior materials (*e.g.,* used a lower grade of HDF or a less expensive mixture of UFRs).

### 2. Xuhua Zhou Conducted Independent Tests Of Lumber Liquidators' Chinese-Made Laminates

126.  On June 20, 2013, Lumber Liquidators' Chinese-made engineered hardwood and laminate flooring was called into question by an on-line journalist, Xuhua Zhou, who conducted

---

[9] http://seekingalpha.com/article/2972606-why-lumber-liquidators-wood-testing-doesnt-comply-with-carb (last visited April 17, 2015).

[10] *Formaldehyde Emissions*, BUILD DIRECT, available at http://learn.builddirect.com/flooring-info/health/formaldehyde-emissions/ (last visited April 10, 2015).

[11] http://propex.com/C_f_env_formldy.htm (last visited April 10, 2015).

[12] http://www.gp-chemicals.com/Urea-Formaldehyde_Product_Category ("Urea-formaldehyde resins are used in the production of composite panel products such as medium density fiberboard (MDF) and particleboard (PB). UF resins are currently used in combination with other resin systems and scavengers to meet reduced formaldehyde emission requirements in the final panel products. A variety of scavenger, buffering and catalyst technologies can be used with these products to control cure speed characteristics for these applications while reducing emissions.") (Last visited April 17, 2015).

his own independent investigation of the imported flooring.   The article explained that the investigation into the quality of the Company's wood sourced from China came about as a result of the Company's explanation for how it has been able to continually produce record gross margins: "Management has often made reference to the significance of its acquisition of Sequoia Floorings Inc., based in Shanghai, as a primary reason for the tremendous improvement in margins.  Sourcing product in China is certainly hardly unknown to competitors, and skeptics have wondered how an $8 million acquisition could have such a dramatic effect on gross margin and bottom line, and more importantly, enable Lumber Liquidators to undercut fierce price competitors such as Home Depot (HD) and Lowe's (LOW)."

127.  Zhou explained the details of the testing he conducted on Lumber Liquidators products that he had purchased from a Southern California retail store:

> I recently conducted independent lab testing – engaging Berkeley Analytical, an IAS accredited testing laboratory – on a sample of Lumber Liquidators house brand flooring ("Mayflower" brand), and the results that came back weren't pretty:   *Over 3.5x the maximum legal level for formaldehyde* . . . Fully understanding the importance of this finding, we submitted samples from the same package to a second laboratory, this one the "gold standard" lab for the National Wood Flooring Association, NTA.  The second lab confirms the product is in violation of the legal limit for formaldehyde.[13]

128.  The article provided a photo of the product tested, which is reproduced below.

---

[13]  Xuhua Zhou, *Illegal Products Could Spell Big Trouble at Lumber Liquidators*, *SEEKING ALPHA*, (Jun. 20, 2013) http://seekingalpha.com/article/1513142-illegal-products-could-spell-big-trouble-at-lumber-liquidators.



129. It also provided the lab results from Berkeley Analytical (reproduced below), showing that while CARB standards require all Hardwood Plywood products sold in the state of California should emit no more than 0.05 ppm, the samples tested emitted 0.17 ppm.



130. Zhou also described how the emission of formaldehyde led to customer complaints. In a note posted on Complaints Board, a customer named Tommy detailed a miserable experience he had with Lumber Liquidators in 2011:

> "We bought 1600sf Bellawood floor from Lumber Liquidators and installed it in our house. ***Right after the installation, my family started suffering irritated eyes, skin rash, and burning throat,***

*respiratory stress.  Indoor air testing showed the formaldehyde level was above 0.2ppm, which is 25 time higher than the normal level (0.008ppm).*  We have to move to other place to avoid exposure.  The Lumber Liquidators and their insurance company Liberty Mutual kicked the ball back and forth, and made us a homeless for 8 months.  I would like to tell other customers of Lumber Liquidators, if you are suffering some respiratory symptoms, check the Formaldehyde level in your house.  If you are going to buy products from Lumber Liquidator, please think about my experience."[14]

131.  The product reviews included complaints from installers.

[A] professional installer expressed his concerns regarding Lumber Liquidators' product quality:

"Just bid 800 sqft install.  Customer found some Strand Bamboo at LL and loves the color and grain.  I'm hesitant to install any Strand Bamboo for several reasons: Dimpling where there are cleats, instability, cracking tongues, and the finish is very sensitive to moisture.  Obviously the price of $3.60/ sqft is appealing to the customer, but *I've read many reviews stating that LL uses a specific type of Formaldehyde that gases off and causes odor issues and medical issues if you have a sensitivity to it*.  I think that I will be able to persuade them into a exotic that will be happy with, but with a new LL in town, I think this will become more frequent.  I have installed a couple Bellawood floors and thought they were ok, not great, but with such a lack of quality control, I am seriously considering not installing any LL products.  I always try to educate the customers, but price can be a difficult obstacle to overcome.  How do you all approach customers when LL is considered?  Have many of you installed their Strand Bamboo before?"

The flooring professional noted "many reviews" stating Lumber Liquidators products cause odor issues and medical issues.  *With a significant price discount to its peers, Lumber Liquidators understandably may appeal to certain consumers who care less about durability or overall quality of their flooring, but they certainly did not sign up to purchase products that will emit excessive level of a known carcinogenic toxic chemical for many years to come*.  The substantial health risks associated with prolonged exposure cannot be quantified in monetary terms.[15]

---

[14] *Id.*

[15] *Id.*

### 3. Additional Independent Tests Demonstrate That Lumber Liquidators Chinese-Made Laminates Were 100 Times Above Legal Limits Set By Proposition 65

132. In 1986, California voters approved an initiative to address exposure to toxic chemicals. That initiative became the Safe Drinking Water and Toxic Enforcement Act of 1986, better known by its original name of Proposition 65. Proposition 65 requires the State to publish a list of chemicals known to cause cancer or birth defects or other reproductive harm. It also requires businesses to notify Californians about significant amounts of chemicals in the products they purchase, in their homes or workplaces, or that are released into the environment. By providing this information, Proposition 65 enables Californians to make informed decisions about protecting themselves from exposure to these chemicals.

133. The environmental advocacy group Global Community Monitor released independent lab tests showing that Chinese-made flooring sold by Lumber Liquidators emits formaldehyde at levels far above the level requiring cancer warnings under California law. In July 2014, Global Community Monitor, along with Sunshine Park, LLC, filed suit in the California Superior Court for the County of Alameda against Lumber Liquidators for its alleged violation of Proposition 65.[16]

134. According to Global Community Monitor Action, "[i]n contrast to Lumber Liquidators' direct representation on its product labels, website, and warranties that its flooring products comply with strict formaldehyde standards, Plaintiffs' extensive testing has shown that the toxic formaldehyde levels released from many of the Defendants' Chinese-made laminate flooring products at the time of testing are far above levels requiring cancer warnings under

---

[16] *Global Community Monitor, a non-profit California corporation, and Sunshine Park LLC, a California limited liability company v. Lumber Liquidators, Inc., et al.*, No. RG14733979 (Cal. Sup. Ct. Cnty. Alameda) ("Global Community Monitor Action").

California law."  The Complaint provides the results of the tests were well in excess of the

Proposition 65 thresholds:

> [Global Community Monitor Action] conducted over 100 tests using various test methods and two different laboratory locations.  ***Test results showed average exposures [of formaldehyde] at the time of testing exceeded 4,000 micrograms per day ("ug/day) – over 100 times above the 40 ug/day threshold established by [Proposition 65].***

135.  The complaint further describes the testing methodology and results as follows:

> Given the significant presence of high formaldehyde emitting resins in the production of Chinese-made flooring and Lumber Liquidators' emphasis on cost savings, the Plaintiffs engaged a certified laboratory to test laminate flooring purchased from Lumber Liquidators.  More than forty boxes of the PRODUCTS were purchased and to date over 100 tests have been performed.  Of the products tested, by far the highest formaldehyde levels were found in the PRODUCTS sold by Lumber Liquidators that were produced in China, where the significant majority of Lumber Liquidators' laminates originate.  ***Without exception, the Lumber Liquidators products produced in China that Plaintiffs tested emitted formaldehyde at far higher rates than those manufactured in Europe or North America – on average, Chinese products emitted at 350% the rate of European/North American products at the time of testing.***

136. As discussed below, *60 Minutes* later reported on its investigation into Lumber

Liquidators laminate flooring products.  *60 Minutes* interviewed the attorney representing Global

Community Monitor, Richard Drury ("Drury"), and Denny Larson ("Larson"), its Executive

Director.  Mr. Drury told *60 Minutes*' Anderson Cooper on the show that aired March 1, 2015,

that "there are probably tens of thousands of households in California that have installed Lumber

Liquidators Chinese laminates that may exceed formaldehyde standards."  When asked how

many installations nationwide, Mr. Drury responded, "It's probably hundreds of thousands."  Mr.

Drury and Mr. Larson sent 150 boxes of laminate flooring to three certified labs for a series of

tests.  According to *60 Minutes*, the results of these tests concluded that "[w]hile laminate

flooring from Home Depot and Lowes had acceptable levels of formaldehyde, as did Lumber

Liquidators American-made laminates, ***every single sample of Chinese-made laminate flooring***

43

*from Lumber Liquidators failed to meet California formaldehyde emissions standards*." Significantly, these tests revealed that many of these samples failed by "a large margin."

**4.    *60 Minutes*' Independent Tests And Investigation Of Lumber Liquidators' Chinese-Made Laminates**

137. *60 Minutes* conducted its own independent tests and investigation of Lumber Liquidators and aired the story on March 1, 2015. *60 Minutes* purchased 31 boxes of Chinese-made laminate flooring that Lumber Liquidators sold in its stores in Virginia, Florida, Texas, Illinois and New York and sent them to two certified labs, HPVA Laboratories and Benchmark International, for two kinds of tests.

138. The first test was designed to determine whether the Chinese-made laminates were compliant with CARB 2. The underlying medium density fiberboard, or "core" of the product must pass CARB's emissions standards in order for the product to be sold legally in California. *60 Minutes* confirmed with CARB officials the appropriate test methodology (*i.e.,* the deconstructive test method is the way CARB officials test finished goods for CARB formaldehyde emissions compliance). The two labs then tested Lumber Liquidators' Chinese-made laminates, using the method developed and utilized by CARB.[17]

139. According to *60 Minutes*, 30 of the 31 samples tested contained levels of formaldehyde emissions that exceed the limits set by CARB. "The labs found that the highest-emitting Lumber Liquidators product tested released 13 times more formaldehyde than CARB Phase 2 limits."[18]

140. The second test, the CDPH 01350 test, measures the concentration of formaldehyde emissions from laminates into the air of a typical home as proscribed by the California

---

[17] http://www.cbsnews.com/news/more-on-tests-used-to-investigate-lumber-liquidators
[18] *Id.*

Department of Public Health.   According to CBS News, the "highest-emitting Lumber Liquidators sample that the labs tested emitted a concentration of formaldehyde into the air of a typical home that the US EPA (Environmental Protection Agency) has cited as "polluted indoor conditions.'"[19]

141.  Mr. Cooper showed Dr. Philip Landrigan, a specialist for environmental pediatrics and exposure to toxic chemicals, the results of the *60 Minutes* tests using the "surface" method – and even using this method, in which the formaldehyde is partially sealed in, Dr. Landrigan expressed grave concerns about the formaldehyde levels:

> **Dr. Philip Landrigan:**  It's not a safe level, it's a level that the US EPA calls polluted indoor conditions.

> **Anderson Cooper:**  Would you want that in your home?

> **Dr. Philip Landrigan:**  No.

* * *

> **Dr. Philip Landrigan:**  I would say long-term exposure at that level would be risky because it would increase the risk for chronic respiratory irritation, change in a person's lung function, increased risk of asthma.  It's not going to produce symptoms in everyone but children will be the people most likely to show symptoms at that sort of level.

142.  Defendant Sullivan told *60 Minutes* that the Chinese mills from which Lumber Liquidators obtains laminate flooring are licensed by California.   Mr. Cooper responded, "[w]hen you say its licensed by California, what that really means is California says this mill is capable of making CARB 2 Compliant product.   California is not saying every piece – every product coming out of this mill is CARB 2 Compliant."

---

[19] *Id.*

143.  While Defendant Sullivan claimed that Lumber Liquidators' "specs are to make it to California standards" *60 Minutes* reported that "for months, we had been hearing from former Lumber Liquidators employees, suppliers and industry competitors that their Chinese-made laminates are ***not*** being made to California standards."

144.  *60 Minutes* sent investigators undercover to the city of Changzhou, the laminate flooring capital of the world.  While using hidden cameras and posing as buyers, these investigators visited three different mills that manufacture laminates for Lumber Liquidators. "Employees at the mills ***openly admitted*** that they use core boards with higher levels of formaldehyde to make Lumber Liquidators laminates, ***saving the company 10-15 percent on the price.***"

145.  *60 Minutes* also reported that at all three mills these employees "also ***admitted falsely labeling the company's laminate flooring as CARB 2***, meaning it meets California formaldehyde emissions standards, and the new U.S. federal law."

146.  At one particular factory, the general manager told the investigators hired by *60 Minutes* that Lumber Liquidators is one of their biggest customers:

**Manager:**  This is a best-seller for Lumber Liquidators.

**Investigator:**  For Lumber Liquidators?

**Manager:**  Yeah.

**Investigator:**  How long have you been selling this?

**Manager:**  From last year.

**Investigator:**  Is this CARB 2?

* * *

**Manager:**  No, no, no... I have to be honest with you. It's not CARB 2.

**Investigator:**  *Can I get CARB 2?*

46

> **Manager:  *Yes, you can. It's just the price issue.  We can make CARB 2 but it would be very expensive.***

147.  Moreover, a different Chinese employee told the *60 Minutes* undercover investigators that the Lumber Liquidator products were mislabeled:

> **Investigator:**  All this stuff here, Lumber Liquidators… All their labeling is CARB 2 right?  But it's not CARB 2?
>
> **Employee:  *Not CARB 2.***

148.  *60 Minutes* interviewed hedge fund manager Tilson.  Mr. Tilson explained that the profit margins at Lumber Liquidators were unusually high compared to its competitors.

> **Whitney Tilson:**  In 16 years of professional money management, I've seen hundreds of companies do all sorts of bad things to get their stock prices up.  But this has got to be the worst…
>
> **Whitney Tilson:**  When you see a commodity business suddenly double its profit margins, that raises red flags.
>
> **Anderson Cooper:**  Because it's hard to have your profit margin double in two years?
>
> **Whitney Tilson:**  Exactly. It's almost unprecedented for a company.
>
> * * *
>
> **Anderson Cooper:**  Why would Lumber Liquidators purchase wood that's tainted with formaldehyde?
>
> **Whitney Tilson:**  The answer is greed. Plain and simple.  It's cheaper and-- it reduces the cost by about 10 percent.
>
> **Anderson Cooper:**  Which in a business with these kinds of profit margins - 10 percent means – it's a lot of money?
>
> **Whitney Tilson:**  It's enormous.

149.  The day after the *60 Minutes* broadcast aired, on March 2, 2015, the Company filed its rebuttal in a Form 8-K with the SEC.

47

> We believe that *60 Minutes* used an improper test method in its reporting that is not included in CARB's regulations and does not measure a product according to how it is actually used by consumers. Our laminate floors are completely safe to use as intended. In our attempt to be fair and transparent, we provided significant testing results to *60 Minutes*, including the results of the random testing performed on products from each of our laminate suppliers. We also went to great lengths to document issues between the validated test method and that used by *60 Minutes*. Our Chairman addressed the differences and our position on the test methodology but *60 Minutes* chose not to include it.

150. Contrary to the Company's response, *60 Minutes* used both "core" testing (*i.e.,* testing performed on the medium density fiberboard "core" of deconstructed laminate flooring) and "surface" testing (*i.e.,* testing performed on the "surface" veneer or the top of the laminated surface of the product) methods properly.[20]  Moreover, contrary to Lumber Liquidators' assertion, "core" or deconstructive testing is a key component of CARB-compliant testing.[21] NBC News confirmed that *60 Minutes* performed both tests on March 3, 2015:

> CBS said the testing it had performed on behalf of *60 Minutes* followed the protocol set by the state of California. That state's formaldehyde regulations, known as CARB 2, are the strictest in the country and will be mirrored by nationwide regulations expected to go into place this year. CBS also had the labs administer the California Department of Public Health test, which measures the concentration of formaldehyde off-gassing from the laminates.

> To test the floorboards for CARB compliance, the outer layer or layers of material such as veneer are removed to expose the core, which is where formaldehyde-containing glue would be used.

---

[20] http://www.cbsnews.com/news/more-on-tests-used-to-investigate-lumber-liquidators

[21] http://www.arb.ca.gov/toxics/compwood/outreach/testmethods.htm; *Standard Operating Procedure for Finished Good Test Specimen Preparation Prior to Analysis of Formaldehyde Emissions from Composite Wood Products* (September 13, 2013) located at http://www.arb.ca.gov/toxics/compwood/outreach/compwood_sop_fg_decon_091313.pdf; and *Final Regulation Order Airborne Toxic Control Measure To Reduce Formaldehyde Emissions From Composite Wood Products* located at http://www.arb.ca.gov/regact/2007/compwood07/fro-atcmfin.pdf

"The method of preparing the sample [entails] removing what's not composite," said Stanley Young, spokesman for the California Air Resources Board. "If it's laminate, removing the laminate… You have to take all of those materials off."[22]

151. According to Kip Howlett, the President of the Hardwood Plywood & Veneer Association ("HPVA"), which operates HPVA Laboratories, the lab that tested samples of Lumber Liquidators' laminates for *60 Minutes*, HPVA Laboratories employed the CARB test:

CARB has an SOP (Standard Operating Procedure) where you take the surface layer off to test the formaldehyde level in the core. So when you have five labs follow the SOP and remove the surface layer – and all show levels of formaldehyde higher than the CARB 2 standard, you have a problem. And when it's 1,000% higher, you have a big problem!

When you have five labs all doing it the same way and getting the same results, it isn't about the test method. The company either didn't understand the SOP, or did understand it and did a work-around. They're either stupid or they're lying – which is it?

Another problem they have is that if you stamp the box CARB compliant, you had damn well better be CARB compliant.

It's telling that the American-made laminate was all compliant, but every sample from China wasn't. The Chinese producers are completely and totally unfairly competing with American and Canadian companies who abide by the law and produce safe laminate.[23]

152. Also on March 10, 2015, analysts at Wedbush concluded that *60 Minutes* implemented the correct tests:

***Importantly, the Standard Operating Procedures for preparing specimens for the test suggest that the 60 Minutes methodology is correct*** based on our interpretation of the procedure 7(D): "These composite core products must have a compliant core that meets the regulation's formaldehyde emission limits. a. Select one side of the board and remove surface coatings of paint, stain, varnish, or laminate one thin layer at a time by planing or sanding (as described in section 3 above) until the surface coatings have been removed and a clean smooth surface of MDF or PB remains."

---

[22] http://www.nbcnews.com/business/consumer/lumber-liquidators-stands-every-plank-should-you-n315826

[23] *Id.*

153.  On March 12, 2015, Defendant Lynch told investors on a conference call "[w]e have been engaged with CARB over many months, provided them with additional information and, like others in the industry, have expressed our concerns on the validity and applicability of the deconstructive testing method."  Defendant Lynch admitted that CARB's preliminary tests had revealed high levels of formaldehyde before the *60 Minutes* broadcast.  "We know that tests on some deconstructed samples have had elevated levels, but we believe that the results of deconstructed tests have little or no bearing on the safety of the finished product."

### 5.     The Company's Defective And Insufficient Quality Control For Formaldehyde Emissions

154.  Throughout the Class Period, Lumber Liquidators' lacked adequate quality controls and lacked an adequate compliance program with respect to its Chinese-made laminate flooring products.  Companies that import goods from China ensure quality by either monitoring the process at the factory or hiring third party inspection firms to manage the process.  This process includes a final random inspection of a statistically valid sample.  This statistically valid sample gives professional inspectors enough to draw conclusions about an entire production run.[24]  Moreover, an inspection should take place either before the components are embedded in the final goods or when the first finished products just get off the lines.  In these cases, some samples can be picked up and sent for lab testing.[25]

155. Lumber Liquidators' Chief Compliance and Sustainability Officer, Ray Cotton ("Cotton"), admitted that the Company did not begin building a compliance team in China until

---

[24]http://www.chinalawblog.com/2011/01/renaud_anjoran_on_the_five_steps_to_successfully_buying_product_from_china.html (last visited April 17, 2015).
[25] *Id.*

December of 2014.[26]   Mr. Cotton described the task of building such a team to be "super challenging" and that as of December 8, 2014 "it's taken months."

156. Moreover, Lumber Liquidators performed insufficient quality control tests.  Kip Howlett, the President of HPVA, explained that the number of quality control tests Lumber Liquidators has done over the past 18 months "is laughable – so few samples for such a huge volume of products."

157. *60 Minutes* showed Defendant Sullivan their undercover video footage of employees at the Chinese mills the Company employs to manufacture its laminate flooring. Defendant Sullivan, while defiant, offered no explanation and admitted that it calls into question Lumber Liquidators' quality control.

> **Anderson Cooper**: Employees at all three mills told us the laminates they make are not CARB 2 compliant. I want you to look at this....
>
> We shared some of our hidden camera footage with him.
>
> **Tom Sullivan**: I don't know the whole situation here. I will guarantee we'll be in that mill tomorrow and test it.  And that is not anything we can condone in any way, to save a cent.
>
> **Anderson Cooper**: This concerns you?
>
> **Tom Sullivan**: Yeah, yeah, of course.
>
> **Anderson Cooper**: Is this acceptable to you?
>
> **Tom Sullivan**: If it's true, no.
>
> **Anderson Cooper**: All three mills told us they falsely label your products as CARB 2 compliant – that's cheating.
>
> **Tom Sullivan**: That would be if that's true.
>
> **Anderson Cooper**: Nobody's ever reported this to you?

---

[26] http://blogs.wsj.com/riskandcompliance/2014/12/08/why-lumber-liquidators-is-building-a-compliance-team-in-china/

**Tom Sullivan**: Again, we will investigate it.  If there is anything going on, we will stop it immediately.  I don't know if it's true or not.  I don't know what the whole story is, but we will investigate it immediately.

**Anderson Cooper**: It certainly calls into question not just these mills, but it calls into question your oversight of these mills.

**Tom Sullivan**: It could, yes.

### 6.    Aftermath And Regulatory Actions In Response To The *60 Minutes* Report

158.  Immediately following the broadcast, the *New York Post* reported that California environmental regulators said they are "finding excessive amounts of formaldehyde in laminate flooring like that featured in a *60 Minutes* exposé on Lumber Liquidators."

159.  U.S. Senator Bill Nelson, (D-FL) called for a federal probe into the practices of Lumber Liquidators.  The ranking democrat on the Senate Committee on Commerce, Science and Transportation Committee, sent letters to the Consumer Product Safety Commission ("CPSC"), Centers for Disease Control and Prevention ("CDC"), and the Fair Trade Commission ("FTC").  And, on March 10, 2015, New York Attorney General Eric T. Schneiderman opened an inquiry into whether the Company violated safety standards.

160.  On March 22, 2015, U.S. Senator Charles E. Schumer (D-NY) called on federal agencies to investigate the safety of Lumber Liquidators' flooring:

> Standing outside a New York City Lumber Liquidators showroom, U.S. Senator Charles E. Schumer today urged the Consumer Product Safety Commission (CPSC) to immediately launch a broad investigation into the safety of Chinese-imported wood flooring material from Lumber Liquidators, and to initiate recalls or other disciplinary action if the product is found to be dangerous.  Schumer noted that homes recently rebuilt after Superstorm Sandy could be at risk, and that negative respiratory impacts are more strongly felt in apartments with poor ventilation.

161.  CPSC Chairman Elliot F. Kaye announced on March 25, 2015, that the commission is "actively investigating laminate flooring products from Lumber Liquidators."[27]

## V.      DEFENDANTS' FALSE AND
##        MISLEADING STATEMENTS AND OMISSIONS

162.  Defendants made false and misleading statements and material omissions during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.   Among other things, Defendants misrepresented to investors that: (i) legitimate "sourcing initiatives" drove the Company's extraordinary margin growth, revenue, and earnings; (ii) direct relationships with the Company's suppliers assured product quality; (iii) the Company sourced its products in compliance with foreign and domestic laws relating to forestry and the environment; (iv) the Company's suppliers were in compliance with foreign and domestic laws relating to forestry and the environment; (v) the Company's products were compliant with industry standards and government regulations; (vi) the Company implemented the necessary internal controls to ensure that its products were compliant with industry standards and government regulations; (vii) in the wake of the initial disclosures relating to the sourcing of non-compliant products, the Company's network of suppliers was diversified and could provide sufficient inventory to meet customer demand; and (viii) in the wake of the initial disclosures relating to the sourcing of non-compliant products, the Company would maintain "retail price discipline" and not resort to discounting.

163.  As further explained herein, Defendants' representations were false and misleading and omitted material facts including that: (i) the Company's laminate and engineered hardwood flooring products manufactured in China had high levels of formaldehyde; (ii) the Company's

---

[27] http://www.cpsc.gov/en/Newsroom/Press-Statements/CPSC-Chairman-Elliot-F-Kayes-statement-on-Lumber-Liquidators/

laminate and engineered hardwood flooring products manufactured in China failed to comply with applicable laws and regulations governing formaldehyde emissions from composite wood products under CARB standards; (iii) the Company imported flooring products sourced from illegally logged wood in the RFE in violation of the Lacey Act; (iv) the Company misrepresented the country of harvest on custom forms, failing to indicate that the wood in the products had been harvested from the RFE, in violation of the Lacey Act; (v) the Company had inadequate internal controls for ensuring compliance with the Lacey Act and CARB standards; (vi) the decrease in the Company's product costs and increase in margins were achieved as a result of sourcing products with high levels of formaldehyde, as well as products that violate the Lacey Act and CARB standards; and (vii) a substantial portion of the Company's earnings and revenues were thereby earned as a result of the violation of these laws.  Any purported statements of "belief" or "opinion" lacked a reasonable basis, contained untrue supporting statements, and misrepresented embedded facts as further explained herein.

A.    **2011 Annual Report**

164.  On February 22, 2012, the Company issued a press release announcing its financial results for the quarter and year end December 31, 2011.  For the quarter, the Company reported net income of $8.5 million, or $0.30 per diluted share, and $174.5 million in net sales, compared to net income of $5.9 million, or $0.21 per diluted share, and $153.2 in net sales in the fourth quarter of 2010.  Gross margin for the fourth quarter 2011 was 35.5% compared to 34.0% in the fourth quarter 2010.  The Company attributed the increase in gross margin in part to the "**lower product costs due primarily to the continued implementation of sourcing initiatives**. . ."  For the year, the Company reported net income of $26.3 million, or $0.93 per diluted share, and net sales of $681.6 million compared to net income of $26.3 million, or $0.93 per diluted share, and

net sales of $620.3 in 2010. Gross margin for the year increased to 35.3% compared to 34.8% in 2010.

165.   On February 22, 2012, the Company filed an annual report with the SEC on a Form 10-K for the year ended December 31, 2011, which was signed by, among others, Defendants Lynch, Terrell and Sullivan, in which it reiterated the Company's previously reported financial results and financial position.   In addition, the 2011 Form 10-K contained certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX").

166.   Defendants' statements in the February 22, 2012 Press Release and Annual Report on Form 10-K, identified above in ¶¶164 – 165, were false and misleading and omitted material facts as further explained herein.   Contrary to Defendants' statements, Lumber Liquidators' margin growth was not due to legitimate "sourcing initiatives" but was instead the product of illegal sourcing practices.   In particular, Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.   A substantial portion of the Company's earnings and revenues were earned as a result of these practices.

167.   For 2011, the Form 10-K also represented the following concerning the Company's business:

> Our value proposition to the customer is a key driver of our business. Important components include:
>
> • **Price.** A fundamental part of our business model is to provide quality hardwood flooring at everyday low prices. ***We are able to maintain these prices across our product range because we generally purchase flooring directly from mills***.

\*     \*     \*

> • **Quality.** *We believe that we have achieved a reputation for quality, and that our proprietary brands are recognized for excellence by our customers. We work directly with our supplier mills to source and produce flooring that will meet our high quality standards.*

168. Defendants' statements in the February 22, 2012 Annual Report on Form 10-K, identified above in ¶167, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards.  The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE. Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards.  The Company's decrease in product costs and increase in margins, revenues, and earnings were achieved by sourcing Chinese-made products that violated the Lacey Act, CARB regulations, and industry standards.

169. Concerning the Company's suppliers, the 2011 Form 10-K stated that: "We work directly with a select group of vendors and mills with whom we have cultivated relationships that provide for a consistent supply of high-quality product at the lowest prices. As part of ensuring the high-quality nature of our brands, we have developed demanding product standards…  We select suppliers based on a variety of factors, including their ability to supply products that meet industry grading standards and our specifications."  It went on to state "We believe that we are the largest customer for most of our suppliers, which we believe enables us to obtain better prices in some circumstances."

170. Defendants' statements in the February 22, 2012 Annual Report on Form 10-K, identified above in ¶169, were false and misleading and omitted material facts including (1) Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB regulations for formaldehyde emissions; (2) Lumber Liquidators violated the Lacey Act by importing flooring products sourced from lumber illegally logged in the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE; and (3) the Company had inadequate internal controls to ensure compliance with the Lacey Act, CARB regulations, and industry standards, as further explained herein.

171. Concerning government regulations bearing on formaldehyde and the harvesting wood, the 2011 Form 10-K stated the following:

> Our suppliers are subject to the laws and regulations of their home countries, including in particular laws regulating forestry and the environment. We consult with our suppliers as appropriate to ensure that they are in compliance with their applicable home country laws.

> \*\*\*

> ***In addition, certain of our products are subject to laws and regulations relating to the importation, acquisition or sale of illegally harvested plants and plant products and the emissions of hazardous materials. We work closely with our suppliers to ensure compliance with the applicable laws and regulations in these areas.***

> We believe that we currently conduct, and in the past have conducted, our activities and operations in substantial compliance with applicable laws and regulations relating to the environment and protection of natural resources, and believe that any costs arising from such laws and regulations will not have a material adverse effect on our financial condition or results of operations.

172. Defendants' statements in the February 22, 2012 Annual Report on Form 10-K, identified above in ¶171, were false and misleading and omitted material facts including: (1)

Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB regulations for formaldehyde emissions; (2) Lumber Liquidators violated the Lacey Act by importing flooring products sourced from lumber illegally logged in the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE; and (3) the Company had inadequate internal controls to ensure compliance with the Lacey Act, CARB regulations, and industry standards, as further explained herein.

173. Concerning the Company's gross margins, the 2011 Form 10-K attributed the increase primarily to the company's close and direct oversight of its suppliers through its "sourcing initiatives," which were described as follows:

> **Sourcing Initiatives.** In 2011, we began a process which will continually challenge the structure of our sourcing relationships with our vendor-mill partners and ultimately strengthen our relationships with the best international and domestic partners, and eliminate weaker sources. **Our sourcing initiatives play a key role in maintaining the best combination of quality and value in our product assortment and will continue to result in lower net product costs, enabling us to strengthen the value proposition to our customer.** . . . Through our own international sourcing operations and working directly with our vendor-mill partners, we can better control product cost and quality, enhance forecasting and broaden our product assortment. As aligned with our strategic long-term goals, we utilize our balance sheet to control raw material costs through scale not available to our vendor-mill partners.

174. Defendants' statements in the February 22, 2012 Annual Report on Form 10-K, identified above in ¶173, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards.  The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom

forms, and failing to indicate that the wood in the products had been harvested from the RFE. Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  The Company's gross margin expansion was not sustainable and the Company faced the risk of large fines, penalties, forfeitures, and judgments related to its practices.

175.  On a conference call with analysts on February 22, 2012, to discuss the Company's 4Q 2011 and full year 2011 results, Defendant Lynch emphasized that the Company would continue to "focus on sourcing" in China, which would be key to the Company's future financial results:

> We will continue to execute the strategy we've pursued over the last year; conducting line reviews and expanding our product assortments.  We expect to further leverage our China office following our acquisition last year, and we will continue to work closely with our vendor partners to develop strong, long-term relationships.

176.  Defendant Terrell, echoed Defendant Lynch's remarks, asserting that these sourcing initiatives would lead to a lower product costs and higher margins, stating that "where our sourcing initiatives either allow us to reduce certain basic stocking levels or the product will come from a new source in 2012 often at a lower cost."  Terrell continued, "I think the real long-term benefit is that ability to be closer to the mill to challenge the purchase cycle, look at broad-based assortment of lower-cost products and that's what is ahead of us in 2012.  So it certainly gave us some lift in 2011 but the real power is coming in 2012."

177.  The Company's discussion of its sourcing initiatives during the February 22, 2012 conference call was particularly important to investors.  Indeed, in a report published after the

call, analysts with Collins Stewart explained that going forward "[t]he company should benefit from significant cost savings generated by its sourcing initiatives."

178.  Defendant Lynch's and Defendant Terrell's statements during the February 22, 2012 conference call, identified above in ¶¶175 – 176, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards.  The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE.  Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  A substantial portion of the Company's earnings and revenues were earned as a result of these practices.

### B.    Website Representations

179.  At least as early as April 6, 2012, the Company's website represented, under the heading "Eco-friendly Flooring" that "Our flooring comes from managed forests," stating that "Lumber Liquidators offers flooring brands that practice responsible harvesting. . . . Tree cutting is monitored very carefully within a selective cutting and replanting strategy. . . .  Flooring mills must submit harvesting plans to the local government for approval. As a part of this process, they map and grid the land affected and take an inventory of the trees (size and species) in each grid. The government will then approve the plan and the mills must cut to it. There are limitations on the number and size of each species that can be harvested from each grid and then they must

move to the next grid. Once a grid is harvested, they cannot go back there until 30 years has passed."[28]

180.  The representations on Lumber Liquidators' website, identified above in ¶179, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE.  Moreover, the Company had inadequate internal controls to ensure compliance with the Lacey Act.

### C.    Quarterly Report For 1Q 2012

181.  On April 25, 2012, the Company issued a press release announcing its financial results for the quarter ended March 31, 2012.  For the quarter, the Company reported quarterly net sales of $188 million, net income of $8.2 million, or $0.29 per diluted share, compared to net sales of $159.7 million, net income of $5.8 million, or $0.20 per diluted share, in the first quarter of 2011.  Gross margin was 37.3% in the first quarter of 2012 compared to 36.2% in the first quarter of 2011.  The Company and Defendant Lynch attributed the increase in gross margin to a "lower costs of product" due to "sourcing initiatives".

182.  On April 25, 2012, the Company filed a quarterly report with the SEC on a Form 10-Q for the first quarterly period ending March 31, 2012, in which it reiterated the Company's previously reported financial results and financial position.  The report was signed by Defendant Terrell, and contained certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX.

---

[28] http://www.lumberliquidators.com/ll/flooring/ECOfriendly

183. Defendants' statements in the April 25, 2012 Press Release and Form 10-Q, identified above in ¶¶181 – 182, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  A substantial portion of the Company's earnings and revenues were earned as a result of these practices.  The Company's gross margin expansion was not sustainable and the Company faced the risk of large fines, penalties, forfeitures, and judgments related to its practices.

184. On a conference call with analysts on April 25, 2012, to discuss the Company's 1Q 2012 results, Defendant Lynch highlighted the impact that the Company's "sourcing initiatives" have had on gross margin: "In terms of sourcing, we are executing the strategy we have employed in recent quarters; performing line reviews and expanding our product assortments. We will continuously foster our vendor relationships and work closely with our vendor partners around the world to further enhance our sourcing strategies.  I am impressed with the team's performance in this area, the benefits of which are reflected in our gross margin and operating income."  Providing more detail, Defendant Terrell stated "Within our sourcing initiatives, gross margin in the first quarter of 2012 benefited relative to 2011 due to the continuing impact of line reviews and an increase in direct sourcing from certain international vendors which were serviced by Sequoia prior to our acquisition in the third quarter of last year, partially offset by lower vendor allowances."

185. Analysts responded favorably to Defendants' representations, again citing the Company's highly-publicized sourcing initiatives.  For example, analysts at Keybanc Capital Markets published an April 25, 2012 report noting that "gross margin came in at all-time highs

for the Company, benefitting from numerous ongoing [sourcing] initiatives that are still in their early innings." Similarly, Cannacord Genuity analysts commented that "[s]ales momentum and benefits from ongoing sourcing initiatives helped drive gross margin expansion" to the Company's "highest gross margin on record." Keybanc Capital Markets analysts reported that Lumber Liquidators' gross margin "benefit[ed] from numerous ongoing initiatives that are still in their early innings."

186. Defendant Lynch's and Defendant Terrell's statements during the April 25, 2012 conference call, identified above in ¶184, were false and misleading and omitted material facts as further explained herein. Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards. The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE. Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards. Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde. The Company's gross margin expansion was not sustainable and the Company faced the risk of large fines, penalties, forfeitures, and judgments related to its practices.

187. On this news, the Company's stock price increased $4.01, or 17%, from $23.47 on April 24, 2012, to $27.48 on April 26, 2012, on unusually high trading volume.

### D.      Quarterly Report For 2Q 2012

188. On July 25, 2012, the Company issued a press release announcing its financial results for the quarter ended June 30, 2012. For the quarter, the company reported quarterly net

sales of $210.3 million, net income of $12.2 million, or $0.43 per diluted share, compared to net sales of $175.5 million, net income of $5.3 million, or $0.19 per diluted share, in the second quarter of 2011.  Gross margin was 37.3% in the second quarter of 2012 compared to 34.0% in the second quarter of 2011. The Company once again attributed the increase in gross margin to a "lower costs of product" due to "sourcing initiatives".

189.  On July 25, 2012, the Company filed a quarterly report with the SEC on a Form 10-Q for the period ending June 30, 2012, signed by Defendant Terrell, in which it reiterated the Company's previously reported financial results and financial position.  In addition, the Form 10-Q certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX.

190. Defendants' statements in the July 25, 2012 Press Release and Form 10-Q, identified above in ¶¶188 – 189, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  A substantial portion of the Company's earnings and revenues were earned as a result of these practices.

191.  On a conference call with analysts on July 25, 2012, to discuss the Company's 2Q 2012 results, Defendant Lynch again asserted that the reason for the company's higher gross margin was the lower costs gained as a result of the "sourcing initiatives":

> To touch on sourcing. We continue to perform line reviews and consider potential product assortment expansions to align with the evolving needs and preferences of our consumer. ***Our sourcing initiatives and optimization of our supply chain continue to positively impact and expand gross margin***. . . . Additionally, our close working relationships with our vendor partners worldwide enable us to continue enhancing our sourcing strategies and we remain committed to seeking

direct relationships with all of our vendors. As many of you know, our fall 2011 acquisition provides us with direct relationships with our vendor mills in China. . . . **[We] have restructured our sourcing and quality control practices and removed certain third-party distributors to strengthen our relationships in this key area**. . . . **As our Chief Merchant, Bill Schlegel, and his teams have dug in with the vendors and done these line reviews**, it's not just been about first cost. It's been about the assortment, expanding.

192.   Defendant Terrell also represented that the Company's line reviews and other sourcing initiatives were the cause for the decline in product costs and increase in gross margins:

Overall, our product costs continued to benefit from shifts in our sales mix and the continuing benefit of our sourcing initiatives. Together, these benefits drove an improvement of approximately 250 net basis points. **Within our sourcing initiatives, gross margin continued to benefit from the impact of line reviews and the establishment of direct relationships with our vendor mills, particularly in China, following our September 2011 acquisition.**

193.   Analysts once again responded favorably.  For example, analysts at Canaccord Genuity reported that they were "starting to see the margin upside generated by the ongoing sourcing initiatives."  Similarly, Piper Jaffray analysts stated "[s]trong . . . gross margin trends appear sustainable through 2013 driven by a solid pipeline of initiatives."

194.   Defendant Lynch's and Defendant Terrell's statements during the July 25, 2012 conference call, identified above in ¶¶191 – 192, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards.  The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE.  Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey

Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde. The Company's gross margin expansion was not sustainable and the Company faced the risk of large fines, penalties, forfeitures, and judgments related to its practices.

195.  On this news, the Company's stock price increased $8.73, or 26.8%, from $32.58 on July 24, 2012 to $41.31 on July 25, 2012, on unusually high trading volume.

### E.      August And September 2012 Analyst Conferences

196.  On a conference call with analysts for the Canaccord Genuity Global Growth Conference on August 16, 2012, Defendant Lynch identified the Company's sourcing as its "key competitive advantage" in its price, selection and quality: "Our sourcing – direct sourcing is a key competitive advantage in our price, selection and quality in our stores. . . . Quality and availability, because we work directly with the mills, we better control the quality of the product, which allows us industry-leading warranties."

197.  Defendant Lynch's statements during the August 12, 2012 investor conference, identified above in ¶196, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards.  The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE. Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  A

substantial portion of the Company's earnings and revenues were earned as a result of these practices.

198. On a conference call with analysts for the Goldman Sachs Global Retailing Conference on September 6, 2012, in response to analyst Matthew J. Fassler's observation that "gross margin has been the biggest story for you, and within that, sourcing has probably been the biggest driver," and request for more detail regarding the Company's sourcing efforts, Defendant Lynch stated that sourcing was "the most important" driver of the Company's gains in gross margin – "only buying direct from factory, no middle man, no distributors, working directly with those factories, expanding our factory base."  He further stated that the "line reviews" had been "very effective" in reducing costs and that more reductions could be expected: "We feel that we are about 50% the way through conducting the line reviews in terms of the categories and the cost of goods in terms of that."

199. Defendant Lynch's statements during the September 26, 2012 investor conference, identified above in ¶198, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards.  The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE. Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  The

Company's gross margin expansion was not sustainable and the Company faced the risk of large fines, penalties, forfeitures, and judgments related to its practices.

**F.    Quarterly Report For 3Q 2012**

200.  On October 24, 2012, the Company issued a press release announcing its financial results for the quarter ended September 30, 2012.  For the quarter, the company reported quarterly net sales of $204.3 million, net income of $12.9 million, or $0.46 per diluted share, compared to net sales of $172.0 million, net income of $6.7 million, or $0.24 per diluted share, in the third quarter of 2011.  Gross margin was 38.1% in the third quarter of 2012 compared to 35.6% in the second quarter of 2011. The Company once again attributed the increase in gross margin to a "lower costs of product" due to "sourcing initiatives".

201.  On October 24, 2012, the Company filed a quarterly report with the SEC on a Form 10-Q for the period ending September 30, 2012, signed by Defendant Terrell, in which it reiterated the Company's previously reported financial results and financial position.   In addition, the Form 10-Q certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX.

202.  Analysts at Cannacord Genuity were enthused that the "company's merchandise margin continues to benefit from ongoing sourcing initiatives."

203.  Defendants' statements in the October 24, 2012 Press Release and Form 10-Q, identified above in ¶¶200 – 201, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  A substantial portion of the Company's earnings and revenues were earned as a result of these practices.

204.  On a conference call with analysts on October 24, 2012, to discuss the Company's 3Q 2012 results, Defendant Terrell stated that the quarter's increase in gross margin was again a direct result of the "line reviews" and other "sourcing initiatives," including the Company's quality control procedures:

- "Within our sourcing initiatives, gross margin continued to benefit from both the impact of line reviews and the close, direct relationships we have with our vendor mills."

- "[W]e are making investments in our quality control procedures and strengthening our relationships with vendors where we feel like we'll eventually get some gross margin benefit here as well."

- "It's – [b]ecause we've now had a stronger relationship in Asia after our acquisition of September of 2011 that opened up the market to additional vendors who may show up at a line review. It also strengthens the direct relationship that we have. So whether the benefit of a lower product costs is strictly related to the line review or the acquisition of that office and the relationship with the vendor, it's hard to parse that out."

205.  Analysts at Keybanc Capital Markets "applaud[ed] management's execution on key initiatives to improve both sales and profitability, and believe LL's long-term outlook remains bright supported by [the Company's] . . . margin initiatives."

206. Defendant Terrell's statements during the October 24, 2012 conference call, identified above in ¶204, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards.  The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE. Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2)

violated CARB regulations; and (3) contained and emitted high levels of formaldehyde. The Company's gross margin expansion was not sustainable and the Company faced the risk of large fines, penalties, forfeitures, and judgments related to its practices.

207. On this news, the Company's stock price increased $5.67 (11.3%) from $50.14 on October 23, 2012 to $55.81 on October 24, 2012, on unusually high trading volume.

### G.     The Company's Supplier Code of Conduct

208. At least as early as November 11, 2012, the Company's website represented that the Company ensures that every supplier complies with the Company's "Supplier Code of Conduct with Respect to Environmental and Social Responsibility":

> Since 2007, each of our suppliers has been required to comply with our supplier code of conduct. . . . Over the years, we have worked directly with a select group of vendors and mills with whom we have cultivated long-standing relationships. We often pay announced and unannounced visits to our suppliers' mills and forests and assess their adherence to our code of conduct and its protocols concerning labor as well as health and safety matters. In many cases, we visit potential suppliers to assess their ability to comply with our environmental and social policies prior to ordering products from them. . . . In the event we learn that any employee or supplier has engaged in behavior that has violated our policies, we would take appropriate remedial action.[29]

209. The representations on Lumber Liquidators' website, identified above in ¶208, were false and misleading and omitted material facts including: (1) Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB regulations for formaldehyde emissions; (2) Lumber Liquidators violated the Lacey Act by importing flooring products sourced from lumber illegally logged in the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE; and (3) the Company

---

[29]http://www.lumberliquidators.com/assets/images/product_page/California_Supply_Chains_Act.pdf

had inadequate internal controls to ensure compliance with the Lacey Act, CARB regulations, and industry standards, as further explained herein.

### H.   2012 Annual Report

210. On February 20, 2013, the Company issued a press release announcing record financial results for the quarter and year end December 31, 2012.  For the quarter, the Company reported net income of $13.8 million, or $0.50 per diluted share, and $210.7 in net sales, compared to net income of $8.5 million, or $0.30 per diluted share, and $174.5 million in net sales in the fourth quarter of 2011.  Gross margin for the fourth quarter 2011 was 39.1% compared to 35.5% in the fourth quarter 2011.  The Company attributed the increase in gross margin in part to the "lower product costs due primarily to the continued implementation of sourcing initiatives. . ."  For the year, the Company reported net income of $47.1 million, or $1.68 per diluted share, and net sales of $813.3 million compared to net income of $26.3 million, or $0.93 per diluted share, and net sales of $681.6 in 2011. Gross margin for the year increased to 38.0% compared to 35.3% in 2011.

211. On February 20, 2013, the Company filed an annual report with the SEC on a Form 10-K for the period ended December 31, 2012, which was signed by, among others, Defendants Lynch, Terrell and Sullivan where it reiterated the Company's previously reported financial results and financial position.  In addition, the 2012 Form 10-K contained certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX.

212. Defendants' statements in the February 20, 2013 Press Release and Annual Report on Form 10-K, identified above in ¶¶210 – 211, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.

A substantial portion of the Company's earnings and revenues were earned as a result of these practices.

213. Concerning the Company's competitive strengths, the 2012 Form 10-K stated that "We believe that our sourcing directly from the mill provides the foundation for the strongest value proposition in a highly-fragmented hardwood flooring market . . ." as follows:

> **Sourcing Direct from the Mill**
> *Our Suppliers*. We believe that our vertically integrated business model enables us to offer a broad assortment of high-quality products to our customers at a lower cost than our competitors. We work directly with a select group of vendors and mills with whom we have cultivated strong relationships that provide for a consistent supply of our products. We select suppliers based on a variety of factors, including their ability to supply products that meet industry grading standards and our demanding product specifications, which support the high-quality nature of our brands. We believe that we are the largest customer for most of our suppliers, which we believe enables us to obtain better prices in some circumstances.

214. Defendants' statements in the February 20, 2013 Annual Report on Form 10-K, identified above in ¶213, were false and misleading and omitted material facts as further explained herein. Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards. The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE. Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards. Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde. A substantial portion of the Company's earnings and revenues were earned as a result of these

practices.  The Company's gross margin expansion was not sustainable and the Company faced the risk of large fines, penalties, forfeitures, and judgments related to its practices.

215.  Concerning the company's "sourcing initiatives," the 2012 Form 10-K stated that "Our sourcing initiatives play a key role in maintaining the best combination of quality and value in our product assortment, while reducing product costs":

> These initiatives are segregated into three primary areas, which are being implemented independently over a multi-year time frame, as follows:
>
> - Volume-based discounts and cost sharing for a range of continuing programs, including marketing, product samples and new store openings;
>
> - Current and potential mill partners' participation in competitive line reviews of specific merchandise categories to evaluate breadth of assortment, quality, logistics and product cost; and
>
> - Direct sourcing with international and domestic mills to control product cost and quality, enhance forecasting and broaden our product assortment.

216.  Defendants' statements in the February 20, 2013 Annual Report on Form 10-K, identified above in ¶215, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards.  The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE.  Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.

217.  Concerning gross margin, the 2012 Form 10-K stated that a significant driver of gross margin expansion was a reduction in the "product costs" resulting from the Company's "sourcing initiatives":

> **Cost of Product:** In both 2012 and 2011, gross margin benefited from our sourcing initiatives and shifts in our sales mix. Our sourcing initiatives, originally launched in the first quarter of 2011, include vendor allowances, line reviews and increases in the percentage of product we source direct from the mill. . . . In September 2011, we entered into an agreement to acquire certain assets of Sequoia Floorings Inc. ("Sequoia") relating to Sequoia's quality control and assurance, product development, claims management and logistics operations in China. ***We believe our product costs was reduced, primarily in 2012, due to both the net cost reduction of owning those services and the benefits of working directly with the mills.***

218.  Defendants' statements in the February 20, 2013 Annual Report on Form 10-K, identified above in ¶217, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards.  The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE. Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  The Company's gross margin expansion was not sustainable and the Company faced the risk of large fines, penalties, forfeitures, and judgments related to its practices.

219.  Concerning government regulation of the Company's foreign suppliers' operations, the 2012 Form 10-K stated in relevant part:

Our suppliers are subject to the laws and regulations of their home countries, including in particular laws regulating labor, forestry and the environment. We consult with our suppliers as appropriate to ensure that they are in compliance with their applicable home country laws. We also support social and environmental responsibility among our supplier community and our suppliers agree to comply with our expectations concerning environmental, labor and health and safety matters. Those expectations include representations and warranties that our suppliers comply with the laws, rules and regulations of the countries in which they operate.

220. Defendants' statements in the February 20, 2013 Annual Report on Form 10-K, identified above in ¶219, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE.  Moreover, the Company had inadequate internal controls to ensure compliance with the Lacey Act.

221. Concerning government regulation of the Company's operations, the 2012 Form 10-K stated in relevant part:

> *In addition, certain of our products are subject to laws and regulations relating to the importation, acquisition or sale of illegally harvested plants and plant products and the emissions of hazardous materials. We work closely with our suppliers to ensure compliance with the applicable laws and regulations in these areas.*
>
> *We believe that we currently conduct, and in the past have conducted, our activities and operations in substantial compliance with applicable laws and regulations relating to the environment and protection of natural resources*, and believe that any costs arising from such laws and regulations will not have a material adverse effect on our financial condition or results of operations.

222. Defendants' statements in the February 20, 2013 Annual Report on Form 10-K, identified above in ¶221, were false and misleading and omitted material facts including: (1) Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB regulations

for formaldehyde emissions; (2) Lumber Liquidators violated the Lacey Act by importing flooring products sourced from lumber illegally logged in the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE; and (3) the Company had inadequate internal controls to ensure compliance with the Lacey Act, CARB regulations, and industry standards, as further explained herein.

223. On a conference call with analysts on February 20, 2013, to discuss the Company's 4Q 2012 and full year 2012 results, Defendant Lynch stated that, once again, the Company's "sourcing initiative" have "continued to contribute significantly to our gross margin expansion": "Ongoing line reviews and product assortment evaluations have remained critical in our ability to align with customer preferences and flooring trends, and these initiatives remain top priorities. We've been pleased with the reduction in product cost; but equally as important, our people have forged stronger relationships with our mills to deliver a broader assortment, enhanced availability and stronger control over product quality."

224. Defendant Lynch's statements during the February 20, 2013 conference call, identified above in ¶223, were false and misleading and omitted material facts as further explained herein. Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards. The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE. Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards. Lumber Liquidators' decrease in product costs and increase in margins were

achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  The Company's gross margin expansion was not sustainable and the Company faced the risk of large fines, penalties, forfeitures, and judgments related to its practices.

225.  During the same call, Defendant Terrell provided more detail, stating that as a result of sourcing initiatives, products costs were, as a percentage of net sales, 220 basis points lower:

> Sourcing initiatives favorable to gross margin included the net benefit of direct relationships with our vendor mills, competitive line reviews and vendor cost sharing primarily through certain allowances.. . . . Looking back over the two years since initial implementation, our product costs for the full year 2012 is 200 basis points lower than the full year 2011, and 340 basis points lower than the full year 2010. ***We believe these sourcing initiatives have not only lowered product costs, they have facilitated the assortment expansion of premium products and enhanced product availability.***

226. Defendant Terrell's statements during the February 20, 2013 conference call, identified above in ¶225, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards.  The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE. Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  The Company's gross margin expansion was not sustainable and the Company faced the risk of large fines, penalties, forfeitures, and judgments related to its practices.

I.      **Quarterly Report For 1Q 2013**

227.  On April 24, 2013, the Company issued a press release announcing record financial results for the quarter ended March 31, 2013.  For the quarter, the company reported quarterly net sales of $230.4 million, net income of $15.8 million, or $0.57 per diluted share, compared to net sales of $188.0 million, net income of $8.2 million, or $0.29 per diluted share, in the first quarter of 2012.  Gross margin was 40.4% in the first quarter of 2012 compared to 37.3% in the first quarter of 2012.

228.  On April 24, 2013, the Company filed a quarterly report with the SEC on a Form 10-Q for the first quarterly period ending March 31, 2013, signed by Defendant Terrell, in which it reiterated the Company's previously reported financial results and financial position.  In addition, the Form 10-Q certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX. The report further stated in relevant part that "[i]n 2013 . . . [w]e expect to . . . [expand] gross margin through continued execution of our sourcing initiatives and optimization of our supply chain."

229.  Defendants' statements in the April 24, 2013 Press Release and Form 10-Q, identified above in ¶¶227 – 228, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  A substantial portion of the Company's earnings and revenues were earned as a result of these practices.

230.  On a conference call with analysts on April 24, 2013, to discuss the Company's 1Q 2013 results, Defendant Lynch again attributed the continued increase in gross margin to the sourcing initiatives: "The first thing I would tell you is our sourcing strategy and merchandising

strategies are really focused on buying direct from the mill, no middle man, going direct to them, so that is one thing that helps us. The other thing as you've noticed the last couple of years, we have been expanding our global sourcing operation; acquiring the office in China, we diversified our mill base within China within all of Asia."

231.   Defendant Lynch's statements during the April 24, 2013 conference call, identified above in ¶230, were false and misleading and omitted material facts as further explained herein. Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards. The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE.   Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards.   Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.   The Company's gross margin expansion was not sustainable and the Company faced the risk of large fines, penalties, forfeitures, and judgments related to its practices.

232.   On this news, the Company's stock price increased $8.19, or 11.6%, from $70.49 on April 23, 2013 to $78.68 on April 25, 2013, on unusually high trading volume.

### J.      Quarterly Report For 2Q 2013

233.   On July 24, 2013, the Company issued a press release announcing its financial results for the quarter ended June 30, 2013.   For the quarter, the company reported quarterly net sales of $257.1 million, net income of $20.4 million, or $0.73 per diluted share, compared to net sales of $210.3 million, net income of $12.2 million, or $0.43 per diluted share, in the second

quarter of 2012.  Gross margin was 41.3% in the second quarter of 2012 compared to 37.3% in the second quarter of 2012.  Defendant Lynch stated "Our value proposition of price, selection, quality, availability and expertise continues to be recognized by a growing customer base, and our commitment to continuous improvement drove strong performance throughout the organization.  We are pleased that our coordinated efforts enabled us to capture additional market share and deliver record operating margin."

234.  On July 24, 2013, the Company filed a quarterly report with the SEC on a Form 10-Q for the period ending June 30, 2013, signed by Defendant Terrell, in which it reiterated the Company's previously reported financial results and financial position.  In addition, the Form 10-Q certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX. The report further stated in relevant part that "[i]n 2013 . . . [w]e expect to . . . [expand] gross margin through continued execution of our sourcing initiatives and optimization of our supply chain."

235. Defendants' statements in the July 24, 2013 Press Release and Form 10-Q, identified above in ¶¶233 – 234, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards.  The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE. Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2)

violated CARB regulations; and (3) contained and emitted high levels of formaldehyde. A substantial portion of the Company's earnings and revenues were earned as a result of these practices.

236. On a conference call on July 24, 2013, following the release of the Q2 2013 results, Defendant Lynch discussed the quality and sourcing of the Company's products, stating that "our mills comply with *our product specs, because we have personnel on the ground, in the mills. . . [We] don't rely on a distributor to measure and control our quality. . . We do stringent testing of our products at multiple levels, beyond what's required*. Our products are tested by third party experts, both at the mill and then off-site . . . And we also go in and do random tests at the mill."

237. Defendant Lynch's statements during the July 24, 2013 conference call, identified above in ¶236, were false and misleading and omitted material facts including: (1) Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB regulations for formaldehyde emissions; (2) Lumber Liquidators violated the Lacey Act by importing flooring products sourced from lumber illegally logged in the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE; and (3) the Company had inadequate internal controls to ensure compliance with the Lacey Act, CARB regulations, and industry standards, as further explained herein.

238. Emphasizing his and management's knowledge of the Company's sourcing practices, Defendant Lynch stated "I'd like to spend a few minutes today on quality, which is fundamentally important to the success of our premium brands and key to a loyal customer base. *Sourcing directly from the mill provides the foundation for our entire value proposition. Due*

81

*to our scale, we often purchase the majority of our mill partner's capacity.  And as a result, we have insight and visibility throughout the sourcing process*."   Defendant Lynch continued, stating that "This provides a significant competitive advantage compared to the distributor model of many of our competitors," specifically referring to "*Virginia Mill Works Handscraped Hardwoods*" (which was one of the brands supplied by Xingjia) as an example of the Company's "high-quality" products.

239.  Defendant Lynch's statements during the July 24, 2013 conference call, identified above in ¶238, were false and misleading and omitted material facts including: (1) Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB regulations for formaldehyde emissions; (2) Lumber Liquidators violated the Lacey Act by importing flooring products sourced from lumber illegally logged in the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE; and (3) the Company had inadequate internal controls to ensure compliance with the Lacey Act, CARB regulations, and industry standards, as further explained herein.

240.  Regarding regulatory compliance, Lynch stated as follows:

Our commitment to quality begins with well-designed product specifications, followed by *strict adherence to a set of internal standards set well above regulatory requirements*. *Because of these standards, the products we sell nationally exceed the most stringent requirements of any state.*

*We have developed quality control and assurance processes for our products that we believe lead our industry.* Due to our international sourcing, we have more than 60 professionals around the world, including in the U.S., Canada, China and South America, who perform and monitor those processes that we believe are most effectively executed on the ground at the mill.

*We augment the on-site controls with additional testing in both our own labs and in independent, certified facilities.* The combination of our on-site controls and our additional testing is designed to ensure that our process exceed the

highest regulatory requirements and meet our more stringent internal quality standards. As national standards are developed around product quality, construction, and packaging, we will engage in and intend to lead our industry in the process.

241.  Defendant Lynch's statements during the July 24, 2013 conference call, identified above in ¶240, were false and misleading and omitted material facts including: (1) Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB regulations for formaldehyde emissions; (2) Lumber Liquidators violated the Lacey Act by importing flooring products sourced from lumber illegally logged in the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE; and (3) the Company had inadequate internal controls to ensure compliance with the Lacey Act, CARB regulations, and industry standards, as further explained herein.

242.  On this news, the Company's stock price increased $6.00, or 6.9%, from $86.61 on July 23, 2013 to $92.61 on July 24, 2013, on unusually high trading volume.

### K.  **August And September 2013 Analyst Conferences**

243.  On a conference call with analysts for the Canaccord Genuity Growth Conference on August 14, 2013, Defendant Lynch asserted that the Company's advantage on cost, price and sourcing was a result of the size of the Company and its sourcing team lead by Schlegel:

> We absolutely have a world-class sourcing team. Our Chief Merchant, Bill Schlegel, and the team that he has built under him is better than I've ever seen in my career. . . . it is because of our size. I mean, all we do is hardwood flooring, Okay? That gives us an advantage.  So we're able to have people on the ground in foreign markets working directly with the mills."

244.  Defendant Lynch's statements during the August 14, 2013 investor conference, identified above in ¶243, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' Chinese-made laminate and engineered hardwood

flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards.  The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE. Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.

245.  On a conference call with analysts for the Goldman Sachs Global Retailing Conference on September 10, 2013, in which Defendants Lynch, Terrell, and Schlegel participated, Defendant Lynch represented that the dramatic increase in gross margins since 2011 was a result of the Company's $8 million acquisition of Sequoia and the sourcing initiatives (direct purchasing and line reviews), which Lynch again emphasized as being spearheaded by the Company's Chief Merchandising Officer, Schlegel:

> **Margin has been a big driver for us and this guy [William K. Schlegel] has been a big part of it as our Chief Merchant**. . . . [B]ut one major thing we've done in the last couple of years is really going back to being 99% direct to the factory, big driver.  [Not] getting direct and working more closely with them, we also shifted to real thorough and professional line review process that Bill has spearheaded, that has driven margin enhancement.

246.  Defendant Lynch's statements during the September 10, 2013 investor conference, identified above in ¶245, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards.  The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom

forms, and failing to indicate that the wood in the products had been harvested from the RFE. Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  The Company's gross margin expansion was not sustainable and the Company faced the risk of large fines, penalties, forfeitures, and judgments related to its practices.

**L.      September 27, 2013 Press Release**

247.  On September 27, 2013, in a press release, the Company continued to misrepresent the sourcing of their products:

> Due to the scale of its international and domestic operations, Lumber Liquidators has policies and procedures in place for the sourcing, harvesting and manufacturing of its products designed to comply with federal and other regulations related to the importation of wood flooring products.  The Company has more than 60 professionals around the world who perform and monitor those processes.  Quality is a key component of Lumber Liquidators' value proposition, and through its commitment to continuous improvement, the Company invests significant resources for quality control and assurance.

248.  Defendants' statements in the September 27, 2013 press release, identified above in ¶247, were false and misleading and omitted material facts as further explained herein.  (1) Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB regulations for formaldehyde emissions; (2) Lumber Liquidators violated the Lacey Act by importing flooring products sourced from lumber illegally logged in the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE; and (3) the Company had inadequate internal controls to ensure

compliance with the Lacey Act, CARB regulations, and industry standards, as further explained herein.

### M.     Quarterly Report For 3Q 2013

249.  On October 23, 2013, the Company issued a press release announcing its financial results for the quarter ended September 30, 2013.   For the quarter, the Company reported quarterly net sales of $254.3 million, net income of $20.4 million, or $0.73 per diluted share, compared to net sales of $204.3 million, net income of $12.9 million, or $0.46 per diluted share, in the third quarter of 2012.  Gross margin was 41.8% in the third quarter of 2013 compared to 38.1% in the second quarter of 2012.

250.  On October 23, 2013, the Company filed a quarterly report with the SEC on a Form 10-Q for the period ending September 30, 2013, signed by Defendant Terrell, in which it reiterated the Company's previously reported financial results and financial position.   In addition, the Form 10-Q certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX.

251. Defendants' statements in the July 24, 2013 Press Release and Form 10-Q, identified above in ¶¶249 – 250, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  A substantial portion of the Company's earnings and revenues were earned as a result of these practices.

252. On a conference call on October 23, 2013, following the release of the Q3 2013 results, Defendant Lynch addressed the sealed search warrant issued by federal authorities and denied that the Company engaged in any illegal sourcing: "I can assure you of our commitment

to uncompromising integrity and ethical business conduct across all areas of Lumber Liquidators' operations. We expect and require the same of our suppliers. Working together, we strive to advance responsible forest management."  Defendant Lynch went on to stress the quality of the Company's sourcing practices and its product:

> The nature of our supplier relationships within our direct sourcing model allows us to develop and produce the highest quality merchandise and the broadest assortment at industry-leading value. We believe these direct relationships are unique in our industry and provide us with a competitive advantage.
>
> ***
>
> Once we establish a mill relationship, ***we monitor and enforce our specifications and practices through more than 60 employees dedicated to quality control and assurance located on the ground in the U.S., Canada, China and South America***. We invest significant time and resources to safeguard quality and enforce product compliance, and we terminate relationships with suppliers we believe are not adhering to those standards.

253. Defendants Lynch's statements during the October 23, 2013 conference call, identified above in ¶252, were false and misleading and omitted material facts including: (1) Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB regulations for formaldehyde emissions; (2) Lumber Liquidators violated the Lacey Act by importing flooring products sourced from lumber illegally logged in the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE; and (3) the Company had inadequate internal controls to ensure compliance with the Lacey Act, CARB regulations, and industry standards, as further explained herein.

254. On this news, the Company's stock price increased $5.17 (4.75%) from $108.82 on October 22, 2013 to $113.99 on October 23, 2013, on unusually high trading volume.

N.    **December 10, 2013 Investor Conference**

255.  On December 10, 2013, the Company presented at the Credit Suisse Hardline Retail Roundup investor conference.  A December 9, 2013 press release filed with the SEC stated that Defendants Lynch, Terrell, and Schlegel "will be meeting with investors throughout the day" during this conference.

256.  The Company's presentation, which was filed with the SEC on Form 8-K, stated that gross margins would continue to grow through retail price discipline – *i.e.*, minimal discounting – and the sourcing initiatives.  Specifically, the Company's presentation stated that investors could anticipate "[c]ontinued gross margin expansion from . . . retail price discipline and sourcing initiatives."  The Company also stated that it "[e]xpect[s] to continue [its] sourcing strategy of direct sourcing with international and domestic mills to control product cost and quality, enhance forecasting and broaden [its] product assortment."   In addition, Lumber Liquidators touted its "[s]trong relationships with more than 150 domestic and international vendors" and reiterated that no single supplier accounts for more than 4% of hardwood purchases.

257.  Defendant Lumber Liquidators' statements in the December 10, 2014 investor presentation, identified above in ¶255-256, were false and misleading and omitted material facts as further explained herein.   Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards.   The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE.  Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards.  Lumber Liquidators' decrease in product costs and increase in

margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde. The Company's gross margin expansion was not sustainable and the Company faced the risk of large fines, penalties, forfeitures, and judgments related to its practices.

O.    **2013 Annual Report**

258.  On February 19, 2014, the Company issued a press release announcing financial results for the quarter and year end December 31, 2013.  For the quarter, the Company reported net income of $20.8 million, or $0.74 per diluted share, and $258.4 million in net sales, compared to net income of $13.8 million, or $0.50 per diluted share, and $210.7 million in net sales in the fourth quarter of 2012.  Gross margin for the fourth quarter 2013 was 40.8% compared to 39.1% in the fourth quarter 2012.  The Company attributed the increase in gross margin in part to the "lower net product costs."  For the year, the Company reported net income of $77.4 million, or $2.77 per diluted share, and net sales of $1 billion compared to net income of $47.1 million, or $1.68 per diluted share, and net sales of $813.3 million in 2012. Gross margin for the year increased to 41.1% compared to 38.0% in 2012.

259.  On February 19, 2014, the Company filed an annual report with the SEC on a Form 10-K for the period ended December 31, 2013, which was signed by, among others, Defendants Lynch, Terrell and Sullivan, in which it reiterated the Company's previously reported financial results and financial position.  In addition, the 2013 Form 10-K contained certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX.

260.  Defendants' statements in the February 19, 2014 Press Release and Annual Report on Form 10-K, identified above in ¶¶258 – 259, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey

Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde. A substantial portion of the Company's earnings and revenues were earned as a result of these practices.

261. Concerning the Company's competitive strengths, the 2013 Form 10-K stated that "Sourcing directly from the mill provides the foundation for [the Company's] value proposition." As to price, the Form 10-K stated "Our retail prices in each merchandise category are generally lower than our competitors. . . . We are able to maintain these prices through our direct sourcing model, including the relationship with the mill . . . ."

262. Defendants' statements in the February 19, 2014 Annual Report on Form 10-K, identified above in ¶261, were false and misleading and omitted material facts as further explained herein. Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards. The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE. Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards. Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde. A substantial portion of the Company's earnings and revenues were earned as a result of these practices.

263. Concerning the Company's "sourcing model," the 2013 Form 10-K stated as follows:

90

**Our Direct Sourcing Model**

*Supplier Relationships.* ***We believe sourcing directly from mills enables us to offer a broad assortment of high-quality, proprietary products to our customers at a consistently lower cost than our competitors.*** We seek to establish strong relationships with mills around the world where the significance of our scale, breadth of assortment and liquidity allow for both higher quality and lower cost. We believe our collaborative relationship enhances the mills' productivity, yield and financial flexibility, such that we access lower net costs than our competitors. We are able to set demanding specifications for product quality and our own quality control and assurance teams are on-site at the mills, coordinating inspection and assurance procedures. . . . ***We seek long-term, core relationships with mills committed to our demanding product specifications, sustainable supply and regulatory compliance.***

264. Defendants' statements in the February 19, 2014 Annual Report on Form 10-K, identified above in ¶263, were false and misleading and omitted material facts as further explained herein. Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards. The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE. Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards. Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.

265. Concerning the Company's "sourcing initiatives," the 2013 Form 10-K stated that "Our sourcing initiatives play a key role in maintaining the best combination of quality and value in our product assortment, while reducing product costs.":

These initiatives, now a continuous and integral part of our sourcing strategy and process, can be segregated into three primary areas:

91

- Volume-based discounts and cost sharing for a range of continuing programs, including marketing, product samples and new store openings;

- Current and potential mill partners' participation in competitive line reviews of specific merchandise categories to evaluate breadth of assortment, quality, logistics and product cost; and

- Direct sourcing with international and domestic mills to control product cost and quality, enhance forecasting and broaden our product assortment.

266. Defendants' statements in the February 19, 2014 Annual Report on Form 10-K, identified above in ¶265, were false and misleading and omitted material facts as further explained herein. Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards. The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE. Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards. Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde. The Company's gross margin expansion was not sustainable and the Company faced the risk of large fines, penalties, forfeitures, and judgments related to its practices.

267. Concerning gross margin, the 2013 Form 10-K stated that a "significant driver[] of gross margin expansion" was a "[s]ourcing initiatives, including line reviews and the percentage of product we source direct from the mill, generally lowered net costs from our suppliers. . ."

268. Defendants' statements in the February 19, 2014 Annual Report on Form 10-K, identified above in ¶267, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards.  The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE. Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  The Company's gross margin expansion was not sustainable and the Company faced the risk of large fines, penalties, forfeitures, judgments and settlements in connection with government regulatory actions and consumer class actions related to its practices.

269. Concerning government regulation of the Company's foreign suppliers' operations, the 2013 Form 10-K stated in relevant part:

> ***Our suppliers are subject to the laws and regulations of their home countries, including in particular laws regulating labor, forestry and the environment. We consult with our suppliers, as appropriate, to ensure that they are in compliance with their applicable home country laws.*** We also support social and environmental responsibility among our supplier community and our suppliers agree to comply with our expectations concerning environmental, labor and health and safety matters. Those expectations include representations and warranties that our suppliers comply with the laws, rules and regulations of the countries in which they operate.

270. Defendants' statements in the February 19, 2014 Annual Report on Form 10-K, identified above in ¶269, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators violated the Lacey Act by importing flooring products

sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE.  Moreover, the Company had inadequate internal controls to ensure compliance with the Lacey Act.

271.  Concerning government regulation of the Company's operations, the 2013 Form 10-K stated in relevant part:

> *In addition, certain of our products are subject to laws and regulations relating to the importation, acquisition or sale of illegally harvested plants and plant products and the emissions of hazardous materials. We work closely with our suppliers in order to comply with the applicable laws and regulations in these areas.*
>
> *We believe that we currently conduct, and in the past have conducted, our activities and operations in substantial compliance with applicable laws and regulations relating to the environment and protection of natural resources.*

272.  Defendants' statements in the February 19, 2014 Annual Report on Form 10-K, identified above in ¶271, were false and misleading and omitted material facts including: (1) Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB regulations for formaldehyde emissions; (2) Lumber Liquidators violated the Lacey Act by importing flooring products sourced from lumber illegally logged in the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE; and (3) the Company had inadequate internal controls to ensure compliance with the Lacey Act, CARB regulations, and industry standards, as further explained herein.

273.  Concerning sustainable forestry, the 2013 Form 10-K stated "We are committed to uncompromising integrity across our operations, and quality is a key component of our value proposition.  The scale of our purchasing and diversity of products require sustainable forestry.

We invest significant time and resources to safeguard quality and comply with regulatory requirements.  We discontinue sourcing from suppliers not adhering to our standards.  We seek long-term relationships with mills that can provide sustainable and growing supplies of high-quality product."

274. Defendants' statements in the February 19, 2014 Annual Report on Form 10-K, identified above in ¶273, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE.  Moreover, the Company had inadequate internal controls to ensure compliance with the Lacey Act.

275.  On a conference call with analysts on February 19, 2014, to discuss the Company's 4Q 2013 and full year 2013 results, Defendant Lynch stated that, "The direct sourcing relationships we have with our mills around the world have never been stronger which enables us to offer the highest quality merchandise and the broadest assortment at the lowest prices. . . [W]e have always been and remain committed to uncompromising integrity and ethical business conduct across all areas of the Company's operations.  We expect and require the same of our suppliers and work together to advance responsible forest management."

276. Defendants' statements during the February 19, 2014 conference call, identified above in ¶275, were false and misleading and omitted material facts as further explained herein. Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards. Lumber Liquidators violated the Lacey Act by importing flooring products sourced from lumber

illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE.  Moreover, the Company had inadequate internal controls to ensure compliance with the Lacey Act.  Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards.

277.  In reference to the federal search warrant served at the end of September 2013, Lynch stated, "In combination with our internal team, we have engaged third-party resources, including forensic specialists, to review our sourcing in Northern China.  These review efforts are in addition to our continuing investment in product sourcing processes and practices over the last two years. I remain confident in these processes and practices, which are designed to elicit adherence to our comprehensive standards for quality and compliance, which we believe exceed industry standards.  Overall, our direct sourcing model is intact, and our diversified sourcing across more than 150 suppliers will continue to afford us the flexibility to add or remove vendors quickly, seamlessly and appropriately as needed."

278.  Defendant Lynch's statements during the February 19, 2014 conference call, identified above in ¶277, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE.  Moreover, the Company had inadequate internal controls to ensure compliance with the Lacey Act.  The Company's gross margin expansion was not sustainable and the Company faced the risk of large fines, penalties, forfeitures, and judgments related to its practices.

279. Concerning gross margin, Defendant Terrell stated, "in the fourth quarter, the product margin category drove 210 basis points of gross margin expansion . . . Within product margin, our sourcing initiatives continued to lower net product cost. . ."

280. Defendant Terrell's statements during the February 19, 2014 conference call, identified above in ¶279, were false and misleading and omitted material facts as further explained herein. Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards. The Company violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE. Lumber Liquidators had inadequate internal controls to ensure compliance with these regulations and standards. Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde. The Company's gross margin expansion was not sustainable and the Company faced the risk of large fines, penalties, forfeitures, and judgments related to its practices.

281. On this news, the Company's stock price increased $4.98, or 5.2%, from $95.60 on February 18, 2014 to $100.58 on February 19, 2014, on unusually high trading volume.

**P.      Quarterly Report For 1Q 2014**

282. On April 30, 2014, the Company issued a press release announcing financial results for the quarter ended March 31, 2014. For the quarter, the company reported quarterly net sales of $246.3 million, net income of $13.7 million, or $0.49 per diluted share, compared to net sales of $230.4 million, net income of $15.8 million, or $0.57 per diluted share, in the first quarter of

2013.  Gross margin was 41.1% in the first quarter of 2014 compared to 40.4% in the first quarter of 2013.

283.  On April 30, 2014, the Company filed a quarterly report with the SEC on a Form 10-Q for the first quarterly period ending March 31, 2014, signed by Defendant Terrell, in which it reiterated the Company's previously reported financial results and financial position.  In addition, the Form 10-Q certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX. The report further stated in relevant part that gross margin benefited from "[s]ourcing initiatives [that] lowered net costs from our suppliers."

284. Defendants' statements in the April 30, 2014 Press Release and Form 10-Q, identified above in ¶¶282 – 283, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  A substantial portion of the Company's earnings and revenues were earned as a result of these practices.

285.  On a conference call with analysts on April 30, 2014, to discuss the Company's 1Q 2014 results, Defendant Lynch again attributed the continued increase in gross margin to the sourcing initiatives: "Turning now to our gross margin, which expanded 70 basis points to 41.1% in the first quarter . . . .  Within product margin, gross margin benefited by 50 basis points, as sourcing initiatives continued to lower net product costs . . ."

286.  In response to an analyst's question, "should that product based gross margin gain be bigger in the second quarter than what you experienced in the first?," Defendant Terrell stated "As far as throughout the rest of the year, we would expect that to increase.  We are looking at a

greater expansion of gross margin for the full year than we saw, given these 70 bps. Product will continue to take the lead in that. . . . [P]roduct margin will drive gross margin expansion during the year."

287. Defendant Lynch's and Defendant Terrell's statements during the April 30, 2014 conference call, identified above in ¶¶285 – 286, were false and misleading and omitted material facts as further explained herein. Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde. A substantial portion of the Company's earnings and revenues were earned as a result of these practices.

288. During the April 30, 2014 conference call, Defendant Lynch also assured investors that the Company's supplier network remained strong and was more than capable of providing sufficient inventory to meet demand. Specifically, Defendant Lynch represented that "the [sourcing] initiatives we have implemented over the last three years have our stores and supporting operations prepared to fully capture available customer demand." Lynch reiterated that, "[a]s a result, our outlook for the full year remains intact."

289. Although the Company's assurances assuaged analysts' concerns over the disappointing quarter, Jon Berg from Piper Jaffray questioned whether there was "something abnormal in the quarter, maybe outside of weather, that impacted" the Company's financial results. In response, Defendant Terrell assured investors of continued margin growth: "What we had always said is: We expected there to be continuing juice from each one of the product margin drivers, and we still believe that, whether it's lower product cost through the sourcing initiatives, or ASP discipline, or attachment of moldings and accessories. There is opportunity in

each one, but it's not going to come at the same scale year over year as it had.  Certainly, it's always hard to handicap what the number would have been, had the sales been where we were originally targeting.  But we are not unhappy with the margin expansion we got here in the first quarter."

290.  Defendant Lynch's and Defendant Terrell's statements during the April 30, 2014 conference call, identified above in ¶¶288 – 289, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' decrease in product costs and increase in margins were achieved by sourcing Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde. A substantial portion of the Company's earnings and revenues were earned as a result of these practices.  The Company experienced inventory constraints from its China suppliers.  The Company's gross margin expansion was not sustainable and the Company faced the risk of large fines, penalties, forfeitures, judgments and settlements in connection with government regulatory actions and consumer class actions related to its practices.

Q.   **Quarterly Report For 2Q 2014**

291.  On July 30, 2014, the Company issued a press release announcing financial results for the quarter ended June 30, 2014.  For the quarter, the Company reported quarterly net sales of $263.1 million, net income of $16.6 million, or $0.60 per diluted share, compared to net sales of $257.1 million, net income of $20.4 million, or $0.73 per diluted share, in the second quarter of 2013.  Gross margin was 40.4% in the second quarter of 2014 compared to 41.3% in the second quarter of 2013.  Selling, general and administrative expenses in the second quarter of 2014 increased $6.1 million, or 8.3%, to 79.1 million.

292.  On July 30, 2013, the Company filed a quarterly report with the SEC on a Form 10-Q for the period ending June 30, 2014 signed by Defendant Terrell, in which it reiterated the

Company's previously reported financial results and financial position.  In addition, the Form 10-Q certifications were signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX.

293.  The report further stated in relevant part that "[s]ince 2011, we have focused on. . . [e]xpanding gross margin through sourcing initiatives, operational efficiencies and supply chain optimization."  According to the Form 10-Q, "Sourcing directly from the mill provides the foundation for this value proposition, strengthened by our unique store model and the industry expertise of our people."

294. Defendants' statements in the July 30, 2014 Press Release and Form 10-Q, identified above in ¶¶291 – 293, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' margins, revenue, and earnings depended upon sourcing less expensive Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  Defendants also failed to disclose that: (1) compliant flooring products are more expensive than non-compliant products; (2) a significant number of mills would not be able to satisfy heightened quality assurance requirements, resulting in insufficient availability of inventory; and (3) as a result of inventory constraints, the Company would be forced to offer higher discounts on alternative merchandise which would erode margins.

295.  On a conference call with analysts on July 30, 2014, to discuss the Company's 2Q 2014 results, Defendant Terrell stated "As most of you know, we segregate our gross margin drivers into those associated with our product, including our sales mix; those associated with transportation; and those associated with all other costs. ***In product, our margin decreased 80 basis*** points after an increase of 320 basis points in the second quarter of 2013. ***We believe the***

*conditions of lower customer count and constrained inventory levels led to shifts in our net sales mix that were adverse to gross margin*."

296.  Defendant Terrell's statements on the July 30, 2014 conference call identified above in ¶295, were false and misleading and omitted material facts as further explained herein. Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards. The Company had violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE.  Lumber Liquidators had inadequate internal controls to ensure compliance with these standards.  Lumber Liquidators' margins, revenue, and earnings depended upon sourcing less expensive Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  Defendants also failed to disclose that: (1) compliant flooring products are more expensive than non-compliant products; (2) a significant number of mills would not be able to satisfy heightened quality assurance requirements, resulting in insufficient availability of inventory; and (3) as a result of inventory constraints, the Company would be forced to offer higher discounts on alternative merchandise which would erode margins.

### R.    Quarterly Report For 3Q 2014

297.  On October 22, 2014, Lumber Liquidators announced in a press release its financial results for the quarter and nine months ended September 30, 2014.  For the quarter, the Company reported quarterly net sales of $266.1 million and net income of $15.7 million, or $0.58 per diluted share, compared to net sales of $254.3 million and net income of $20.4 million, or $0.73 per diluted share in the third quarter of 2013.

298. Gross margin was 39.2% in the third quarter of 2014 compared to 41.8% in the third quarter of 2013.   According to Defendant Lynch as quoted in the press release, the Company was "able to achieve the lower end of our revenue and EPS ranges, although constrained inventory of certain key products and promotional events led to a gross margin which was lower than we had anticipated."

299. Also on October 22, 2014, the Company filed a quarterly report with the SEC on a Form 10-Q for the period ending September 30, 2014, signed by Defendant Terrell, where it reiterated the Company's previously reported financial results and financial position.

300. Defendants' statements in the October 22, 2014 Press Release and Form 10-Q, identified above in ¶¶297 – 299, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' margins, revenue, and earnings depended upon sourcing less expensive Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  Defendants also failed to disclose that: (1) compliant flooring products are more expensive than non-compliant products; (2) a significant number of mills would not be able to satisfy heightened quality assurance requirements, resulting in insufficient availability of inventory; and (3) as a result of inventory constraints, the Company would be forced to offer higher discounts on alternative merchandise which would erode margins.

301. On a conference call on October 22, 2014, following the release of the Q3 2014 results, Defendant Lynch explained the status of constrained inventory as follows:  "our net sales improved throughout the quarter due to strengthening customer traffic, *as products previously constrained were brought back to full availability*.  Laminates and vinyl plank recovered in August through early September. And engineered hardwood had materially recovered by the end

of the quarter.  As such, we believe net sales in the fourth quarter will not be materially impacted by the availability of these products."

302.  Defendants Lynch's statements during the October 23, 2013 conference call, identified above in ¶301, were false and misleading and omitted material facts including: Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards.  The Company had violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE.  Lumber Liquidators had inadequate internal controls to ensure compliance with these standards. Lumber Liquidators' margins, revenue, and earnings depended upon sourcing less expensive Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  Defendants also failed to disclose that: (1) compliant flooring products are more expensive than non-compliant products; (2) a significant number of mills would not be able to satisfy heightened quality assurance requirements, resulting in insufficient availability of inventory; and (3) as a result of inventory constraints, the Company would be forced to offer higher discounts on alternative merchandise which would erode margins.

## S.    2014 Annual Report

303.  On February 25, 2015, the Company issued a press release announcing financial results for the quarter and year end December 31, 2014.  For the quarter, the Company reported net income of $17.3 million, or $0.64 per diluted share, and $272.0 million in net sales, compared to net income of $20.8 million, or $0.74 per diluted share, and $258.4 million in net sales in the fourth quarter of 2013.

304.  Gross margin was 39.2% in the fourth quarter of 2014 compared to 40.8% in the fourth quarter of 2013.  The Company attributed the decrease in gross margin "primarily due to adverse net shifts in sales mix, marketing changes and greater costs of inventory shrink and obsolescence."

305.  For the year, Net sales increased 4.7% to $1.05 billion in 2014 from $1.00 billion in 2013.  Gross margin decreased to 39.9% in 2014 compared to 41.1% in the prior year.  Net income decreased 18.1% to $63.4 million, or $2.31 per diluted share, in 2014 compared to $77.4 million, or $2.77 per diluted share, in the prior year.

306.  On February 25, 2015, the Company filed an annual report with the SEC on a Form 10-K for the period ended December 31, 2014, which was signed by, among others, Defendants Lynch, Terrell and Sullivan, in which it reiterated the Company's previously reported financial results and financial position.  In addition, the 2013 Form 10-K contained certifications signed by Defendants Lynch and Terrell pursuant to Sections 302 and 906 of SOX.

307.  Defendants' statements in the February 25, 2015 Press Release and Annual Report on Form 10-K, identified above in ¶¶303 – 306, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' margins, revenue, and earnings depended upon sourcing less expensive Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde. Defendants also failed to disclose that: (1) compliant flooring products are more expensive than non-compliant products; (2) a significant number of mills would not be able to satisfy heightened quality assurance requirements, resulting in insufficient availability of inventory; and (3) as a result of inventory constraints, the Company would be forced to offer higher discounts on alternative merchandise which would erode margins.

308.  According to the 2014 Form 10-K, "[s]ourcing directly from the mill… provides the foundation for our value proposition."  Concerning the Company's competitive strengths, the 2014 Form 10-K stated that "[o]ur retail prices in each merchandise category are generally lower than our competitors. . . . We are able to maintain these prices by sourcing proprietary products direct from the mill . . . ."

309. Defendants' statements in the February 25, 2015 Annual Report on Form 10-K, identified above in ¶308, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards.  The Company had violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE.  Lumber Liquidators had inadequate internal controls to ensure compliance with these standards. Lumber Liquidators' margins, revenue, and earnings depended upon sourcing less expensive Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  Defendants also failed to disclose that: (1) compliant flooring products are more expensive than non-compliant products; (2) a significant number of mills would not be able to satisfy heightened quality assurance requirements, resulting in insufficient availability of inventory; and (3) as a result of inventory constraints, the Company would be forced to offer higher discounts on alternative merchandise which would erode margins.

310. Concerning the Company's "sourcing model," the 2014 Form 10-K stated as follows:

**Our Direct Sourcing Model**

*Supplier Relationships*. **We believe sourcing directly from mills enables us to offer a broad assortment of high-quality, proprietary products to our customers at a consistently lower cost than our competitors**.  We seek to establish strong relationships with mills around the world where the significance of our scale, breadth of assortment and liquidity allow for both higher quality and lower cost. We believe our collaborative relationship enhances the mills' productivity, yield and financial flexibility, such that we access lower net costs than our competitors. We are able to set demanding specifications for product quality and our own quality control and assurance teams are on-site at certain mills, coordinating inspection and assurance procedures.

* * *

**We seek long-term, core relationships with mills committed to our demanding product specifications, sustainable supply and regulatory compliance**.

311. Defendants' statements in the February 25, 2015 Annual Report on Form 10-K, identified above in ¶310, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards.  The Company had violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE.  Lumber Liquidators had inadequate internal controls to ensure compliance with these standards. Lumber Liquidators' margins, revenue, and earnings depended upon sourcing less expensive Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  Defendants also failed to disclose that: (1) compliant flooring products are more expensive than non-compliant products; (2) a significant number of mills would not be able to satisfy heightened quality assurance requirements, resulting in insufficient availability of inventory; and (3) as a result of inventory constraints, the Company would be forced to offer higher discounts on alternative merchandise, which would erode margins.

312. Concerning the Company's "Direct Sourcing Model," the 2014 Form 10-K stated that the Company's "sourcing initiatives" ultimately produce "the best combination of quality and value at the lowest cost."

313. Defendants' statements in the February 25, 2015 Annual Report on Form 10-K, identified above in ¶312, were false and misleading and omitted material facts as further explained herein.  Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards.  The Company had violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE.  Lumber Liquidators had inadequate internal controls to ensure compliance with these standards. Lumber Liquidators' margins, revenue, and earnings depended upon sourcing less expensive Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde.  Defendants also failed to disclose that: (1) compliant flooring products are more expensive than non-compliant products; (2) a significant number of mills would not be able to satisfy heightened quality assurance requirements, resulting in insufficient availability of inventory; and (3) as a result of inventory constraints, the Company would be forced to offer higher discounts on alternative merchandise, which would erode margins.

314. Concerning gross margin, the 2014 Form 10-K stated that a "[g]ross margin was impacted by… [s]ourcing initiatives, including line reviews and the percentage of product we source direct from the mill, generally lowered net costs from our suppliers. . ."

315. Defendants' statements in the February 25, 2015 Annual Report on Form 10-K, identified above in ¶314, were false and misleading and omitted material facts as further explained herein. Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB standards. The Company had violated the Lacey Act by importing flooring products sourced from lumber illegally harvested from the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE. Lumber Liquidators had inadequate internal controls to ensure compliance with these standards. Lumber Liquidators' margins, revenue, and earnings depended upon sourcing less expensive Chinese-made flooring products that: (1) violated the Lacey Act; (2) violated CARB regulations; and (3) contained and emitted high levels of formaldehyde. Defendants also failed to disclose that: (1) compliant flooring products are more expensive than non-compliant products; (2) a significant number of mills would not be able to satisfy heightened quality assurance requirements, resulting in insufficient availability of inventory; and (3) as a result of inventory constraints, the Company would be forced to offer higher discounts on alternative merchandise, which would erode margins.

316. Concerning government regulation of the Company's operations, the 2014 Form 10-K stated in relevant part:

> *In addition, certain of our products are subject to laws and regulations relating to the importation, acquisition or sale of illegally harvested plants and plant products and the emissions of hazardous materials. We work closely with our suppliers to ensure compliance with the applicable laws and regulations in these areas.*
>
> *We monitor changes in applicable laws and regulations and believe that we currently conduct, and in the past have conducted, our activities and operations in substantial compliance with applicable laws and regulations relating to the environment and protection of natural resources.*

317. Defendants' statements in the February 25, 2015 Annual Report on Form 10-K, identified above in ¶316, were false and misleading and omitted material facts including: (1) Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB regulations for formaldehyde emissions; (2) Lumber Liquidators had violated the Lacey Act by importing flooring products sourced from lumber illegally logged in the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE; and (3) the Company had inadequate internal controls to ensure compliance with the Lacey Act, CARB regulations, and industry standards, as further explained herein.

318. Concerning compliance with government regulations, the 2014 Form 10-K stated "We are committed to uncompromising integrity across our operations, and quality is a key component of our value proposition. With over 310 million square feet of flooring sold through over 620,000 customer transactions in 2014, the scale of our purchasing and diversity of products require sustainable forestry. We invest significant time and resources to safeguard quality and comply with regulatory requirements. We discontinue sourcing from suppliers that are unable to meet our standards. We seek long-term relationships with mills that can provide sustainable and growing supplies of high-quality product."

319. Defendants' statements in the February 25, 2015 Annual Report on Form 10-K, identified above in ¶318, were false and misleading and omitted material facts including: (1) Lumber Liquidators' Chinese-made laminate and engineered hardwood flooring products contained and emitted high levels of formaldehyde and failed to comply with CARB regulations for formaldehyde emissions; (2) Lumber Liquidators had violated the Lacey Act by importing

flooring products sourced from lumber illegally logged in the RFE, misrepresenting the country of harvest on custom forms, and failing to indicate that the wood in the products had been harvested from the RFE; and (3) the Company had inadequate internal controls to ensure compliance with the Lacey Act, CARB regulations, and industry standards, as further explained herein.

## VI.   THE INDIVIDUAL DEFENDANTS PROFITED FROM THEIR FRAUDULENT SCHEME

### A.   Insider Trading Allegations

320. The Individual Defendants' and other insiders' stock transactions during the Class Period were unusual and well timed to take advantage of the inflated stock price before the fraud was revealed to the market, indicating knowledge that Defendants' statements had inflated the Company stock price.

321. Transactions By Defendant Lynch:   During the Class Period, Defendant Lynch disposed of $21,642,410 worth of Company stock.  As of May 2013, Lynch held 34,000 shares of unrestricted stock (all but 7,147 of which had been granted to him by the Company).  He also owned 130,082 options with a strike price of $26.73.  Prior to May 2013, Lynch's two stock sales occurred on January 17, 2012, when he sold 1,492 shares for $19.94 per share under Transaction Code "F" indicating that the sale was for "Payment of exercise price or tax liability by delivering or withholding securities incident to the receipt, exercise or vesting of a security issued in accordance with Rule 16b-3."

322. Defendant Lynch's trading changed dramatically in May 2013, when the Company's stock reached unprecedented heights as a result of the fraud.  Between May 14, 2013 and July 31, 2013, *Lynch engaged in a wholesale selloff of stock, exercising 130,000, or 99.98% of his vested options*, selling the shares for a total of $12,000,831.39, reaping an

instantaneous profit of $8,525,931.39. During this time, Lynch also sold an additional 24,500 shares of stock for $2,100,917.03. By the time the government raided the Company's headquarters on September 26, 2013, Lynch owned only 10,000 shares of unrestricted stock.

323. <u>Transactions By Defendant Terrell</u>: During the Class Period, Defendant Terrell disposed of $8,885,442 worth of Company stock. Terrell has been with the Company since 2006. Prior to November 2012, Terrell owned 170,122 vested stock options (150,405 of which had vested by March 2011), and he had independently purchased 7,000 shares of stock. During this six year and four month period, Terrell did not exercise a single option or sell a single share of stock. On November 7, 2012, after the Company's stock price had increased from $19.17 at the start of the Class Period to $58.04, ***Terrell exercised over 94% of his vested options, selling 116,960 shares of stock*** at an average price of 57.858, for a total of $6,767,083, an immediate profit of $5,873,688. On July 31, 2013, after additional options vested in March 2013, Terrell exercised another 21,750 options, selling them for an average price of $97.3958, for a total of $2,118,358.65 and a profit of $1,692,588.55. Following the July 31, 2013 transaction, Terrell had exercised *over 97%* (all but 5,367) of his vested options. ***In total, between November 7, 2012 and July 31, 2013, Terrell sold a total of 138,710 shares, for a total of $8,885,430.33 and a profit of $7,566,264.54***.

324. <u>Transactions By Defendant Sullivan</u>: During the Class Period, Defendant Sullivan disposed of $53,672,066 worth of Company stock. Upon the Company's purchase of Sequoia on September 28, 2011, Sullivan held 2,199,801 shares of Company stock. During the Class Period (when the stock price was inflated by the fraud), Sullivan did not purchase a single share of stock. Rather, following the acquisition of Sequoia, between November 11, 2011 and September 26, 2013 (when federal agents raided the Company's corporate offices), ***Sullivan sold 1,590,803***

**shares, over 75% of his holdings, for a total of $60,216,632.10.**  Sullivan's last sale was on August 22, 2013, just one month before the raid.

325.  <u>Transactions By Defendant Schlegel</u>:  During the Class Period, Defendant Schlegel disposed of $1,530,163 worth of Company stock.  As of July 29, 2013, Schlegel owned 15,591 vested stock options.  Prior to this date (and prior to the Class Period) he had not sold a single share of stock or exercised a single option.  **On July 29, 2013, he exercised every last one of his vested options and sold all 15,591 shares at an average price of $93.35, a total of $1,455,452.59, an instant profit of $1,076,997.44.**  Following this transaction, Schlegel owned only 685 shares that were not restricted.

326.  <u>Coordination Of Transactions By Insiders</u>:   When transactions of insiders are examined together, a suspicious pattern of sales emerges.  Between May 3, 2013 and May 24, 2013, when the Company's stock was hitting record highs, fluctuating between $81.90 and $89.91, the following insider transactions occurred:

- Defendant Sullivan sold 200,000 shares for $16,455,671.13;
- Defendant Lynch sold 104,500 shares for $9,277,848.42;
- Marco Pescara (Chief Marketing Officer) sold 28,199 shares for $2,533,292.81;
- E. Jean Matherne (Senior V.P.) sold 7,124 shares for $594,511.34;
- Livingston B. Haskell (Secretary and General Corporate Counsel) sold 2,500 shares for $223,125;
- Douglas T. Moore (Director) sold 10,547 shares for a total of $914,213; and
- John M. Presley (Director) sold 3,739 shares for $323,577.

In total, these insiders sold 356,609 shares for $30,322,238.70 during this three week period.

327. Similarly, between July 24, 2013 and August 5, 2013, immediately after announcing record results on July 24, 2013, which resulted in a one day $6.00 increase and record stock prices as high as $96.82 per share, the following insider transactions occurred:

- Defendant Lynch sold 50,000 shares for $4,823,900;
- Defendant Terrell sold 21,750 shares for $2,118,358.65;

- Defendant Schlegel sold 15,591 shares for $1,455,452.59;
- Pescara sold 6,012 shares for $584,667, and
- Haskell sold 5,000 shares for $482,250;

328. In total, these insiders sold 98,353 shares for $9,464,628.24 during this 12-day window. Moreover, on August 22, 2013, Defendant Sullivan sold 100,000 shares for an additional $10,159,420.

329. After the above transactions, the following were the holdings of each insider not individually discussed above in ¶¶321 – 325:

- Pescara held only 3,001 shares (having sold 87,381 shares during the Class Period);
- Matherne held only 4,000 shares (having sold 13,109 shares during the Class Period);
- Haskell held only 2,095 shares (having sold 7,500 shares during the Class Period); and
- Moore held only 1,965 shares (having sold 25,547 shares during the Class Period)

330. Management's coordinated and wholesale selling of securities in the summer did not go unnoticed by analysts. On May 29, 2013, an article appeared in *Barron's* titled "Lumber Liquidators Execs Sell Near All-Time High: Seven insiders sold $30.3 million in shares of the flooring retailer," detailing how "From May 6 through 28, seven insiders including the company's founder and top executive sold 355,909 shares to the tune of $30,259,377, an average of $85.02 each," including 200,000 shares by Defendant Sullivan and 104,500 shares by Defendant Lynch. InsiderScore, which monitors and reports on trading activity by company insiders, also noted the unusual stock sales.

**B.    Defendants' Bonus Compensation Was
Linked To Gross Margins And Operating Income**

331. In 2012, the Individual Defendants' performance-based compensation was based on two components: the Company's earnings per share for the year and "personal goals" for each

individual.  Among the personal goals for Defendants Lynch and Schlegel were the Company's gross margins, which contributed to 25% of Lynch's personal goals and 60% of Schlegel's personal goals.  In 2013, the Company determined all performance-based compensation solely on the Company's operating income.

332. As alleged herein, Defendants' increased reported gross margins and operating income by sourcing cheap flooring products in China that were contaminated with high levels of formaldehyde and illegally harvested from protected forests.  Defendants' misconduct resulted in the Company exceeding gross margins and operating income targets in both 2012 and 2013.

333. In September of 2013, the Company's headquarters was raided by federal authorities as part of the DOJ's investigation into whether Lumber Liquidators violated the Lacey Act.  The following year, the target operating income for the Individual Defendants' bonuses was increased by $60 million, and the Company failed to reach that target.  As a result, none of the Individual Defendants received any incentive bonuses in 2014.

334. During the Class Period, the Individual Defendants were compensated as follows:

|  | Fiscal Year | Salary | Incentive Bonus | Other Compensation[1] | Total Compensation |
|---|---|---|---|---|---|
| Lynch | 2012 | 567,308 | **654,063** | 21,382 | 1,242,753 |
|  | 2013 | 655,769 | **1,350,000** | 4,861,114 | 6,866,883 |
|  | 2014 | 715,890 | 0 | 142,708 | 858,598 |
| Terrell | 2012 | 290,749 | **198,804** | 157,276 | 646,829 |
|  | 2013 | 332,587 | **409,979** | 409,795 | 1,152,361 |
|  | 2014 | 351,307 | 0 | 258,146 | 609,453 |
| Schlegel | 2012 | 305,145 | **179,472** | 197,034 | 681,651 |
|  | 2013 | 358,728 | **442,610** | 470,290 | 1,271,628 |
|  | 2014 | 383,738 | 0 | 378,591 | 762,329 |
| Sullivan | 2012 | 329,192 | **376,443** | 18,877 | 724,512 |
|  | 2013 | 330,939 | **397,127** | 26,241 | 754,307 |
|  | 2014 | 338,958 | 0 | 24,511 | 363,469 |

## VII.  ADDITIONAL ALLEGATIONS OF SCIENTER

335.  Numerous facts, in addition to those discussed above, support a strong inference that Defendants knew or were severely reckless in disregarding the true facts concerning Lumber Liquidators' sourcing of Chinese-made solid, engineered, and laminate wood flooring products that were: (1) illegally harvested from protected forests; and (2) contained and emitted high levels of formaldehyde, when disseminating the false and misleading statements discussed herein.

336.  *Outside third parties easily determined that Lumber Liquidators' Chinese-made laminates and engineered flooring products contained and emitted high levels of formaldehyde.* As previously explained herein, Mr. Zhou conducted tests of the Company's Chinese made engineered hardwood and laminates through two independent laboratories a found that a sample of the "Mayflower" brand was over 3.5 times the maximum legal level for formaldehyde. Similarly, the environmental advocacy group Global Community Monitor tested more than 40 boxes of flooring products using two different laboratories and found that "without exception, the Lumber Liquidators products produced in China emitted formaldehyde at far higher rates than those manufactured in Europe or North America – on average, Chinese products emitted 350% the rate of European/North American products at the time of testing." *60 Minutes* conducted its own independent tests and investigation and found that 30 of the 31 samples of the Company's Chinese-made products tested contained levels of formaldehyde emissions that exceeded CARB limits. *60 Minutes* also interviewed employees at three Chinese mills who explained that it would cost 10-15% more to obtain CARB compliant flooring.

337.  *Xingjia's executives confirm Defendants' knowledge of the Company's illegal sourcing from protected forests.* Lumber Liquidators has received hardwood flooring from Xingjia since at least 2007. Xingjia' president and manager of Russian operations, Mr. Sun,

116

confirmed that since 2011, high level management from Lumber Liquidators visited Xingjia and its mills in the RFE on multiple occasions.  According to Mr. Sun, he gave a tour to a high-level U.S. management team of senior executives from Lumber Liquidators of Xingjia's operations in Russia.  According to CW5, Mr. Sun told undercover investigators that the "head of sourcing" for Lumber Liquidators (Defendant Schlegel) was on the tour.

338.  Mr. Yu, who manages Xingjia's Dalian facilities and is the brother-in-law of Xingjia President Mr. Sun, told EIA investigators that the raw material for shipments of solid wood flooring to Lumber Liquidators included oak from Russia.  During a second visit to Dalian Xingjia in early 2012, Mr. Yu stated that around half of the oak used in flooring for Lumber Liquidators came from Russia.  According to CW5, Mr. Yu openly admitted that Xingjia "misdeclared" the source of wood for its products to avoid scrutiny from enforcement agencies because any wood that is declared as Russian in origin receives intense scrutiny due to the high likelihood that it was harvested illegally.  When CW5 asked Mr. Yu *if Lumber Liquidators was aware of this illegal harvesting activity*, Mr. Yu said, "*Yes, of course they know that*."

339.  In early 2012, Mr. Sun provided a tour similar to a high-level team of U.S. executives from Lumber Liquidators, which included Defendant Schlegel.  According to Mr. Sun, this tour included a trip to Xingjia's operations in Khabarovsk, visiting sawmills and meeting with local officials in the RFE.  Mr. Yu, who accompanied these officials on their visit, reported that Lumber Liquidators officials were not troubled at all by what they saw.  To the contrary, Lumber Liquidators has expanded its relationship with Xingjia.  For example, Mr. Yu explained to EIA investigators that Lumber Liquidators was moving its production of hand-scraped solid oak flooring from multiple suppliers to Xingjia and, in May 2012, Lumber

Liquidators' head of sourcing operations visited Xingjia's offices and sawmills in the RFE to ensure that Xingjia's oak "supply was secure for a long time."

340. *The Individual Defendants repeatedly admitted to their direct and intimate involvement in overseeing Lumber Liquidators' sourcing practices in China.* Defendants Lynch and Schlegel, as President and Chief Merchandising Officer, respectively, were directly responsible for the Company's sourcing initiatives. During the Class Period, they both had intimate knowledge of both the source and quality of the wood and laminate products Lumber Liquidators purchased from Chinese mills and manufactures. For example, during the July 25, 2012 Q2 earnings call, Defendant Lynch represented that Defendant Schlegel and his teams "have dug in with the vendors and done these line reviews." Similarly, Defendant Terrell told analysts on March 4, 2013, that Defendants Lynch and Schlegel were responsible for the Company benefiting from the "sourcing initiatives." Defendant Lynch confirmed during a July 24, 2013 analyst conference call that the Company monitored sourcing directly, with "onsite controls" at the mills. Defendants assured investors they were particularly focused on the Company's sourcing initiatives. Defendant Lynch admitted he "saw sourcing initiatives and gross margin enhancement as probably one of the most significant opportunities we had to drive value for the Company, so we've been focusing on that." Defendant Lynch stressed that "sourcing is the big one, most important."

341. CWs confirmed that the Defendants were personally involved in implementing the sourcing initiatives, particularly products from China. For example, several CWs established that Defendants Lynch and Schlegel regularly traveled to China to visit suppliers and negotiate supply agreements. In addition, CW4 who worked directly with Schlegel and accompanied him on trips to China, regularly communicated information from the personnel in Shanghai to

Schlegel.  According to CW2, all the Company's buyers in China reported to Defendant Schlegel, who was responsible for quality assurance.  CW1 stated that Defendant Schlegel traveled to China frequently to oversee operations, find new Chinese suppliers, and reported back his findings to Defendant Lynch.

342.  *The absurdly low prices of the laminates.*  The laminate flooring at issue is a low-end, global commodity product in which 1% or 2% differences in pricing are meaningful. Defendants are highly sophisticated players in the wood flooring industry, with experience sourcing in China for almost two decades.  As such, Defendants realized when the Company received laminates at 10% below the standard price, the product was of dubious quality (*e.g.,* used illegal wood and/or was filled with excessive amounts of toxic chemicals such as formaldehyde).

343.  Chinese factories will offer laminate flooring that is substantially cheaper than other mills' pricing, even explicitly stating that they will use a lower grade of high density fiberboard (HDF) – the component of laminate and engineered hardwood flooring that contains formaldehyde.  Given that laminate flooring is a commoditized and thus a widely accessible product in China, Lumber Liquidators could receive a price concession by agreeing to purchase **substandard** materials.  The report aired by *60 Minutes* shows Defendants did just that.  *60 Minutes* interviewed employees at three Chinese mills that admitted products for Lumber Liquidators were not compliant with CARB Phase 2 requirements, despite being labeled as such. The mills also explained ***they are capable of manufacturing CARB compliant flooring, but it would cost 10-15% more***.

344.  *Lumber Liquidators' lacked adequate quality controls and lacked an adequate compliance program.*  Lumber Liquidators' Chief Compliance and Sustainability Officer, Ray

Cotton, admitted that ***Lumber Liquidators did not begin building a compliance team in China until December of 2014***.[30]  Mr. Cotton described the task of building such a team to be "super challenging" and that "it's taken months."  Before becoming the Company's Chief Compliance and Sustainability Officer, Cotton had little relevant experience related to his most important areas of responsibility at Lumber Liquidators – quality control, sourcing, managing suppliers in China, and overseeing the product testing program.

345. According to Kip Howlett, the President of HPVA which operates HPVA Laboratories, a CARB-certified lab that tested samples of Lumber Liquidators' laminates, the number of tests Lumber Liquidators has done over the past 18 months "is laughable – so few samples for such a huge volume of products."

346. *Lumber Liquidators' Chinese-made solid, engineered hardwood, and laminate flooring was critical to the Company's core business.*  Solid and laminate wood flooring made up between 43-48% of the Company's net sales during the Class Period.  During this time, solid and engineered hardwood and laminate flooring together accounted for hundreds of millions of dollars of sales for Lumber Liquidators and between 40-50% of the Company's products were sourced from China.

347. Moreover, laminate flooring sourced from China also comprised a material portion of Lumber Liquidators' annual sales.  In 2011, the year Lumber Liquidators acquired Sequoia, laminates made up 23% of net sales, and almost 70% of that volume was sourced from China. Because the margins for laminate flooring were significantly higher than the Company's average product margins, Lumber Liquidators' sales of laminate flooring had an outsized impact of the

---

[30] http://blogs.wsj.com/riskandcompliance/2014/12/08/why-lumber-liquidators-is-building-a-compliance-team-in-china/

Company's bottom line.   According to analysts at Wedbush Securities, gross margins for laminate flooring were well over 50% compared to the Company average of about 40%.  Every dollar of laminate flooring sold contributed more to Lumber Liquidators' profits than the average Lumber Liquidators product.

348.  *Customers' complaints concerning harmful formaldehyde emissions*.   Numerous Lumber Liquidator customers have posted internet complaints on the Company's website, which the Company monitored.  For example, Sandra of Vienna, Virginia posted on the Company's Consumer Affairs website on May 30, 2013:

> Recently, I had bamboo flooring from Lumber Liquidators installed… I noted the odor as the installation took place and found it quite peculiar… Within the next 48 hours I realized it was not a temporary odor. *I have burning nostrils; my face feels like it is stinging, and I'm having a dull headache*. Yet, when I leave the house, the above symptoms disappear… I believe the bamboo wood has a high level of formaldehyde.[31]

349.  Similarly, Bethany wrote on the Consumer Affairs website on July 27, 2013:

> Formaldehyde in bamboo flooring - There is a class action lawsuit against this company.  I noticed *my eyes burning whenever I was in the room where the flooring had been placed*. Just today I started looking into it, wondering if I was allergic to bamboo!  Lumber Liquidators has been informed on the high level of toxins and responded by having a massive sale. Their stock has plummeted. They need to issue a recall but in the meantime no one will talk to me.[32]

350.  Smith Miller posted on April 3, 2010:

> We purchased Morning Star Bamboo from Lumber Liquidators and installed it in a bedroom... We noticed a strange, acrid odor right after installation. We weren't using the room much, though, so it wasn't a problem. We just left the window open for a few days, thinking that would take care of it. Well, a couple months later we moved in and the fumes were AWFUL – I mean, make your eyes tear and your nose burn awful. For the past month we have been venting the room with a fan to the outside, but it doesn't seem to be doing much good. We've been sleeping in this room and if we can't ventilate it for at least ten hours first (and we

---

[31] http://www.consumeraffairs.com/homeowners/lumber_liquidators.html
[32] http://www.consumeraffairs.com/homeowners/lumber_liquidators.html

often can't now that the weather is getting so cold) then I wake up with a burning nose and a headache and my husband's eyes swell up. ***This product supposedly meets "more stringent" European emission standards, but it is definitely causing a health issue for us – perhaps not for folks who don't have allergies or sensitivities or whatever, but for us it is a big problem.*** LL will not take what's left back.[33]

351. Deborah of North Fork, California posted on the Consumer Affairs website on September 11, 2014:

We spent thousands of dollars and went with the LL recommended professional installer… the product we were sold was supposedly ***Made in the USA – nope, China. One of my children cannot walk barefoot on the floor because he will blister from the formaldehyde content.*** We saved for years for this floor, it will need to be replaced. Please RUN to another dealer. This company does not care about the customer one bit. This has been a devastating blow to our family.[34]

## VIII.  **LOSS CAUSATION**

352.  Throughout the Class Period, the price of Lumber Liquidators' stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above.  Certain disclosures revealed to the market, on a piecemeal basis, the false and misleading nature of Defendants' statements and omissions.

353. First, on June 20, 2013, new facts were revealed to the market that partially corrected Defendants' prior misrepresentations and omissions.  An article written by Xuhua Zhou entitled "Illegal Products Could Spell Big Trouble At Lumber Liquidators" and published on *SeekingAlpha.com* revealed that, among other things, testing of one of Lumber Liquidators' branded wood flooring products (imported from China and sold in California) at two accredited independent laboratories found that formaldehyde emissions from the tested product were over 3.5x the maximum legal limit even though the product was labeled as being CARB-compliant.

---

[33] http://www.plumbingforums.com/forum/f4/sick-bamboo-floor-fumes-problem-415/
[34] http://www.consumeraffairs.com/homeowners/lumber_liquidators.html

The Company's stock has been on a tear, rallying 300% over the last year, primarily on dramatic expansion of its gross and net margins.  Management had often made reference to the significance of its acquisition of Sequoia Floorings Inc., based in Shanghai, as a primary reason for the tremendous improvement in margins.  Sourcing product in China is certainly hardly unknown to competitors, and skeptics have wondered how an $8 million acquisition could have such a dramatic effect on gross margin and bottom line, and more importantly, enable Lumber Liquidators to undercut fierce price competitors such as Home Depot (NYSE: HD) and Lowe's (NYSE: LOW).

354. The price of the Company's stock declined in response to this news.  Lumber Liquidators' stock price declined $5.53 per share (6.73%), from $82.16 on June 20, 2013 to $76.63 on June 21, 2013, on unusually high trading volume.  Mr. Zhou's article only partially revealed the truth, however, as Defendants continued to misrepresent, as alleged above, the true reasons behind the Company's dramatic increases in gross margin.

355. Second, on September 27, 2013, new facts were revealed to the market that partially corrected Defendants' prior misrepresentations and omissions.  The Company revealed in a press release that on the preceding day, agents from the DHS, FWS and DOJ executed sealed search warrants at Lumber Liquidators' corporate offices in Toano and Richmond, Virginia, related to the importation of certain wood products.  This news called into question whether the Company complied with applicable laws and regulations governing lumber importation and harvesting, including the Lacey Act, and had adequate controls in place to ensure such compliance.  It also raised doubts whether the Company's dramatic increase in margin was attributed to lawful "sourcing initiatives" and that such gains were sustainable.

356. On this news, the Company's stock price declined $5.83 per share (5.16%), from $112.96 on September 26, 2013 to $107.13 on September 27, 2013, on unusually high trading volume.  However, the disclosure of the federal investigation only partially revealed the truth, as Defendants continued to misrepresent, as alleged above, the true reasons behind the Company's dramatic increases in gross margin.

357.  Third, on November 22, 2013, new facts were revealed to the market that further corrected Defendants' prior misrepresentations and omissions.  On this date, well known hedge fund manager Tilson criticized the Company for importing illegally sourced timber from Russia in direct violation of U.S. laws.  Analyzing the Company's dramatic increase in margins since 2011, and the Company's assertion that it is a result of the Sequoia acquisition and other sourcing initiatives, Mr. Tilson sought to answer the question "How could a tiny $8 million acquisition have such a big impact???" observing that "It's not like directly sourcing wood from mills in China is some great secret, unavailable to Home Depot, Lowe's and others…".  Discussing the EIA's *Liquidating the Forests* report and the federal government's September 26th raid on the Company, Mr. Tilson demonstrated that the Company was only able to maintain its unbelievably high margins, and thus inflate its revenues, as a result of importing illegal timber.  For example, Mr. Tilson concluded that "While the largest mill supplying [Lumber Liquidators] only accounts for 4% of LL's hardwood purchases, I think it is likely that a meaningful percentage of the 51% of [Lumber Liquidators'] wood sourced in Asia is from Chinese mills that are trafficking in illegal wood."

358.  The additional revelations caused the price of Lumber Liquidators' price to decline.  The price of the stock fell $13.55 per share (11.75%), from $115.36 on November 21 to $101.81 on November 22, on unusually high trading volume.  Mr. Tilson's presentation, however, only partially revealed the truth, as Defendants continued to misrepresent, as alleged above, the true reasons behind the Company's dramatic increases in gross margin.

359.  Fourth, after trading closed on July 9, 2014, the Company updated its second quarter earnings forecast and provided new facts that further corrected Defendants' prior misrepresentations and omissions.  The Company announced, among other things, that its gross

margin in the second quarter of 2014 was expected to **contract** in comparison to the second quarter of 2013, **resulting in the first year-over-year contraction of gross margin since the second quarter of 2011**.  The Company also reported second quarter sales of only $263.1 million and announced that it expected to report EPS of only $0.59-$0.61, well below the consensus of $303.2 million and $0.90.

360. Analysts had been led to expect the Company's sourcing and price discipline initiatives would continue to drive revenue and earnings growth despite tighter quality standards imposed following the illicit wood sourcing scheme.  For example, analysts at KeyBanc Capital Markets were stunned by the Company's "surprisingly poor 2Q results and lowered guidance . . . especially with numerous initiatives in place to drive share gains."  Analysts at SunTrust Robinson Humphrey attributed the inventory shortfall directly to the problems the Company was facing in China.  Specifically, the SunTrust analysts reported that the inventory problems "derived from compliance issues around Chinese imported goods that are, in our view, a direct impact from the alleged illegally harvested wood investigation."  Analysts at Jeffries Group reported that the Company and its senior executives knew about the supply chain issues "but underestimated the magnitude of the problem when considered in aggregate."

361. On the July 9, 2014 business update call, Defendant Lynch attributed the "aggregated net sales shortfall in the second quarter of up to $18 million" to reduced traffic at their stores, which was significantly a result of inventory unavailability due to the company's foreign suppliers needing to comply with stricter compliance controls:

> "**Our inventory was constrained in certain key products, including laminates, vinyl plank and engineered hardwoods, as certain of our mills experienced production delays in meeting our open orders, as we continued to enhance our quality assurance requirements**. . . . Across all product categories with constrained inventory, we estimate an aggregate net sales shortfall in the second quarter of up to $18 million. . . .**[W]e have continued to implement enhanced**

***controls throughout our supply chain***. For example, we changed the timing and level of supporting documentation required from our international mills. . . [*C*]*ertain mills and their supply chains experienced delays in meeting the revised requirements*. We underestimated the impact of these requirements would create at any individual mill, and we did not anticipate the aggregate impact on our supply chain."

362. In response to an analyst's question regarding the cause for the estimated "aggregate net sales shortfall in the second quarter of up to $18 million" Defendant Terrell stated, "the constrained inventory situation that we called out impacted all stores, regardless of the category they were in."  No doubt was left as to the specific cause to the financial shortfall after an analyst asked "geographically is there any one particular source country where you had the biggest QA challenges?"

| | |
|---|---|
| **Terrell:** | Asia. |
| **Lynch:** | Yes. In Asia. |
| **Analyst:** | Are you . . . |
| **Terrell:** | China. |
| **Analyst:** | Specifically, China? Yes? |
| **Lynch:** | Yes. |

363. These disclosures were contrary to Defendants' prior explanations for how the Company achieved its dramatic increases in gross margin and decrease in cost of products (*e.g.,* lawful "sourcing initiatives") and that such gains were sustainable.

364.  The additional revelations caused the Company's stock price to decline $15.17 per share (21.5%), from $70.42 on July 9, 2014 to $55.25 on July 10, 2014, on unusually high trading volume.  By July 15, 2014, the Company stock was trading at $53.85, less than half of the Class Period high of $115.36.  The news on July 9, 2014, however, only partially revealed the truth, as Defendants continued to misrepresent, as alleged above, the true reasons behind the Company's dramatic increases in gross margin.

365. Fifth, on February 25, 2015, new facts were revealed to the market that further corrected Defendants' prior misrepresentations and omissions.  On that day, the Company held a conference call with analysts to discuss the Company's 4Q 2014 and full year 2014 results and disclosed that the DOJ may file criminal charges from the inquiry that began in 2013 for violation of import laws under the Lacey Act.  Specifically, Defendant Lynch responded to a question from an analyst concerning the status of the DOJ's investigation that "they were either going to come with a misdemeanor or a felony under the Lacey Act."  Defendant Lynch also disclosed that the news program, *60 Minutes*, would feature Lumber Liquidators in an "unfavorable light with regard to our sourcing and product quality, specifically related to laminates."

366. In response, analysts at Evercore ISI downgraded Lumber Liquidators stock "following the revelation that *60 Minutes* is preparing a segment regarding the safety & quality of LL products which could air as early as this weekend."  Analysts at Keybanc Capital Markets commented that "a number of other legal and regulatory factors were also discussed on the Company's earnings call and in its 10-K that are giving investors pause.  The *60 Minutes* story is expected to air, the DOC is weighing anti-dumping related duties, and the DOJ is getting closer to a ruling on a violation of the Lacey Act, and there are lawsuits regarding levels of formaldehyde (and limits in California)."  Analysts at Piper Jaffray downgraded Lumber Liquidators shares "following the recent announcement that *60 Minutes* will likely be airing a negative piece on LL this weekend regarding formaldehyde emissions in certain flooring products."

367.  Lumber Liquidators stock price declined $18.15 per share (26.39%), from $68.78 on February 24, 2015 to $50.63 on February 25, 2015, on unusually high trading volume. However, the news on February 25, 2015, only partially revealed the truth.

368.  <u>Sixth</u>, on March 1, 2015, the CBS News television program *60 Minutes* aired a news report entitled "Lumber Liquidators" which revealed new facts to the market that further corrected Defendants' prior misrepresentations and omissions.  According to the *60 Minutes*, program, much of the laminate flooring sold by Lumber Liquidators "may fail to meet health and safety standards, because it contains high levels of formaldehyde, a known cancer causing chemical."  The *60 Minutes* news team sent samples from 31 boxes of Chinese-made laminate flooring purchased from stores in Virginia, Florida, Texas, and New York to two certified laboratories for testing.  "It turns out of the 31 samples of Chinese-made laminate flooring, ***only one was compliant with formaldehyde emissions standards***.  Some were more than 13x over the California limit."  According to *60 Minutes*, the two certified labs "***had never seen formaldehyde levels that high***."

369.  *60 Minutes* also sent its own investigators undercover to China where they used hidden cameras and posed as buyers at three different mills that manufacture laminates for Lumber Liquidators.  According to 60 Minutes, "[e]mployees at the mills ***openly admitted*** that they use core boards with higher levels of formaldehyde to make Lumber Liquidators laminates, ***saving the company 10-15 percent on the price***."  And, these employees "also admitted falsely labeling the Company's laminate flooring as CARB 2, meaning it meets California formaldehyde emissions standards, and the new U.S. federal law."

370.  This news was contrary to the Defendants' prior explanations for the dramatic growth in gross margin and decrease in the cost of goods sold.  Piper Jaffray commented that the

"*60 Minutes* segment on LL was worse than we thought based on 1) how specific the story was on LL, 2) the evidence provided by *60 Minutes*, and 3) a poor on-camera interview by founder Tom Sullivan who conceded that the video evidence called into question the company's oversight of its suppliers." Moreover, "***the most concerning aspects of the segment was the undercover video footage from multiple Chinese mills that openly admitted to labeling product as CARB 2 compliant when it was not***." Wedbush analysts concluded, "Last night's exposé on LL by *60 Minutes* produced one major development, in our view…. the [Chinese] mills explained they are capable of manufacturing CARB compliant flooring but it would cost 10-15% more, suggesting LL did not want to pay the higher price in order to earn higher profits. We believe that laminate is LL's highest-margin major flooring product line, with gross margins well over 50% on some products vs. the company average 40%."

371. The next day following the broadcast, on March 2, 2015, Lumber Liquidators' stock price declined $13.03 per share (25.13%), from $51.86 on February 27, 2015 to $38.83 on March 2, 2015, on unusually high trading volume. By March 9, 2015, the Company stock was trading at $27.95, less than one quarter of the Class Period high of $115.36.

## IX.    PRESUMPTION OF RELIANCE

372. At all relevant times, the market for Lumber Liquidators' securities was efficient for the following reasons, among others:

(a) Lumber Liquidators' stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Lumber Liquidators filed periodic reports with the SEC and NYSE;

(c) Lumber Liquidators' regularly communicated with public investors *via* established market communication mechanisms, including through regular

disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Lumber Liquidators was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

373. As a result of the foregoing, the market for Lumber Liquidators' securities reasonably promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Lumber Liquidators' securities. All purchasers of Lumber Liquidators securities during the Class Period suffered similar injury through their purchase of Lumber Liquidators securities at artificially inflated prices, and a presumption of reliance applies.

## X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

374. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint. None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Lumber Liquidators' compliance with applicable laws governing permissible formaldehyde emissions from certain flooring products and importation of wood products sourced from the RFE, as well as the Company's financial condition and internal controls, among others.

375.  To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Lumber Liquidators' compliance with applicable laws governing permissible formaldehyde emissions from certain flooring products and importation of wood products sourced from the RFE, as well as the Company's financial condition and internal controls, among others.  Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Lumber Liquidators were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

376.  To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Lumber Liquidators who knew that the statement was false when made.

## XI.  CLASS ACTION ALLEGATIONS

377.  Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Lumber Liquidators securities during the Class Period (the "Class"); and were damaged thereby.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

378. The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Lumber Liquidators securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Lumber Liquidators or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

379. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

380.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

381. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Lumber Liquidators;

- whether the Individual Defendants caused Lumber Liquidators to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

132

- whether the prices of Lumber Liquidators securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

382. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

383. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Lumber Liquidators securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Lumber Liquidators securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

384. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

385. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**
**(For Violations Of Section 10(B)**
**And Rule 10b-5 Promulgated Thereunder**
**Against The Company, Lynch, Terrell, And Sullivan)**

386. Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

387. This Count is asserted against the Company and Individual Defendants Lynch, Terrell, and Sullivan and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

388. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Lumber Liquidators securities; and (iii) cause Plaintiffs and other members of the Class to purchase Lumber Liquidators securities at artificially inflated prices. In furtherance of this

unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

389. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Lumber Liquidators securities and options. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Lumber Liquidators' finances and business prospects.

390. By virtue of their positions at Lumber Liquidators, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

391. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Lumber Liquidators, the Individual Defendants had knowledge of the details of Lumber Liquidators' internal affairs.

392. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Lumber Liquidators. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Lumber Liquidators' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Lumber Liquidators securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Lumber Liquidators' business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased Lumber Liquidators securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

393. During the Class Period, Lumber Liquidators securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Lumber Liquidators securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said securities or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiffs and the Class, the true value of Lumber Liquidators securities were substantially lower than the prices paid by Plaintiffs and the other members of the Class.

The market price of Lumber Liquidators securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

394.  By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

395.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure of the alleged corrective disclosures.

## COUNT II
### (For Violations Of Section 20(a) Of The
### Exchange Act Against The Individual Defendants)

396.  Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

397.  During the Class Period, the Individual Defendants participated in the operation and management of Lumber Liquidators, and conducted and participated, directly and indirectly, in the conduct of Lumber Liquidators' business affairs.

398.  As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Lumber Liquidators' financial condition and results of operations, and to correct promptly any public statements issued by Lumber Liquidators which had become materially false or misleading.

399.  Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Lumber Liquidators disseminated in the marketplace during the Class Period concerning Lumber Liquidators' financial prospects.   Throughout the Class Period, the

Individual Defendants exercised their power and authority to cause Lumber Liquidators to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Lumber Liquidators within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Lumber Liquidators securities.

400. Each of the Individual Defendants, therefore, acted as a controlling person of Lumber Liquidators.  By reason of their senior management positions, participation in conference calls, and/or being directors of Lumber Liquidators, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Lumber Liquidators to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Lumber Liquidators and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

401. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Lumber Liquidators.

## XII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## XIII.   DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  April 22, 2015                    Respectfully submitted,

                                          **COHEN MILSTEIN SELLERS &
                                             TOLL PLLC**

                                          */s/ Elizabeth A. Aniskevich*

                                          Steven J. Toll (Va. Bar #15300)
                                          Daniel S. Sommers
                                          S. Douglas Bunch
                                          Elizabeth A. Aniskevich (Va. Bar #81809)
                                          1100 New York Ave. N.W.
                                          Suite 500, East Tower
                                          Washington, DC 20005-3965
                                          Telephone: (202) 408-4600
                                          Facsimile: (202) 408-4699
                                          stoll@cohenmilstein.com
                                          dsommers@cohenmilstein.com
                                          dbunch@cohenmilstein.com
                                          eaniskevich@cohenmilstein.com

                                          *Liaison Counsel for the Class*

                                          Jeremy A. Lieberman
                                          Michael J. Wernke
                                          **POMERANTZ LLP**
                                          600 Third Avenue, 20th Floor
                                          New York, NY 10016
                                          Telephone: (212) 661-1100
                                          Facsimile: (212) 661-8665
                                          jalieberman@pomlaw.com
                                          mjwernke@pomlaw.com
                                                   -and-
                                          Patrick V. Dahlstrom
                                          **POMERANTZ LLP**
                                          10 South LaSalle Street, Suite 3505
                                          Chicago, IL 60603
                                          Telephone: (312) 377-1181
                                          Facsimile: (312) 377-1184
                                          pdahlstrom@pomlaw.com

David R. Stickney
Brett M. Middleton
**BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP**
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Telephone: (858) 793-0070
Facsimile: (858) 793-0323
davids@blbglaw.com
brettm@blbglaw.com
            -and-
Gerald H. Silk
Avi Josefson
Scott R. Foglietta
**BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jerry@blbglaw.com
avi@blbglaw.com
scott.foglietta@blbglaw.com

*Co-Lead Counsel for the Class*


Susan R. Podolsky (Va. Bar #27891)
**LAW OFFICES OF SUSAN R. PODOLSKY**
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
Telephone: (571) 366-1702
Facsimile: (703) 647-6009
spodolsky@podolskylaw.com

*Additional Counsel for Plaintiffs*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1. I, _Charles R. Hickman_ , make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Lumber Liquidators Holdings, Inc. ("Lumber Liquidators" or the "Company") and, authorize the filing of a motion on my behalf for appointment as lead plaintiff.

3. I did not purchase or acquire Lumber Liquidators securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4. I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Lumber Liquidators securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my transactions in Lumber Liquidators securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7. I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed _____4/18/15_____
                    **(Date)**


                                        _Charles R Hickman_____
                                        **(Signature)**

                                        _Charles R Hickman_____
                                        **(Type or Print Name)**

### SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| 11/26/13 | Purchase | 1000 | 104.26 |
| 10/30/14 | Sale | 1000 | 51.08 |
| 12/10/13 | Purchase | 500 | 94.27 |
| 10/30/14 | Sale | 500 | 51.08 |
| 12/10/13 | Purchase | 1000 | 91.02 |
| 10/30/14 | Sale | 1000 | 51.08 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, David A. Lorenzo, hereby certify, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the Consolidated Amended Complaint in this matter and authorize its filing by counsel.

2. The securities that are the subject of this action were not purchased at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. I fully understand the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. The transactions in the Lumber Liquidators Holdings, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. I have sought to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *In re Lumber Liquidators Holdings, Inc. Securities Litigation,* No. 13-cv-157 (E.D. Va.)

6. I will not accept any payment for serving as a representative party on behalf of the Class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 20ᵗʰ day of April, 2015.

David A. Lorenzo

**David A. Lorenzo**
**Transactions in Lumber Liquidators Holdings, Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| **Account 1** | | | |
| Purchase | 12/10/2013 | 1,900 | 100.0000 |
| Purchase | 5/30/2014 | 1,900 | 77.0000 |
| Sale | 12/19/2014 | 1,400 | 62.9900 |
| | | | |
| **Account 2** | | | |
| Purchase | 6/24/2014 | 6,800 | 73.8000 |
| Purchase | 7/8/2014 | 3,400 | 73.7500 |

## **CERTIFICATE OF SERVICE**

I, Elizabeth A. Aniskevich, hereby certify that on April 22, 2015, I caused a copy of the foregoing to be served on all parties via the Court's ECF filing system.

/s/ *Elizabeth A. Aniskevich*
Elizabeth A. Aniskevich